UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
Bangor Division

| | |
|---|---|
| CALVARY CHAPEL BELFAST,<br><br>            *Plaintiff*;<br><br>    v.<br><br>UNIVERSITY OF MAINE SYSTEM; BOARD OF TRUSTEES, University of Maine System; RYAN LOW, individually and in his official capacity as Vice Chancellor for Finance and Administration, University of Main System; RACHEL PIPER, in her official capacity as Executive Director of Strategic Procurement and Services, University of Maine System; ROBIN CYR, in her official capacity as Senior Director of Strategic Procurement, University of Maine System; DEREK HOUTMAN, in his official capacity as Associate Strategic Sourcing Director, University of Maine System,<br><br>            *Defendants*. | **VERIFIED COMPLAINT**<br><br>**INJUNCTIVE RELIEF SOUGHT**<br><br>**Jury Trial Demanded** |

For its Verified Complaint against Defendants, University System of Maine, Board of Trustees, University of Maine System, Ryan Low, individually and in his official capacity as Vice Chancellor for Finance and Administration, University of Maine System; Rachel Piper, in her official capacity as Executive Director of Strategic Procurement and Services, University of Maine System; Robin Cyr, in her official capacity as Senior Director of Strategic Procurement, University of Maine System; Derek Houtman, in his official capacity as Associate Strategic Sourcing Director,

University of Maine System (collectively "Defendants"), Plaintiff Calvary Chapel Belfast (the "Church" or "Calvary Chapel") alleges and avers as follows:

## NATURE OF THE ACTION

1.     Plaintiff Calvary Chapel Belfast (the "Church") is a cornerstone of faith and service in the Midcoast. As a growing church dedicated to spreading the Gospel and supporting the local community, Calvary Chapel has outgrown its current place of worship. With a vision to expand not only its congregation but also its outreach efforts, the Church eagerly embraced the opportunity to submit a proposal to purchase the University of Maine's vacant Hutchinson Center. The additional space would allow the Church to offer larger worship services, expand its homeschool co-op space, develop a literacy program for the special needs community, and further its addiction-recovery outreach.

2.     In August 2024, Defendant University of Maine System (UMS) awarded the Church the right to negotiate the purchase of the Hutchinson Center. But the Church's celebration for being the winning bidder was short lived: Local curmudgeons were outraged by the Hutchinson Center's sale to a church that holds Biblical Christian beliefs. That being so, these purportedly "inclusive" and "tolerant" community members, along with the two disappointed bidders, unlawfully conspired together to pressure UMS's officials to rescind the Church's award because of the Church's Christian beliefs.

3.     As demonstrated more fully herein, the conspirators and disappointed bidders did not hide their animus towards the Christian Church receiving the bid

award, going so far as to say that the Church must not receive the property because its "very design" as a Christian Church with Biblical views was discriminatory and had no place in the community. Some disappointed bidders went so far as to assert that a Church cannot even operate in "good faith" concerning alleged nondiscrimination because the Church's website espoused Biblical teachings and quoted Scripture.

4.      And, to make matters worse, the disappointed bidders and their co-conspirators were joined in their religious animosity and religious hostility towards the Church and its efforts to purchase the Hutchinson Center by elected officials in Maine. Specifically, Senator Chip Curry—the elected state senator in Belfast where the Hutchinson Center is located—said it was completely inappropriate to have a religious organization own the Hutchinson Center. It is bad enough that an elected official, such as Senator Curry, would openly espouse such religious animosity towards a Church in his community. It is far worse and unlawfully conspiratory to make such statements not simply as an elected official but also as a member of the Board of Directors of one of the disappointed bidders, who just so happened to receive the winning bid in the second rigged bidding process.

5.      In essence, the conspirators made plain that their aim in seeing to UMS's rescission of the Church's winning bid was to make the Church a constitutional orphan in the community, ostracize it, and prevent that religious Church from even operating in the community, and they used government officials who sit on the board of the disappointed bidders to stoke animosity towards the

Church, incited a mob opposed to the Church, and bent UMS's will to ultimately rescind the Church's fairly obtained award.

6.      Under the pretense of a deficiency in the request for proposal, UMS caved to the mob, joined the unlawful conspiracy against the Church's constitutional rights, and revoked the Church's award. In truth, the non-appealable decision—made by UMS's Vice Chancellor of Finance and Administration—was motivated by animus towards the Church's religious beliefs and practices. There was no deficiency in the proposal, only in the pretextual and discriminatory decision to rescind the award.

7.      After caving to the disappointed bidders and conspirators' demands to revoke the Church's winning bid and providing transparently pretextual justifications to conceal its discriminatory motive of rescinding the Church's award, UMS set about to "cure" its award to the Church by opening up a new bidding process. Only this time, UMS's conspiratorial efforts were designed to ensure that the Church would not win the award so that the discriminatory purpose of the conspiracy would be achieved.

8.      In further disregard of its obligations to act neutrally and fairly and in furtherance of the conspiracy's objectives, UMS has now selected disappointed bidder Waldo Community Action Partners (WCAP) to purchase the Hutchinson Center. Not surprisingly, WCAP is the organization that stoked religious animus towards the Church, pressured UMS to rescind the Church's original award on the basis of the Church's religious beliefs, and dispatched its elected State Senator and Board member to incite the community against the Church. Like the prior rescission of the

4

Church's winning bid, this decision reflects UMS's ongoing pattern of discriminatory treatment against the Church and the achievement of the unlawful aims of the conspiracy to ensure the Church did not operate its religious mission in the community.

9.     Consequently, by rescinding the Church's rightfully earned award and then conspiring to rig the second bidding process to ensure its co-conspirator and secular bidder WCAP—who deployed its State Senator Board Member to maliciously attacked the Church's beliefs in public and openly espoused hostility toward the Church's religious beliefs in its pressure campaign on UMS—would prevail, Defendants have discriminated against the Church on the basis of religion in violation of the First and Fourteenth Amendments. And, Defendants have engaged in an unlawful conspiracy to deprive the Church of its civil rights in violation of 42 U.S.C. §1985. Only a temporary restraining order will restore the status quo and prevent irreparable harm from befalling the Church.

**URGENCIES JUSTIFYING TEMPORARY RESTRAINING ORDER**

10.     The United States Supreme Court recently instructed that government officials cannot act in ways "that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018). Nor may state officials exclude or penalize a religious organization from participating in a government program on account of that organization's religious beliefs and practices. *See Trinity Lutheran Church of*

*Columbia, Inc. v. Comer*, 582 U.S. 449 (2017). Indeed, the Supreme Court has declared that it is unconstitutional to exclude a religious organization "from a public benefit for which it is otherwise qualified, solely because it is a church." *Trinity Lutheran*, 582 U.S. at 467.

11.    And, these instructions should be well familiar to Maine's government officials by now. As the Supreme Court just recently noted in *Carson v. Makin*, wherein it invalidated Maine's unconstitutionally discriminatory exclusion of religious participants from a program for which they were otherwise qualified, "[s]uch discrimination [is] odious to our Constitution and [can]not stand." 596 U.S. 767, 779 (2022). The University of Maine System and its officials have failed these lessons.

12.    This action therefore seeks to vindicate the Church's constitutional rights and restore the Church's rightfully earned opportunity to negotiate the purchase of the Hutchinson Center. ***Time is of the essence***. After rescinding the award to the Church and conspiring to rig the second bidding process to ensure that the Church would not prevail the second time, UMS has announced WCAP as the new winning respondent under a second RFP, and Defendants are moving forward with the property sale.

13.    The newly issued RFP, however, was tainted by the unconstitutionally discriminatory actions that UMS and its co-conspirators took against the Church, which is continuing to suffer irreparable harm. UMS and its co-conspirators' actions to deprive the Church of its rights to equal protection and free exercise requires a temporary restraining order to prevent the irreparable loss appurtenant to

Defendants unlawful conspiratorial actions. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

14.     Issuing a temporary restraining order against the new RFP process, and halting the property sale to WCAP, is the only available option to restore the status quo—the Church's rightful status as the winning bidder entitled to negotiate the purchase of the Hutchinson Center. *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995) (holding that the purpose of a temporary restraining order is to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs.").

15.     The Church therefore requests that this Court enforce the constitutional principles clearly established in the Supreme Court's Equal Protection and Free Exercise jurisprudence, enjoin the unconstitutional rescission of the bid award to the Church, and allow the Church to move forward with negotiating the purchase of the Hutchinson Center without delay. Anything else runs roughshod over the Church's fundamental constitutional rights.

## PARTIES

16.     Plaintiff Calvary Chapel Belfast (the "Church") is a nonprofit local independent church formed pursuant to Me. Rev. Stat. tit. 13, § 3021. The Church is part of the global Calvary Chapel association, a network of churches committed to Biblical teaching and Christ-centered community outreach. Led by Paston Greg

Huston, the Church is not only a place of worship but a vibrant community center, offering a variety of ministries to meet the needs of the Belfast area. Among its ministries, the Church hosts a homeschool co-op and operates an addiction-recovery program for individuals seeking freedom from addiction through faith-based counseling and group support. The Church also has plans to build an educational resource center that is open to the community, which will include literacy programs with a heart for special needs children. With a mission to serve both the spiritual and material needs of its members and the broader Belfast community, the Church is an integral part of the Midcoast region. The Church may sue and be sued.

17.     Defendant University of Maine System (UMS) is the state university system for the State of Maine. Established in 1968, UMS is Maine's largest educational enterprise, operating seven universities across the Pine Tree State, including the University of Maine (UMaine). Through its Office of Strategic Procurement, UMS solicited and evaluated a proposal submitted by the Church to purchase the Hutchinson Center. UMS bears ultimate responsibility for the actions of its officers acting under color of state law. UMS may sue and be sued.

18.     Defendant Board of Trustees is UMS's governing and planning body. The Board has final authority over all matters within its jurisdiction, including all educational, public service and financial policies. The Board has final authority to approve the sale of real property. The Board is a "person" under 42 U.S.C. § 1983, and it may sue and be sued.

19.   Defendant Ryan Low is UMS's Vice Chancellor for Finance and Administration. Pursuant to UMS's purchasing procedures, the Vice Chancellor has final decision-making authority for UMS in resolving protests of bid awards. Defendant Low is a "person" under 42 U.S.C. § 1983 and is sued in both his official and personal capacities.

20.   Defendant Rachel Piper is UMS's Executive Director of Strategic Procurement and Services. Pursuant to UMS's purchasing procedures, the Executive Director of Strategic Procurement and Services is responsible for deciding upon protests to procurement and bid awards. Defendant Piper is a "person" under 42 U.S.C. § 1983 and is sued in her official capacity only.

21.   Defendant Robin Cyr is UMS's Senior Director of Strategic Sourcing. Cyr is responsible for administering and processing requests for proposals and bids. Defendant Cyr is a "person" under 42 U.S.C. § 1983 and is sued in her official capacity only.

22.   Defendant Derek Houtman is UMS's Associate Director of Strategic Sourcing. Houtman is responsible for administering and processing requests for proposals and bids. Defendant Cyr is a "person" under 42 U.S.C. § 1983 and is sued in his official capacity only.

**JURISDICTION AND VENUE**

23.   This is a civil rights action brought under 42 U.S.C. § 1983, and raises federal questions under the United States Constitution, particularly the First and

Fourteenth Amendments. This action also arises under federal statutory laws, including 42 U.S.C. §1985(3).

24. This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

25. This Court has supplemental jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367(a).

26. This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; and attorney's fees and costs under 42 U.S.C. § 1988.

27. Venue lies in this District under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants are located in relevant part in this District.

## FACTUAL ALLEGATIONS

28. On June 18, 2024, the University of Maine System (UMS) Board of Trustees announced that it would convene to consider authorizing the sale of underutilized properties, including the Frederick Hutchinson Center ("Hutchinson Center") in Belfast, Maine.[1]

---

[1] Press Release, *University of Maine System Trustees to Consider Authorizing Sales of Underutilized Properties*, University of Maine System (June 18, 2024), https://www.maine.edu/blog/2024/06/18/university-of-maine-system-trustees-to-consider-authorizing-sales-of-underutilized-properties/.

29. On July 15, 2024, the UMS Board of Trustees formally authorized the sale of the Hutchinson Center, the subject of this dispute.[2]

30. Located at 80 Belmont Avenue in Belfast, Maine, the Hutchinson Center was built in 2000 and gifted to the University of Maine (UMaine) in 2007 by Bank of America.

31. Once a vibrant hub for university education and community events in the Midcoast, the Hutchinson Center saw a decline in usage since the pandemic and as enrollment for courses shifted online. That being so, UMaine closed the Hutchinson Center in 2023.

32. Below is a picture of the exterior of the Hutchinson Center:



---

[2] Press Release, *University of Maine System Trustees Authorize Sale of Hutchinson Center in Belfast*, University of Maine System (July 15, 2024), https://www.maine.edu/blog/2024/07/15/university-of-maine-system-trustees-authorize-sale-of-hutchinson-center-in-belfast/.

33.     In January 2024, UMS issued on behalf of UMaine a competitive request for purchase, lease or alternative creative real property offer ("RFP 2024-048") concerning the future of the Hutchinson Center. (A true and correct copy of the RFP 2024-048 is attached hereto as EXHIBIT A and incorporated herein.)

34.     The bid process for RFP 2024-048 was structured on a 100-point scale, which was used to evaluate the degree to which each submitted proposal met specific criteria set forth by UMS.

35.     Beyond the proposed purchase price and other factors, UMS's scoring took into consideration how the buyer would work with UMS to maintain internet connectivity for Midcoast schools, libraries, and community centers through a system-supported "Networkmaine" data hub located in Room 100Y, a small room adjacent to the restrooms in the Hutchinson Center.

36.     Below is a partial floor plan of the Hutchinson Center highlighting Room 100Y, the location of the Networkmaine data hub:



37.   Networkmaine is a unit of UMS that provides Maine's educational community—including K-12 schools and public libraries—with access to high-bandwidth, low-latency connectivity and complimentary services.

38.   Pursuant to the terms of RFP 2024-048, the winning bidder would secure the right to negotiate with UMS to finalize a contract. (Ex. A, FRP 2024-48, 11 §§2.2, 2.4.)

39.   These negotiations were subject to certain restrictions, including the stipulation that the negotiations may not significantly alter the content, nature, or requirements of the proposal or the RFP itself. Nevertheless, UMS "reserve[d] the right to waive minor irregularities, which may include contacting the Respondent to resolve the irregularity." (Ex. A, RFP 2024-048, 1 §1.0.)

40.   Under RFP 2024-048, if contract negotiations with the highest-ranked respondent were unsuccessful, UMS could withdraw its award and negotiate with the next-highest ranked respondent. (Ex. A, RFP 2024-048, §2.4.)

41.   Per UMS procurement policies, respondents to the RFP were entitled to appeal the award decision by submitting a written protest to the Executive Director of Strategic Procurement and Services within five business days of the award date. The protest needed to include a statement outlining the basis for the challenge. (Ex. A, RFP 2024-048, 11-12 §2.5.)

42.   If a protest was not resolved to the protesting bidder's satisfaction, then, pursuant to UMS procurement policies, the disappointed bidder may file an appeal with the Vice Chancellor of Finance and Administration within ten business days of

the date of the written decision of the Executive Director of Strategic Procurement & Services. The Vice Chancellor's determination is final and non-appealable.

43.     The Church was especially excited when it learned that the Hutchinson Center was being offered for sale, given that it had previously rented space there from 2017 to 2020 until the facility was closed for the pandemic. During that time, the Hutchinson Center proved to be well-suited for the Church's activities, allowing for larger gatherings and offering the space to expand its ministries and programs.

44.     Upon receipt of RFP 2024-048, the Church engaged in an extensive proposal preparation effort led by congregant Jason Stutheit. Among other things, the Church incurred proposal preparation costs and even began to liquidate assets in order to make a competitive offer. For example, the Church sold its current property for $100,000 and sold a utility trailer and shipping container for $15,000 in June 2024. And on August 1, 2024, TD Bank informed the Church that it was prepared to provide financing for $750,000 to acquire the Hutchinson Center subject to underwriting and approval.

45.     In response to RFP 2024-048, the Church timely submitted a proposal to UMS to purchase the Hutchinson Center.

46.     Upon information and belief, UMS received only three proposals in response to RFP 2024-048. Proposals were submitted by the Church, Waldo Community Action Partners (WCAP), and Future of the Hutchinson Center Steering Committee and Waterfall Arts (FHC-WA).

47.    On August 14, 2024, Defendant Robin Cyr, UMS's Senior Director of Strategic Sourcing, sent a letter by email to the Jason Stutheit and the Church's pastor, Greg Huston, notifying them that UMS "is awarding to Calvary Chapel Belfast the right to negotiate terms and conditions for RFP 2024-048 … because it produced the top-scoring response." (A true and correct copy of the August 14 Award Letter is attached hereto as EXHIBIT B and incorporated herein.)

48.    The next day, on August 15, 2024, UMS publicly announced that Calvary Chapel Belfast had been selected as the buyer for the Hutchinson Center. (A true and correct copy of the August 15 Press Release is attached hereto as EXHIBIT C and incorporated herein.)

49.    According to UMS's press release, "[k]ey factors that distinguished the winning proposal" included:

- "The top-scoring proposal offered a $1 annual lease agreement in perpetuity for a carve-out of space so the UMS can continue to maintain internet connectivity for midcoast schools, libraries and community centers through a NetworkMaine access hub historically located at the center. This was more favorable than the proposal from WCAP, which offered to lease the space back to the System at a rate of $2 per square foot annually."
- "The top-scoring proposal waived the right to inspect the property before the sale. As the university has publicly disclosed, there was water damage due to burst pipes in the building in February."
- "The top-scoring proposal offered $250,000 in earnest money, five times the offer of the second-highest bidder."

(Ex. C, August 15 Press Release, 1.)

50.    On August 19, 2024, disappointed bidder FHC-WA submitted a bid protest letter to Defendant Piper (hereinafter "FHC-WA Protest Letter"). (A true and

correct copy of the FHC-WA Protest Letter is attached hereto as EXHIBIT D and incorporated herein.)

51.    Aside from arguing that its proposal "provides higher value to the University, should have been scored higher than the other proposals, and should receive the award" (Ex. D, FHC-WA Protest Letter, 1), FHC-WA attacked the Church's religious beliefs, suggesting that its beliefs were alone sufficient to revoke the award to the Church.

52.    FHC-WA suggested that the lease agreement for the hub "is problematic" for the Church because the agreement provides that the "Lessor shall not discriminate and shall comply with applicable laws prohibiting discrimination on the basis of race, color, religion, sex, sexual orientation, transgender status or gender expression…." (Ex. D, FHC-WA Protest Letter, 2.)

53.    FHC-WA argued that the Church "cannot in good faith guarantee nondiscrimination as required in the Lease Agreement." (Ex. D, FHC-WA Protest Letter, 2.)

54.    In support of that sweeping, offensive, and discriminatory conclusion, FHC-WA declared that "CCB and its parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage." (Ex. D, FHC-WA Protest Letter, 2.)

55.    On information and belief, the basis for this sweeping, offensive, and discriminatory conclusion was simply that the Church had expressed its religious beliefs, quoted Scripture, and espoused a Christian message on its website.

16

56.     FHC-WA thus contended that, in its view, the Church "simply cannot" "warrant nondiscrimination under the Lease Agreement." (Ex. D, FHC-WA Protest Letter, 2.)

57.     Put simply, FHC-WA argued that UMS should rescind the award to the Church because, in FHC-WA's view, a Christian church would necessarily discriminate on the basis of its sincere religious convictions concerning marriage and human sexuality. Its only basis for such an offensive and discriminatory statement was the Church's sincere religious beliefs.

58.     The next day, on August 20, 2024, the other disappointed bidder, WCAP, submitted a bid protest to Defendant Piper (hereinafter "WCAP Protest Letter"). (A true and correct copy of the WCAP Protest Letter is attached hereto as EXHIBIT E and incorporated herein.)

59.     As with FHC-WA, WCAP also attacked the Church for its religious beliefs, declaring that "[a] Church *by its very design* could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intentions as outlined in its nondiscrimination section of the lease." (Exhibit E, WCAP Protest Letter, 3.)

60.     In other words, WCAP believes that because the Church is a Christian institution with Biblical values and espouses its sincerely held religious beliefs rooted in Scripture, "by its very design" it will likely discriminate against members of the community and would not be "inclusive," as WCAP claimed to be.

61.    Presumably in contrast to its incorrect view of the Church, WCAP is "an inclusive social organization committed to the education of and delivery of services to all" and that only its proposed use was consistent with "efforts towards diversity and inclusion." (Ex. E, WCAP Protest Letter, 1.)

62.    FHC-WA and WCAP were not the only ones who attacked the Church for its ("real or perceived") religious beliefs. After UMS announced the award to the Church, community members waged a vitriolic public campaign against both the Church and the University. That campaign represented nothing more than a mass heckler's veto campaign to persuade UMS to rescind the Church's rightly obtained award.

63.    Below is a sampling of the comments on a local news article reporting on the award to the Church.[3]



---

[3] Lynda Clancy, *UPDATE: University of Maine Chooses Calvary Chapel Belfast to Be New Owners of Hutchinson Center*, Penobscot Bay Pilot (Aug. 14, 2024), https://www.penbaypilot.com/article/update-university-maine-chooses-calvary-chapel-belfast-be-new-owners-hutchinson-cente/190052.

18

64.     Following the announcement of the Church's winning proposal, on August 21, 2024, Maine State Senator Chip Curry, a Democrat who represents Belfast and who sits on the Board of Directors for WCAP, publicly criticized the sale and attempted to stoke community outrage over the award to the Church: "At this point, transferring [the Hutchinson Center] from public access and gifting it to a religious organization, *any religious organization*, seems completely inappropriate."[4]

65.     By falsely and publicly accusing UMS of "gifting" the Hutchinson Center to the Church, while knowing the truth that the Church proposed to *purchase* the property, Senator Curry's disinformation served only to fan the flames of animosity against the Church and increase the pressure on UMS to engage in the conspiracy to discriminate against the Church's constitutional liberties.

66.     On August 22, 2024, UMS issued a press release announcing that it had rejected the bid protests and "will move forward in negotiating a final agreement for the sale of the Hutchinson Center" to the Church, "the organization that submitted the highest-scoring proposal." (A true and correct copy of the August 22 Press Release is attached hereto as EXHIBIT F and incorporated herein.)

67.     After again explaining the reasons why the Church received the highest score, UMS offered a "response" to "at least 135 citizen comments" that "have been

---

[4] Morgan Womack, *University of Maine System Faces Criticism for Sale of Hutchinson Center to Local Church*, Portland Press Herald (Aug. 21, 2024), https://www.pressherald.com/2024/08/21/umaine-system-faces-criticism-for-sale-of-hutchinson-center-to-local-church/ (emphasis added).

sent to the System about the pending sale." Relevant here, UMS stated: "*The university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion.*" (Ex. D, August 22 Press Release, 2 (emphasis original).)

68.     The fact that UMS felt compelled to issue an official statement about being unable to discriminate based on religion demonstrates that there was significant public outcry—sparked by Senator Curry and the organization on whose board he sits—related to the Church's purchase of the Hutchinson Center.

69.     UMS specifically referenced the "at least 135 citizen comments" it had received, implying that these comments reflected opposition to the Church's religious status and beliefs, just as the comments of Senator Curry had done. (Ex. F, August 22 Press Release, 2.)

70.     Put simply, the mention of legal prohibitions against religious discrimination and UMS's "commitment to inclusion" indicates that the nature of the public backlash raised enough concern for UMS to publicly assert that it was adhering to anti-discrimination laws.

71.     After UMS announced that it was continuing with its previous award of the bid to the Church, both WCAP and FHC-WA—displeased that their initial religious hostility had not achieved the desired end—submitted second appeal letters to Defendant Ryan Low, UMS's Vice Chancellor of Finance and Administration. (A true and correct copy of FHC-WA's Second Appeal Letter is attached hereto as

EXHIBIT G and incorporated herein.) (A true and correct copy of WCAP's Second Appeal Letter is attached hereto as EXHIBIT H and incorporated herein.)

72.     Perhaps sensing that their religious animosity was not sufficiently expressed in the first appeals, the discriminatory intent of the disappointed bidders to persuade UMS to rescind the award to the Church on the basis of its religion became even more apparent in the second appeals.

73.     FHC-WA's Second Appeal Letter specifically noted that "tempers and frustrations with the award are running high in the community and presumably within the University of Maine community as well." (Ex. G, FHC-WA Second Appeal Letter, 1.)

74.     FHC-WA appealed to Defendant Ryan Low, UMS's Vice Chancellor of Finance and Administration, hoping that his "review will result in a change in the award," that it would "ameliorate this situation" of the community desiring for UMS to discriminate against the Church's religion, and "put the community and the University back on the same path together." (Ex. G, FHC-WA Second Appeal Letter, 1.)

75.     The unquestioned suggestion inherent in this statement was that the "situation" that needed amelioration was the sale of the Hutchinson Center to a religious organization that FHC-WA believed had made the community and the University somehow not on the same path (*i.e.*, the path of religious discrimination against the Church).

21

76.     And, if FHC-WA's animus towards the Church was not evidence enough already by suggesting religion needed to be "ameliorated" in the community, FHC-WA stated unequivocally that it believed University's decisions and justification were "patently absurd," and that "the University is unfortunately demonstrating *stubborn closemindedness in the service of an institution with an opposite mission*." (Ex. G, FHC-WA Second Appeal Letter, 3 (emphasis added).)

77.     The religious animus in FHC-WA's Second Appeal letter is beyond question and demonstrates the overt hostility to the Church in the community.

78.     WCAP's Second Appeal Letter equally demonstrated its religious intolerance of the Church and advocated that its religious values should preclude the Church from receiving the award. (Ex. H, WCAP Second Appeal Letter, 3.)

79.     Specifically, WCAP suggested that UMS's decision to stick with the original award to the Church was not "what is best for the community." (Ex. H, WCAP Second Appeal Letter, 3.) And, WCAP argued that UMS should rescind the award to the Church because that is required to ensure the winner comes from among those purportedly "supporting diversity and inclusion." (Ex. H, WCAP Second Appeal Letter, 3.)

80.     To put a final point on how the Church's religious views warranted rescinding the award, WCAP noted that if UMS would "think about the true intent of the location and its mission . . . this should be a different choice." (Ex. H, WCAP Second Appeal Letter, 3.)

81.    This is presumably what WCAP's Board Member, State Senator Curry meant when he said it was "completely inappropriate" for UMS to award the building to a religious organization that did not meet Senator Curry's or WCAP's idea of inclusive and that allowing a religious group to purchase the property was not in the community's best interest.

82.    Despite UMS's initial rejection of the bid protests and its purported commitment to nondiscrimination on the basis of religion, something changed when the disappointed bidders submitted the second appeals to Defendant Low.

83.    In addition to serving as UMS's Vice Chancellor of Finance and Administration, Defendant Low is a longtime donor to Democratic politicians and causes.

84.    Upon information and belief, Defendant Low has donated over $3,000 through multiple donations to Emily Cain, Executive Director of EMILY's List, a political action committee that works to elect pro-abortion candidates to office.

85.    Rather than deferring to the decisions made by the Office of Strategic Procurement to uphold the bid award to the Church, and without seeking any input from the Church, Defendant Low summarily reversed course and rescinded UMS's award to the Church.

86.    On September 12, 2024, Defendant Low issued a letter to each of the respective bidders concerning his decision to rescind the award to the Church. (A true and correct copy of Defendant Low's September 12 Letters is attached hereto as Exhibit I and incorporated herein.)

87.     Defendant Low informed the Church's liaison, Jason Stutheit, by letter that he has rescinded the original award to the Church. In his letter, Low explained that his decision was "in response" to the second appeals lodged by FHC-WA and WCAP. (Ex. I, Low Appeal Letter, 1.)

88.     Defendant Low noted WCAP's protest had no merit, but FHC-WA's protest had "merit … with regards to the Networkmaine internet hub." (Ex. I, Low Appeal Letter, 1.)

89.     Defendant Low provided no further explanation for his reasoning. Instead, he stated that there was no further level of appeal and that "all decisions by the Vice Chancellor for Finance and Administration are final." (Ex. I, Low Appeal Letter, 1.)

90.     Defendant Low then stated that he "will be directing the System's Office of Strategic Procurement to work with UMaine to determine their desired next steps for soliciting offers to purchase or facilitate the transfer of the property, whether by facilitating a new RFP process, which would appropriately take into account both the real and potential value of all aspects of the proposals including those that related to Networkmaine, or listing with a pre-qualified commercial broker." (Ex. I, Low Appeal Letter, 1.)

91.     Defendant Low's response to FHC-WA acknowledged that UMS's original RFP process had been transparent, adhered to public procurement policies, and was executed with integrity. (Ex. I, Low Appeal Letter, 3.)

92.     Yet, despite affirming the fairness of the process, Defendant Low took the extraordinary step of rescinding the award to the Church based on a single issue related to the evaluation criteria. (Ex. I, Low Appeal Letter, 3.)

93.     Defendant Low's reasoning hinged on FHC-WA's proposed alternative arrangement to keep the Networkmaine internet hub within the Hutchinson Center building, thus allegedly reducing the costs of relocating the hub. In the letter, Low claimed that this measure had not been considered in the original evaluation yet represented a "clear financial and operational benefit" to UMS. (Ex. I, Low Appeal Letter, 3.)

94.     Upon information and belief, to the extent that Defendant Low relied on FHC-WA's estimate of $500,000 for the relocation of the Networkmaine hub (Ex. D, FHC-WA Protest Letter at 2), such reliance was improper. The estimate provided by FHC-WA was external, speculative, and not subjected to independent verification by UMS.

95.     By basing his decision on an unsubstantiated external estimate, rather than through UMS's own internal cost analysis, Defendant Low failed to adhere to proper procedural standards, thereby undermining the legitimacy of his decision to rescind the award to the Church.

96.     Beyond that, FHC-WA's estimate of $500,000 is grossly exaggerated. The Church received an opinion from a contractor who regularly performs work for the University, and this contractor estimated the relocation costs of the network hub to between $100,000 and $250,000.

25

97.    In any event, Defendant Low's cost-related rationale directly contradicts UMS's earlier actions when it failed to engage in good faith negotiations with the Church on the very same issue, and thus demonstrates the pretextual nature of his decision to rescind the Church's award.

98.    The Church had made clear its willingness to lease the hub space and maintain the Networkmaine hub within the building, as evidenced in the Church's proposal and in subsequent communications with UMS.

99.    Despite the Church's willingness to negotiate the location and logistics of the hub space, UMS made no attempt to negotiate with the Church, as required under RFP 2024-048 § 2.4.

100.    Defendant Low's letter also acknowledged that the RFP criteria had not originally accounted for the purported cost-saving benefits that FHC-WA later proposed. By rescinding the award based on factors outside the established criteria, UMS undermined the integrity of its own process and demonstrated the pretextual nature of its decision to rescind the Church's award.

101.    The sudden emphasis on the cost of the network hub's relocation—despite the Church's earlier offer to negotiate—shows that the real motivation behind the rescission lay elsewhere.

102.    Indeed, Defendant Low's decision came when UMS was under intense public pressure from vocal opponents of the Church—including Democratic State Senator Chip Curry, who sits on n WCAP's Board of Directors —and the disappointed

bidders, both of which lobbed unsubstantiated claims of bigotry against the Church in their bid protest appeals.

103.    The timing of Low's decision and the selective invocation of financial concerns indicate that UMS bowed to the community and political pressure and the not-so-subtle insinuations by the disappointed bidders.

104.    Defendant Low's political biases also influenced his decision to rescind the award to the Church. Low is a longtime donor to Democratic politicians and causes, which often carry positions contrary to those of the Church. Upon information and belief, Low has donated thousands of dollars to Democratic politicians and causes, including over $3,000 to Emily Cain, Executive Director of EMILY's List, a political action committee that exclusively supports pro-abortion candidates.

105.    Consequently, and as demonstrated by the extraordinary lengths to which Defendant Low went to ignore the proper procedures and his unilateral decision to rescind the Church's award based on something that it had already indicated its willingness to account for in the purchase, the evangelical Christian Church found itself at odds with Defendant Low's personal political leanings.

106.    Rather than upholding the Office of Strategic Procurement's decision to award the bid to the Church, Defendant Low abruptly rescinded the award without consulting the Church, showing that his decision was driven by his own bias and the hostile and discriminatory views of the disappointed and co-conspiring bidders and the community against the Church's religious beliefs and social stances.

107.   In short, despite Defendant Low's claim that his decision was not a reflection on the merits of any proposal, the abrupt shift in UMS's position strongly shows that discriminatory animus—masked as a logistical and financial deficiency in the original RFP—was the driving force behind the rescission.

108.   The same day that Defendant Low rescinded the Church's award, UMS announced in a press release that it would restart the sale process for the Hutchinson Center, citing deficiencies in the original RFP's evaluation criteria. (A true and correct copy of the September 12 Press Release is attached hereto as EXHIBIT J and incorporated herein.)

109.   Specifically, UMS asserted that "UMS houses a Networkmaine internet hub inside the Hutchinson Center that the RFP noted would need to be relocated in the event of a sale, ideally into a to-be-constructed outbuilding on the property." (Ex. J, September 12 Press Release, 1.)

110.   UMS stated that "[w]hile other respondents proposed favorable property lease arrangements and access as solicited in the RFP, [FHC]-WA suggested that the hub could permanently remain within the existing building." (Ex. J, September 12 Press Release, 1.)

111.   UMS concluded: "Because only the purchase price and not the longer-term financial benefit of that proposal could be considered based on the scoring criteria set at the start of the RFP process, the System concluded the criteria for evaluating so-called 'alternative creative real property offers' was materially deficient." (Ex. J, September 12 Press Release, 1.)

112.    The UMS press release contained the following statement from Defendant Low:

> As Vice Chancellor for Finance & Administration, I uniquely appreciate that the avoidance of hundreds of thousands of dollars in relocation expenses presents clear financial and operational benefits that are decidedly in the best interests of the System and thus should have been valued in the criteria by which all proposals were scored. Please know that my final decision is specific to a single deficiency of the evaluation criteria and is not a reflection on the merits of the proposals submitted by any respondent or any other aspect of the university's process.

(Ex. J, September 12 Press Release, 1.)

113.    Although Defendant Low's letter framed the decision as a response to practical and financial concerns about the hub's location, UMS's failure under RFP 2024-048 § 2.4 to engage in meaningful negotiations about the location of the hub with the Church—as the winning bidder—demonstrates that Low's rescission of the bid award was not about the hub but because of his, the disappointed bidders, State Senator Curry's, and the community's hostility towards the Church's religious status and beliefs.

114.    In fact, the conduct of the parties even before UMS announced the Church's award demonstrates that the location of the hub was not a barrier to completing the purchase. Although Defendants claimed that the Church's proposal would require a costly relocation of the hub, in reality, the parties had already begun to negotiate the location of the hub *prior to the Church's winning the original award*.

115.    In an email dated April 18, 2024, Defendant Robin Cyr, UMS's Director of Strategic Sourcing, contacted Jason Stutheit, the Church's liaison for the RFP,

about the Church's submission for the Hutchinson Center sale. Cyr inquired whether Addendum 4, which provided detailed information about the carve-out space for Networkmaine's hub, would necessitate any changes to the Church's submission. Specifically, Cyr asked: "Our question for your consideration is will this need change your submission and if so how?" (A true and correct copy of the April 18 email exchange is attached hereto as EXHIBIT K and incorporated herein.)

116.    Stutheit responded later that same day, affirming that the Church's submission would remain unchanged. He referenced a prior bid meeting where Cyr had stated that the hub-related matters would be negotiated with the winning proposal. Stutheit reiterated the Church's willingness to lease the future space for the hub and provide 24-hour access to the hub in the interim, thus offering a flexible solution to any potential hub-related concerns. In his response, Stutheit wrote: "It does not change our submission. ***As you had stated in a previous bid meeting this would be negotiated with the winning proposal***. I am happy to lease the future space and also provide 24-hour access in the interim." (Ex. K, April 18 Email exchange, 2.)

117.    On May 30, 2024, Defendant Cyr emailed Stutheit a draft lease agreement outlining a lease arrangement for the Networkmaine hub. The proposed arrangement consisted of two phases: (1) an interim lease of Room 100Y within the Hutchinson Center, and (2) a future lease for the hub in a to-be-constructed utility shed on the property. This lease agreement demonstrates that both UMS and the Church were already negotiating a flexible lease for the hub. (A true and correct copy

of the May 30 email exchange is attached hereto as EXHIBIT L and incorporated herein.)

118.   The above email exchanges and the provision of the lease agreement confirm the Church's proactive willingness to work with UMS on the Networkmaine hub issue, offering both short- and long-term solutions that would have addressed UMS's concerns.

119.   Despite the Church's clear willingness to negotiate, and despite the actual negotiations between the parties, UMS later used the hub relocation issue as a pretext to cover its religious discrimination against the Church and to rescind the award to the Church.

120.   Moreover, as noted above, UMS itself admitted in its press release announcing the Church's award—weeks before on August 22—that one of the primary reasons why the Church received the highest score was because it "offered a $1 annual lease agreement in perpetuity for a carve-out of space so the UMS can continue to maintain internet connectivity for midcoast schools, libraries and community centers through a NetworkMaine access hub historically located at the center." (Ex. F, August 22 Press Release, 1.)

121.   Thus, there was simply no immediate concern about relocating the hub because the Church already offered to keep it in the Hutchinson Center, which proves that Defendant Low's decision to rescind the Church's award was not based on anything related to the Networkmaine issue but on the Church's religious views and the community and disappointed bidder's hostility towards the Church.

122.    Even if disappointed bidder FHC-WA's argument about the cost of relocating the network hub had merit, UMS still retained the ability and requirement to negotiate a solution with the Church as the initially awarded bidder. The Church was ready, willing, and able to keep the hub in place and negotiate terms that would favor both parties.

123.    Under the original RFP, UMS was not permitted to immediately reject the Church's bid based on concerns about the hub. The RFP explicitly provided UMS with the authority to enter into negotiations with the highest-ranked respondent; and if those negotiations were unsuccessful, UMS could withdraw its award and negotiate with the next-highest ranked bidder (Ex. A, RFP 2024-048, 11 §2.4.)

124.    Furthermore, UMS's procurement policies expressly contemplate that parties may begin negotiations before and after a proposal is accepted. Per UMS Administrative Practice Letter VII-A § V(C)(3)(b): "Once formal competitive proposals have been -received electronically, 'negotiations' between the University and proposers may take place but shall not significantly alter the original proposal."

125.    Thus, both RFP 2024-048 (Ex. A, 11 §2.4) and UMS's procurement policies provided for flexible negotiations between the parties, and UMS had the opportunity to engage in good faith negotiations with the Church before rescinding the award or considering any other bidder.

126.    The fact that UMS chose not to exercise this option demonstrates that Defendant Low's decision to rescind the award was not driven by legitimate concerns about the network hub but was instead a pretext for religious discrimination.

127.    Indeed, the timing and circumstances of the rescission show that UMS's decision was motivated by pressure from community members, a State Senator who sits on the Board for one of the disappointed bidders, and the disappointed bidders hostile to the Church's religious identity and not by concerns over the Networkmaine hub.

128.    Upon information and belief, UMS received at least 135 citizen comments opposing the sale to the Church, many of which were likely animated by religious bias. (*E.g.*, Ex. F, August 22 Press Release, 2.)

129.    Defendant Low's abrupt termination of the award without engaging in good faith negotiations with the Church as contemplated by the RFP *and that had already begun with UMS* shows that the decision was made in response to this public outcry rather than any legitimate logistical or financial concerns.

130.    Consequently, the pattern of conduct by UMS and its officials acting under color of law strongly indicates that the stated reason for the recission was pretextual.

131.    By refusing to engage in negotiations with the Church—despite its clear willingness to negotiate the network hub's location and its efforts to engage in such discussions and negotiation—and then citing the very issues that could have been resolved through those negotiations as the basis for rescinding the award, UMS has shown that Defendant Low's decision was driven by wholly impermissible motives—animus against the Church's religious status and beliefs.

132.   When viewed in light of the intense community pressure and religious bias that surfaced during the bid process, coupled with Low's political biases, it is evident that the Church was not treated fairly or impartially as required by the First and Fourteenth Amendments.

133.   Defendants' actions since rescinding the Church's award further demonstrate that its post-hoc justification for rescinding the award based on the Networkmaine hub was pretextual.

134.   On September 26, 2024, University spokesperson Samantha Warren confirmed that the University would issue a new RFP for the Hutchinson Center, which would be posted by October 4, 2024, and close on November 1, 2024. (A true and correct copy of the September 26 Press Release is attached hereto as EXHIBIT M and incorporated herein.)

135.   On October 4, 2024, UMS issued a new request for proposal, RFP 2025-031, for the sale of the Hutchinson Center. (A true and correct copy of RFP 2025-031 is attached hereto as EXHIBIT N and incorporated herein).

136.   The due date for submission under FRP 2025-031 was November 1, 2024.

137.   RFP 2025-031 also emphasized that the purchase price would carry the greatest weight (85 points) in the evaluation criteria, followed by contingencies (10 points) and "Networkmaine Lease Cost" (5 points). (Ex. N, RFP 2025-031, 7, §2.1.1.)

138.   The new RFP also outlined a mandatory leaseback provision for the Networkmaine hub. Specifically, the new RFP requires the winning bidder to lease

back 120 square feet of data closet space to UMS for an annual fee of no more than $3,000. This lease term would extend for five years, with potential renewals upon mutual agreement. (Ex. N, RFP 2025-031, 8, §2.1.2.3.)

139.    On October 17, 2024, UMS released a Q&A sheet entitled "Addendum #2" to the RFP 2025-031. (A true and correct copy of Addendum #2 to RFP 2025-031 is attached hereto as EXHIBIT O and incorporated herein).

140.    Addendum #2 reveals procedural irregularities in UMS's approach and further confirms that the Networkmaine issue is just pretext for discrimination against the Church.

141.    For example, the addendum specifies that UMS now plans to share the data closet for the Networkmaine hub with the new owner and states that these terms will be negotiated with the successful bidder. (Ex. O, Addendum #2, 1.)

142.    UMS's willingness to negotiate with the new RFP directly contrasts with how UMS handled the hub issue during the original RFP involving the Church, where UMS abruptly rescinded the award over alleged relocation concerns without engaging in negotiations. Yet now, UMS is willing to negotiate with the winning bidder shared access to the very space that had been grounds for rescinding the Church's award.

143.    In Addendum #2, UMS expresses its flexibility in response to multiple questions around negotiating the lease terms and covering utility costs related to the hub. (*See, e.g.*, Ex. O, Addendum #2, 1.)

144.    UMS is now open to discussing these issues with potential buyers, yet similar concerns purportedly led to an abrupt halt in negotiations with the Church and a rescission of the Church's award.

145.    In other words, the previously insurmountable issues surrounding the network hub are now considered negotiable—a clear double standard in UMS's treatment of bidders and a clear demonstration of the pretextual and discriminatory reason for the rescission of the Church's award.

146.    In short, the new RFP and its addenda reveal that UMS is now willing negotiate flexible terms for leasing the hub space, which contradicts UMS's previous position that such lease negotiations were impossible and represents a clear demonstration of the pretextual and discriminatory reason for the rescission of the Church's award.

147.    On October 14, 2024, legal counsel for the Church sent a demand letter to UMS by email, warning UMS that the rescission of the award to the Church constituted impermissible religious discrimination. (A true and correct copy of the October 14 demand letter is attached hereto as EXHIBIT P and incorporated herein.)

148.    The letter demanded that UMS (1) pause all consideration on the second RFP, (2) rescind the UMS's improper and unlawful recission of the first RFP, and (3) resume the transaction with the Church, including any necessary good faith negotiations on outstanding issues. (Ex. P, Demand Letter, 9.)

149.    On October 21, 2024, UMS's legal counsel sent a letter defending the decision to rescind the award to Calvary Chapel under the original RFP process for

the Hutchinson Center. (A true and correct copy of the October 21 response letter is attached hereto as EXHIBIT Q and incorporated herein.)

150.   In the letter, UMS claimed that the rescission was necessary due to flaws in the original evaluation criteria, particularly concerning the financial implications of relocating the Networkmaine hub. (Ex. Q, October 21 Response, 1.)

151.   The letter framed the rescission as consistent with state procurement policies, emphasizing that the decision was based on business considerations rather than any discriminatory intent. (Ex. Q, October 21 Response, 1.)

152.   Notably, UMS argued that Calvary Chapel had the opportunity to submit a proposal under the revised RFP process but sidestepped addressing the Church's allegations of religious discrimination and community bias.

153.   Instead of engaging with claims of discriminatory motives, UMS focused solely on procedural justifications for the rescission and the issuance of the new RFP.

154.   UMS's refusal to acknowledge or address the serious allegations of religious animus further highlights the pretextual nature of its stated rationale for rescinding the award to the Church.

155.   In response to the letter, and in a good faith attempt to resolve the dispute without resorting to litigation, the Church submitted a second bid pursuant to RFP 2025-031.

156.   The Church's revised proposal included a significantly increased purchase price of $1.1 million, a marked improvement over its initial $1 million bid under the original RFP.

157.   To specifically address UMS's purported concerns regarding the Networkmaine hub, the Church's bid also included an offer to provide a free lease for the data closet space, eliminating any financial burden to UMS for maintaining the hub on the property.

158.   The Church also offered to pay for all utilities relating to Networkmaine hub.

159.   On November 15, 2024, UMS notified the Church's pastor, Greg Huston, that it had awarded RFP 2025-031 to Waldo Community Action Partners (WCAP), granting WCAP the right to negotiate the purchase of the Hutchinson Center. (A true and correct copy of the November 15 award letter is attached hereto as EXHIBIT R and incorporated herein.)

160.   WCAP's proposal scored highest overall due primarily to its purchase offer of $3,060,000—nearly three times higher than its initial offer of $1,000,000 in response to RFP 2024-048. (A true and correct copy of the Consensus Scoring Report is attached hereto as EXHIBIT S and incorporated herein.)

161.   Despite the higher purchase price, the Church had outscored WCAP on other criteria, including combined contingencies and the Networkmaine lease costs.

162.   The Church's bid would have saved UMS $187,310.81 in utility costs for the Networkmaine hub during the initial lease term, yet this operational savings was given no meaningful weight in the final scoring process.

163.   Despite Defendant Low's explicit finding in September 2024 that WCAP's initial protest under RFP 2024-048 lacked merit, UMS selected WCAP as

38

the winning respondent under RFP 2025-031. This decision is deeply ironic given Low's prior dismissal of WCAP's protest arguments and further undermines the legitimacy of UMS's evaluation process and demonstrates the pretextual nature of the rescission.

164.    Indeed, the procedural anomalies in UMS's decision-making demonstrate that UMS's actions were motivated not by objective criteria but by a desire to exclude the Church on the basis of its religious beliefs.

165.    This about-face demonstrates that UMS's purported concerns regarding fairness and operational priorities were little more than pretext to justify its discriminatory treatment of the Church in response to community outrage.

166.    Moreover, in awarding RFP 2025-031, UMS again disregarded the Church's significant operational and community benefits, effectively prioritizing raw purchase price over the broader interests of the Belfast community and UMS's stated commitment to fostering equitable access to public resources.

167.    By rescinding its prior award to the Church under RFP 2024-048 and subsequently awarding RFP 2025-031 to WCAP based on criteria heavily skewed toward purchase price, UMS has consistently demonstrated a lack of good faith in its dealings with the Church.

168.    The reversal also reflects UMS's decision was based on discriminatory community pressure and fails to account for the Church's proposed operational savings and unique contributions to the Belfast community.

169. The Church's proposal for RFP 2025-031 reflected a commitment to resolving UMS's grounds for rescinding the RFP 2024-048 award, including offering to cover the Networkmaine hub's utility costs—a benefit that UMS had previously cited as a dispositive logistical concern. Yet, UMS failed to credit the Church adequately for this concession, further supporting the conclusion that UMS's decision-making was tainted by discriminatory intent.

170. The Church has exhausted its administrative remedies, including submitting timely bids for both RFP processes and offering to negotiate reasonable terms to address UMS's concerns.

171. Following the discriminatory rescission of its initial award under RFP 2024-048, the Church participated in good faith in the RFP 2025-031 process, only to see its proposal denied again in favor of WCAP, a secular bidder that had maliciously criticized the Church's religious identity and beliefs and on whose Board sits a State Senator who openly stoked flames of religious hostility towards the Church in the community.

172. UMS's actions, culminating in the award of RFP 2025-031 to WCAP, represent a continuation of its pattern of discriminatory treatment toward the Church and a conspiracy against its constitutional rights.

173. The decision to select WCAP as the purchaser, coupled with the shifting justifications provided throughout the bidding processes, demonstrates UMS's failure to act neutrally and fairly in its treatment of the Church on the basis of the Church's religion.

40

## IRREPARABLE HARM TO THE CHURCH

174.   If UMS proceeds with selling the Hutchinson Center to WCAP, then the Church will be irreparably harmed by being denied the benefit of its rightly earned bidding award and discriminated against on the basis of its religion.

175.   Not only has Defendants' discriminatory treatment violated its constitutional rights, the Church will lose its opportunity to expand its mission in the Belfast community, including its outreach efforts such as the homeschool co-op and addiction-recovery program.

176.   If the sale to WCAP is allowed to proceed, the integrity of the competitive procurement system also will be compromised. UMS has demonstrated selective treatment in handling both RFPs, and such actions set a precedent that undermines fairness and neutrality in future public transactions, including that religious organizations in the community, such as the Church, can be discriminated against in the bidding process on the basis of its religious views.

177.   Furthermore, rescinding the Church's award and favoring another bidder would cause even more community division, exacerbating the religious animus that has infected what should have been a simple real property sale.

178.   The Church has no adequate means to address the irreparable injury to its cherished constitutional liberties.

## CLAIMS

### Count I
### 42 U.S.C. § 1983
#### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION
#### Equal Protection Clause – Religious Discrimination
#### (Against All Defendants)

179.   Plaintiff incorporates by reference all preceding paragraphs.

180.   "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

181.   The Equal Protection Clause prohibits discrimination on the basis of religion.

182.   Defendants have deprived Plaintiff Calvary Chapel Belfast of equal protection of the laws, as secured by the Fourteenth Amendment, through a policy and practice that treats Plaintiff differently from similarly situated persons because of Plaintiff's religious status and beliefs.

183.   Plaintiff is similarly situated to other respondents to purchase the Hutchinson Center property, as all bidders participated in the same competitive bidding process under RFP 2024-048 and RFP 2025-031, issued by Defendant University of Maine System (UMS).

184.   Plaintiff submitted a valid, timely bid in compliance with all terms and conditions of RFP 2024-048.

185.   Plaintiff's bid was the highest-scoring response that met or exceeded the specifications required for the sale of the Hutchinson Center, including offering a $1 annual lease for the Networkmaine internet hub and providing an earnest deposit significantly larger than that of other bidders.

186.   Despite being the highest-ranked bidder and winning the award to negotiate the purchase of the Hutchinson Center, Plaintiff was subjected to selective and discriminatory treatment by UMS and its officials, including Defendant Ryan Low, because of its religious status and beliefs.

187.   After Plaintiff's bid was accepted, Defendant Ryan Low, UMS's Vice Chancellor of Finance and Administration, rescinded the award without fulfilling UMS's obligation to negotiate in good faith, citing pretextual concerns regarding the relocation of the Networkmaine internet hub.

188.   UMS's subsequent issuance of a second RFP that allowed for the Networkmaine hub to be negotiated as part of the sale demonstrates that the stated reason for rescission was a mere pretext for discrimination against Plaintiff due to its religious status.

189.   Evidence of procedural irregularities, combined with unusual levels of public pressure motivated by animus, are sufficient to infer discriminatory intent. *See Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom. Bogan v. Scott-Harris*, 523 U.S. 44 (1998). The procedural anomalies here—Defendants' failure to engage in good-faith negotiations with Plaintiff as required under the RFP, followed by the rapid issuance of a second RFP

with more favorable terms—evinces discriminatory animus and pretext, particularly in light of the pressure from the disappointed bidders, public officials, and individuals hostile to Plaintiff's religious beliefs.

190. Indeed, the fact that Defendants acquiesced to this community animus, as manifested by constituent pressure, the animosity stoked by State Senator Curry, and negative public commentary, further supports the inference of pretextual discrimination. *See Pines Church v. Hermon Sch. Dep't*, No. 1:23-cv-214-LEW, 2024 WL 3624290, at *8 (D. Me. July 31, 2024).

191. Defendants' actions constituted selective and discriminatory treatment of Plaintiff. UMS applied different standards and requirements to Plaintiff than it did to other secular bidders, including allowing the hub to remain in place under the second RFP while using the hub's relocation costs as a basis to rescind Plaintiff's award.

192. This selective treatment was based on impermissible considerations— namely, Plaintiff's religious identity and beliefs—and was motivated by a desire to placate vocal opposition to an evangelical Christian church's purchase of the Hutchinson Center, thereby inhibiting the exercise of Plaintiff's constitutional rights under the First Amendment.

193. Defendants' discriminatory treatment of Plaintiff was done with malicious intent or bad faith to injure Plaintiff and prevent it from purchasing the Hutchinson Center because of its religious identity and beliefs, as evidenced by the media campaign and vocal public opposition to Plaintiff's successful bid.

44

194.   Defendants' treatment of Plaintiff in the bidding process and the pretextual rescission of its awarded bid is unworthy of any credence in violation of the Equal Protection Clause.

195.   Defendants have no compelling interest in discriminating against Plaintiff because of its religious status and beliefs and singling out Plaintiff for discriminatory treatment is not the least restrictive means of furthering any such interest.

196.   Defendants have no legitimate, substantial, or important interest in discriminating against Plaintiff because of its religious status and beliefs, and discriminating against Plaintiff on the basis of its religious status and beliefs is not narrowly tailored to achieve any such legitimate interest, even if it existed.

197.   Defendants have no rational basis to discriminate against Plaintiff on the basis of its sincere religious beliefs and status, and rescinding Plaintiff's awarded bid on the basis of its religion is irrational and unjustifiable.

198.   Absent injunctive and declaratory relief, Plaintiff has suffered, and will continue to suffer, irreparable harm to its equal protection rights.

199.   Plaintiff has no adequate remedy at law to protect the deprivation of its cherished constitutional liberties and sincere religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

**Count II**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION**
**Free Exercise Clause – Religious Discrimination**
**(Against All Defendants)**

200.   Plaintiff incorporates by reference all preceding paragraphs.

201.   The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, protects against "penalties on the free exercise of religion." *Carson as next friend of O. C. v. Makin*, 596 U.S. 767, 778 (2022). The Free Exercise Clause also prohibits government from excluding churches and ministries from government programs because of their religious status. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 (2017).

202.   Plaintiff Calvary Chapel Belfast is a Christian church and religious ministry with sincerely held religious beliefs that it should minister to the community, love their neighbors, counsel those who need addiction recovery or other assistance, educate the community, and otherwise benefit the community that surrounds it.

203.   Plaintiff participated in Defendant University of Maine System's (UMS) competitive bidding process for the purchase of the Hutchinson Center under RFP 2024-048.

204.   Plaintiff's bid was the top-scoring proposal, meeting or exceeding the specifications required by UMS. Based on the merits of the proposal, Plaintiff was awarded the right to negotiate the terms of the sale.

205.   After the bid was awarded to Plaintiff, Defendants received vocal opposition from a State Senator who sits on the Board of Directors for one of the originally losing bidders, the opposing bidder organizations themselves, and community members, including anti-Christian bigots, who objected to the sale of the Hutchinson Center to an evangelical Christian church.

206.   Defendants then rescinded the Plaintiff's award under the pretext of deficiencies in the RFP in an effort to cover their religious discrimination.

207.   Defendants' rescission of the bid was a direct result of Plaintiff's religious status and beliefs. When the government punishes a religious organization because of its religious beliefs, such an action "imposes a penalty on the free exercise of religion that can be justified only by a state interest 'of the highest order." *Trinity Lutheran*, 582 U.S. 449, 458 (2017) (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978) (plurality opinion)).

208.   Here, Defendants "disqualified" Plaintiff from receiving the bid award "solely because of [its] religious character." *Carson*, 596 U.S. at 780 (cleaned up).

209.   Consequently, the penalty imposed on Plaintiff—the recission of the bid award to purchase the Hutchinson Center to use as its new church—placed a substantial burden on its ability to freely exercise its faith and to participate equally in a public benefit, in violation of the First Amendment.

210.   Defendants have no compelling interest in singling Plaintiff out for discriminatory treatment and rescinding the bid award. Nor are UMS's procurement

policies and practices as applied to Plaintiff the least restrictive means of furthering any compelling government interest.

211.   Defendants have no legitimate, substantial, or important interest in discriminating against Plaintiff because of its religious status and beliefs, and discriminating against Plaintiff on the basis of its religious status and beliefs is not narrowly tailored to achieve any such legitimate interest, even if it existed.

212.   Defendants have no rational basis to discriminate against Plaintiff on the basis of its sincere religious beliefs and status, and rescinding Plaintiff's awarded bid on the basis of its religion is irrational and unjustifiable.

213.   As a direct and proximate result of Defendants' policies and practices, Plaintiff has suffered harm, including the deprivation of the constitutionally protected right to free exercise of religion.

214.   Plaintiff has not adequate remedy at law to protect the deprivation of its cherished constitutional liberties and sincere religious beliefs.

215.   Absent injunctive and declaratory relief, Plaintiff has suffered, and will continue to suffer, irreparable harm to its First Amendment rights

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

## Count III
## 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION
### Free Exercise Clause – Religious Targeting
### (Against All Defendants)

216.   Plaintiff incorporates by reference all preceding paragraphs.

48

217.   The Free Exercise Clause prohibits the government from acting with hostility toward religious beliefs or practices, and it protects against both overt and covert discrimination based on religious status or beliefs. *See Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993).

218.   Defendant University of Maine System's (UMS) decision to rescind the award of the Hutchinson Center sale to Plaintiff was not a neutral application of its procurement policies and practices. Instead, it was a discriminatory action tainted by religious animus, spurred by public opposition to Plaintiff's religious status and beliefs, the effect of which exerted significant pressure on UMS to reverse its bid award to Plaintiff under the pretext of a deficiency in the RFP.

219.   By targeting Plaintiff for distinctive treatment due to its religious character while facially hiding behind a pretext of policy deficiencies, Defendants carried out a "religious gerrymander" to deprive Plaintiff of its rightfully earned award and punish Plaintiff because of its religious beliefs.

220.   By targeting Plaintiff for distinctive treatment due to its religious character while facially hiding behind a pretext of policy deficiencies, Defendants' pretextual rescission of Plaintiff's award constitutes covert suppression of religious beliefs.

221.   Defendants' recission of the bid award to Plaintiff "was neither tolerant nor respectful of [the Church] religious beliefs." *Masterpiece Cakeshop*, 584 U.S. at 639.

222.    Defendants have no compelling interest in singling out Plaintiff for discriminatory treatment and rescinding the bid award. Nor are UMS's procurement policies and practices as applied to Plaintiff the least restrictive means of furthering any compelling government interest.

223.    Defendants have no legitimate, substantial, or important interest in discriminating against Plaintiff because of its religious status and beliefs, and discriminating against Plaintiff on the basis of its religious status and beliefs is not narrowly tailored to achieve any such legitimate interest, even if it existed.

224.    Defendants have no rational basis to discriminate against Plaintiff on the basis of its sincere religious beliefs and status, and rescinding Plaintiff's awarded bid on the basis of its religion is irrational and unjustifiable.

225.    As a direct and proximate result of Defendants' discriminatory actions, Plaintiff has been denied its constitutionally protected right to free exercise of religion, in violation of the First Amendment.

226.    Absent injunctive and declaratory relief, Plaintiff has suffered, and will continue to suffer, irreparable harm to its First Amendment rights.

227.    Plaintiff has no adequate remedy at law to protect the deprivation of its cherished constitutional liberties and sincere religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

## Count IV
## 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION
### Free Speech Clause – Viewpoint Discrimination
### (Against All Defendants)

228.    Plaintiff incorporates by reference all preceding paragraphs.

229.    The Free Speech Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, prohibits the state from excluding a private organization from government programs and facilities "based on its religious nature," and such "exclusion constitutes viewpoint discrimination." *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 107 (2001).

230.    Plaintiff Calvary Chapel Belfast is a non-profit legal independent church formed to proclaim the Gospel and carry out its religious ministries and community outreach programs through expressive activities.

231.    Through their rescission of the bid award to Plaintiff, Defendants acted to exclude Plaintiff from a government program solely due to its religious identity and the expression of its Bible-centered beliefs and viewpoint, including its beliefs on marriage and sexuality.

232.    Government efforts to punish speech based on the "specific motivating ideology or the opinion or perspective of the speaker" is a "blatant" and "egregious" form of speech restriction. *Rosenberger v. Rector and Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

233.    Defendants' actions constitute impermissible viewpoint discrimination.

234.    Plaintiff was singled out solely because of its religious beliefs, which triggered anti-Christian hecklers in the community—stoked by their own local state senator—to pressure Defendants to reverse its bid award.

235.    Defendants' discriminatory action deprived Plaintiff of its right to freely participate in a government program while expressing its beliefs without punishment.

236.    Defendants' decision to revoke the award was a direct response to public animus and vocal opposition to Plaintiff's religious beliefs—including by the two disappointed bidders—rather than any legitimate concern related to the RFP or the bid process. The rescission was not based on neutral or content-neutral criteria but instead was a pretext to punish religious speech and expression.

237.    Defendants' decision represented a heckler's veto over Plaintiff's religious beliefs and viewpoint.

238.    Defendants furthered no legitimate or compelling state interest by engaging in this conduct. Nor did Defendants narrowly tailor their actions to serve any such interest.

239.    Defendants have no legitimate, substantial, or important interest in discriminating against Plaintiff because of its religious status and beliefs, and discriminating against Plaintiff on the basis of its religious status and beliefs is not narrowly tailored to achieve any such legitimate interest, even if it existed.

240.   Defendants have no rational basis to discriminate against Plaintiff on the basis of its sincere religious beliefs and status, and rescinding Plaintiff's awarded bid on the basis of its religion is irrational and unjustifiable.

241.   By rescinding the award as a consequence of Plaintiff's religious speech and expression, Defendants have infringed upon Plaintiff's First Amendment right to free speech and expression.

242.   As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and will continue to suffer irreparable harm, including the loss of their award to negotiate the purchase of the Hutchinson Center.

243.   Absent injunctive and declaratory relief, Plaintiffs will continue to be harmed by Defendants' actions.

244.   Plaintiff has no adequate remedy at law to protect the deprivation of its cherished constitutional liberties and sincere religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

**Count V**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT TO THE U.S. CONSTITUTION**
**Free Speech Clause – Retaliation**
**(Against All Defendants)**

245.   Plaintiff incorporates by reference all preceding paragraphs.

246.   The Free Speech Clause of the First Amendment prohibits government retaliation against persons for engaging in constitutionally protected speech, expression, and conduct.

247.   Plaintiff Calvary Chapel Belfast engaged in constitutionally protected conduct by expressing and maintaining its religious beliefs, which were publicly known and a central part of its identity, as it submitted a proposal to purchase the Hutchinson Center.

248.   Defendants, acting under the color of state law, retaliated against Plaintiff by rescinding the previously awarded bid under RFP 2024-048 for the purchase of the Hutchinson Center.

249.   Defendants, acting under the color of state law, further retaliated against Plaintiff by awarding RFP 2025-031 to WCAP, even though Plaintiff's bid received the highest score as to the Networkmaine hub, which was purportedly the decisive factor for rescinding RFP 2024-48.

250.   Defendants' actions were taken in response to the heckler's veto of public opposition and controversy surrounding Plaintiff's religious beliefs and affiliation, as well as pressure from political figures and community members who expressed hostility toward those beliefs.

251.   The rescission of the bid award, the initiation of a second RFP process, and Defendants' refusal to allow Plaintiff to appeal the recission were actions that would chill and deter a person of ordinary firmness from exercising their constitutional rights to express or maintain their religious beliefs.

252.   Defendants' award of RFP 2025-031 to WCAP—a secular bidder that explicitly attacked and smeared Plaintiffs' religious beliefs—was a retaliatory action taken in response to Plaintiff exercising their fundamental rights to religious exercise

54

and speech, which Plaintiff conveyed to Defendants after they rescinded RFP 2024-048.

253.    A clear causal link exists between Plaintiff's religious exercise (both in words and deeds) and Defendants' retaliatory conduct.

254.    The timing of the rescission and the public statements opposing Plaintiff's plan to purchase the Hutchinson Center demonstrate that the bid award was revoked and later awarded to WCAP solely because of Plaintiff's religious status, beliefs, and expression.

255.    Defendants' actions were undertaken in bad faith and with the intent to punish Plaintiff for its religious status, beliefs, views, and expression, effectively penalizing Plaintiff for engaging in constitutionally protected conduct and expression.

256.    As a direct result of Defendants' retaliatory actions, Plaintiff has suffered substantial harm, including the loss of the bid award and damage to its reputation, as well as a chilling effect on its future participation in public programs.

257.    As a further result of Defendants' violation of the First Amendment, Plaintiff has suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, and are entitled to injunctive, declaratory, and monetary relief.

258.    Absent injunctive and declaratory relief, Plaintiff has suffered, and will continue to suffer, irreparable harm to its First Amendment rights.

259.    Plaintiff has no adequate remedy at law to protect the deprivation of its cherished constitutional liberties and sincere religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

## Count VI
### 42 U.S.C. § 1985
### CONSPIRACY TO VIOLATE CIVIL RIGHTS
### (Against All Defendants)

260.    Plaintiff incorporates by reference all preceding paragraphs.

261.    Section 1985(3) prohibits "two or more persons" from conspiring "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

262.    The elements of the claim of conspiracy to violate civil rights under § 1985 include (1) a conspiracy, (2) a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws or of a constitutionally protected liberty, (3) an overt act in furtherance of the conspiracy, and (4) a deprivation of a constitutionally protected right. *See Parker v. Landry*, 935 F.3d 9, 17–18 (1st Cir. 2019).

263.    Defendants conspired together with third parties with the purpose of depriving Plaintiff Calvary Chapel Belfast of its constitutionally protected rights, including the right to equal protection of the laws, free exercise of religion, and its right to free speech, and to discriminate against Plaintiff on the basis of its religious beliefs, status, and expression.

264.   Defendants entered into a conspiratorial agreement to rescind the bid awarded to Plaintiff with the conspiratorial purpose of depriving Plaintiff of its constitutionally protected rights, including the right to equal protection of the laws, free exercise of religion, and its right to free speech, and to discriminate against Plaintiff on the basis of its religious beliefs, status, and expression.

265.   Defendants engaged in a conspiracy to deprive Plaintiff of its rights to equal protection under the law, in violation of 42 U.S.C. § 1985(3).

266.   Motivated by anti-religious bias and under pressure from individuals and groups hostile to Plaintiff's religious viewpoints, Defendant conspired to discriminate against Plaintiff by rescinding the awarded bid under RFP 2024-048 despite Plaintiff's having submitted the highest-scoring proposal.

267.   Defendant's actions were not based on any compelling, legitimate, substantial, or rational concerns regarding the University of Maine's real estate or the purported relocation of the Networkmaine internet hub but were pretextual, aimed at denying Plaintiff the benefit of the contract because of its religious character, status, views, expression, and beliefs.

268.   In furtherance of this conspiracy, Defendant committed overt acts, including but not limited to: (1) rescinding Plaintiff's award to negotiate the purchase of the Hutchinson Center; (2) falsely claiming that the relocation of the Networkmaine was grounds for rescinding the award, despite Plaintiff's offer to leave the hub in place; and (3) directing Defendants UMS's Strategic Procurement officials to issue a second RFP with negotiable terms for the hub and then selecting WCAP as

the winning bidder, further demonstrating that the prior rescission was baseless and pretextual.

269.    Defendants' overt acts were intended to deny Plaintiff its rights under the original bid and were performed in furtherance of the conspiratorial agreement to discriminate against Plaintiff.

270.    By denying Plaintiff its properly awarded bid and opportunity to purchase the Hutchinson Center because of the exercise of its sincerely held religious beliefs, expression, and status, Defendants' conspiracy has resulted in a deprivation of Plaintiffs' constitutionally protected rights under the First and Fourteenth Amendments to the United States Constitution.

271.    As a direct and proximate result of Defendant's conspiracy, Plaintiff has suffered injury, including the loss of its legally awarded right to negotiate the purchase of the Hutchinson Center, the potential loss of unique real property, and unrecoverable (and, thus, irreparable) financial damages.

272.    Plaintiff has also been deprived of its constitutionally protected rights, including the right to be free from discriminatory treatment under the First and Fourteenth Amendments to the United States Constitution.

273.    Defendant's actions have caused irreparable harm to Plaintiff, warranting relief to restore Plaintiff's rightful position under the original bid award.

274.    Absent injunctive and declaratory relief, Plaintiff has suffered, and will continue to suffer, irreparable harm to its cherished constitutional rights.

275.    Plaintiff has no adequate remedy at law to protect the deprivation of its cherished constitutional liberties and sincere religious beliefs.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

**Count VII**
**PROMISSORY ESTOPPEL**
**(Against Defendant UMS)**

276.    Plaintiff incorporates by reference all preceding paragraphs.

277.    Under Maine law, a promissory estoppel claim consists of the following elements: (1) a promisor making a promise that it should reasonably realize will cause the promisee to act or to forbear (2) the promise actually inducing the promisee to act or to forebear (3) an injustice resulting if the promisor is not bound by its promise. *See Struck v. Hackett*, 668 A.2d 411, 420 (Me. 1995).

278.    Defendant University of Maine System (UMS), acting through its officers and officials, made a clear and definite promise by awarding Plaintiff Calvary Chapel Belfast the right to negotiate the purchase of the Hutchinson Center as part of the RFP 2024-048.

279.    UMS, through written communication and public statements, expressly notified Plaintiff and the public that Plaintiff was the successful respondent in the bidding process and had the right to negotiate the final terms and conditions of the sale.

280.    UMS, through written communication and public statements, also confirmed that Plaintiff would remain the successful respondent in the bidding

59

process, even after the discriminatory animus displayed at Plaintiff in the appeal letters from the dissatisfied bidders and the public, thereby confirming its promise to Plaintiff that it would have the opportunity to purchase the Hutchinson Center.

281.   UMS knew or should have reasonably known that when it made that promise, Plaintiff would act in reliance on the promise to begin preparations for the purchase.

282.   In reliance on UMS's promise, Plaintiff incurred significant expenses and efforts to proceed with the transaction, including preparing for negotiations, seeking legal counsel, evaluating the property, and planning for the integration of the Hutchinson Center into its religious and community activities.

283.   Plaintiff, acting in good faith, refrained from pursuing other opportunities or alternatives because UMS assured it of its successful bid.

284.   Plaintiff was ready and willing to proceed with negotiations and, in fact, made several efforts to engage with UMS to finalize the sale.

285.   If UMS is not bound by its promise, an injustice would result.

286.   After awarding the bid to Plaintiff, UMS wrongfully rescinded the award without engaging in good faith negotiations, as required under the RFP. Then it selected WCAP as the winning respondent under RFP 2025-031.

287.   Having relied on UMS's promise, Plaintiff has been significantly harmed by the unjust rescission of the award, losing its opportunity to acquire a unique piece of property at considerable expense.

288. Plaintiff's reliance on UMS's promise was reasonable and foreseeable, and it would be unjust to allow UMS to escape its obligations after Plaintiff has incurred significant costs and losses based on that reliance.

289. As a direct result of UMS's failure to fulfill its promise, Plaintiff has suffered financial damages and other harm, though that damages may be unrecoverable monetarily, thus mandating a temporary restraining order and injunctive relief to preclude irreparable injury.

290. Therefore, under the doctrine of promissory estoppel, UMS must be held liable to fulfill its obligations, and Plaintiff should be entitled to appropriate relief, including but not limited to specific performance and damages.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief.

**Count VIII**
**BREACH OF CONTRACT**
**Breach of Implied-in-Fact Contract**
**(Against Defendant UMS)**

291. Plaintiff incorporates by reference all preceding paragraphs.

292. Defendant University of Maine System (UMS) issued a request for proposal (RFP 2024-048) on behalf of the University of Maine for the sale of the Hutchinson Center property in Belfast, Maine.

293. Plaintiff Calvary Chapel Belfast submitted a timely and successful bid in response to the RFP, meeting all required criteria.

294.   On August 14, 2024, UMS notified Plaintiff that it had been selected as the highest-scoring respondent for the RFP, awarding Plaintiff the right to negotiate the terms and conditions for the sale of the Hutchinson Center.

295.   Through its conduct and communications with Plaintiff, UMS represented that Plaintiff's bid had been accepted and that the parties would enter into good faith negotiations to finalize the terms of the sale, as outlined in the RFP.

296.   In reliance on UMS's representations and conduct, Plaintiff incurred significant expenses in preparing for the purchase of the Hutchinson Center, including but not limited to the costs associated with planning for the relocation of the Networkmaine hub, legal fees, and administrative expenses.

297.   Despite Plaintiff's willingness to engage in good faith negotiations, UMS rescinded its award to Plaintiff on the pretext that the cost of relocating the Networkmaine hub was not adequately addressed in the RFP, without engaging in the promised negotiations or providing an opportunity for Plaintiff to address the issue. And Defendants did so on the impermissible basis of Plaintiff's religious beliefs, expression, and status.

298.   After rescinding the award, UMS issued a second RFP for the sale of the Hutchinson Center, this time including a provision allowing for the winning bidder to negotiate the lease of Networkmaine hub, thus revealing that the purported cost to relocate the hub was a pretext for UMS's refusal to negotiate with Plaintiff.

299.   UMS's actions in accepting Plaintiff's bid and awarding Plaintiff the right to negotiate, followed by its public statements announcing the bid award to the Church, created rights and obligations between the parties.

300.   Notwithstanding the terms of the RFP, the conduct of the parties created an implied-in-fact contract between Plaintiff and UMS.

301.   UMS's subsequent conduct in rescinding the award and issuing a new RFP, despite Plaintiff's compliance with all terms of the original RFP, constitutes a breach of the implied-in-fact contract.

302.   Under Maine law, every contract, including implied-in-fact contracts, contains an implied duty of good faith and fair dealing.

303.   UMS had a duty to engage in good faith negotiations with Plaintiff to finalize the terms of the sale of the Hutchinson Center, as required under the RFP and as reasonably expected from the parties' conduct.

304.   UMS breached its duty of good faith and fair dealing by rescinding its award to Plaintiff without engaging in meaningful negotiations and by issuing a new RFP that included provisions that could have resolved the purported issues with the Networkmaine hub in the original RFP process.

305.   As a result of UMS's breach of the implied-in-fact contract, Plaintiff has suffered damages, including but not limited to, lost opportunity, legal and administrative costs, and expenses incurred in preparing for the purchase of the Hutchinson Center.

306. UMS's failure to negotiate in good faith caused Plaintiff significant harm, including lost opportunity and economic damages, and deprived Plaintiff of its fair opportunity to purchase the Hutchinson Center as the successful bidder.

307. Therefore, UMS must be held liable to fulfill its obligations, and Plaintiff should be entitled to appropriate relief, including but not limited to specific performance and damages.

WHEREFORE, Plaintiff respectfully prays for relief against Defendants as hereinafter set forth in its prayer for relief

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Calvary Chapel Belfast requests that the Court:

A. Issue a temporary restraining order, restraining and enjoining Defendants, all of their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from continuing with any negotiations under RFP 2025-031 and from awarding or transferring ownership of the Hutchinson Center to any other bidder or purchaser while this litigation proceeds;

B. Issue a preliminary injunction pending trial, and any permanent injunction necessary after trial, restraining and enjoining Defendants, all of their officers, agents, employees, and attorneys, and all other persons in active concert or participation with them, from continuing with any negotiations under RFP 2025-031 and from awarding or transferring ownership of the Hutchinson Center to any other bidder or purchaser while this litigation proceeds;

C. Render a declaratory judgment declaring that

(1)    Defendants have violated the First and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §§ 1983 and 1985;

(2)    Defendants made clear promises to negotiate with Plaintiff and complete the sale of the Hutchinson Center,

(3)    Plaintiff reasonably relied on those promises to its detriment,

(4)    Defendants' failure to fulfill those promises constitutes a violation of the doctrine of promissory estoppel;

(5)    Defendants created an implied-in-fact contract between Plaintiff Calvary Chapel Belfast and the University of Maine System (UMS) based on the parties' conduct, including UMS's award of the Hutchinson Center to Plaintiff and subsequent discussions regarding the terms of the sale, and

(6)    Defendants breached this implied-in-fact contract by failing to negotiate in good faith as required under the RFP and by wrongfully rescinding the award to Plaintiff;

D.    Award Plaintiff specific performance, requiring UMS to proceed with negotiating the sale of the Hutchinson Center to the Church under the original RFP 2024-048;

E.    Order Defendants to pay Plaintiff its proposal preparation costs and appropriate interest on these amounts;

65

F.     Award Plaintiff the costs of this action and reasonable attorney's fees; and

G.     Award such other and further relief that the Court finds proper.

## JURY DEMAND

Plaintiff requests a trial by jury on all triable issues.

Dated: November 19, 2024          Respectfully submitted,

/s/ Stephen C. Whiting_____          /s/ Daniel J. Schmid_____
Stephen C. Whiting                      Horatio G. Mihet*
(ME Bar No. 559)                        Daniel J. Schmid*
THE WHITING LAW FIRM                    Richard L. Mast*
75 Pearl Street, Suite 207              LIBERTY COUNSEL
Portland, ME 04101                      P.O. Box 540774
(207) 780-0681                          Orlando, FL 32854
steve@whitinglawfirm.com                (407) 875-1776
                                        court@lc.org
                                        hmihet@lc.org
                                        dschmid@lc.org
                                        rmast@lc.org

                                        *pro hac vice certifications
                                        forthcoming

          Attorneys for Plaintiff

## VERIFICATION OF COMPLAINT

I, Gregory Huston, am over the age of eighteen years  and the duly authorized agent and officer of Calvary Chapel Belfast, a non-profit independent church registered under the laws of the State of Maine. Pursuant to 28 U.S.C. § 1746, I verify and declare under penalty of perjury that the foregoing allegations that pertain to the Church are true and correct, and based upon my personal knowledge (unless otherwise indicated). If called upon to testify to their truthfulness, I would and could do so competently.

Executed on November 19, 2024          /s/ Gregory Huston
                                        Gregory Huston