UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
Bangor Division

| | |
|---|---|
| CALVARY CHAPEL BELFAST,<br><br>*Plaintiff*;<br>v.<br><br>UNIVERSITY OF MAINE SYSTEM, et al.,<br><br>*Defendants*. | Case No.<br><br>**INJUNCTIVE RELIEF SOUGHT** |

**MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION AND MEMORANDUM OF LAW**

Pursuant Fed. R. Civ. P. 65 and Local Rule 7, Plaintiff Calvary Chapel Belfast (the "Church") hereby moves the Court for a Temporary Restraining Order (TRO) and Preliminary Injunction against Defendants, University of Maine System; Board of Trustees, University of Maine System; Ryan Low, individually and in his official capacity as Vice Chancellor for Finance and Administration, University of Main System; Rachel Piper, in her official capacity as Executive Director of Strategic Procurement and Services, University of Maine System; Robin Cyr, in her official capacity as Senior Director of Strategic Procurement, University of Maine System; Derek Houtman, in his official capacity as Associate Strategic Sourcing Director, University of Maine System (collectively "Defendants") as set forth below and in Plaintiff's contemporaneously filed Verified Complaint. To wit, a temporary restraining order and preliminary injunction restraining and enjoining Defendants, all of their officers, agents, employees, and attorneys, and all other persons in active

concert or participation with them, from continuing with any negotiations under RFP 2025-031 and from awarding or transferring ownership of the Hutchinson Center to any other bidder or purchaser while this litigation proceeds. For the following reasons, the Court should grant the Motion and issue the TRO.

## MEMORANDUM OF LAW

The purpose of a temporary restraining order is to "preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Prop., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). "The standard for issuing a temporary restraining order is the same as for a preliminary injunction," *Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013), namely, "the record before the Court must demonstrate (A) that the plaintiff is likely to succeed on the merits of a claim for which injunctive relief is available; (B) that plaintiff is likely to suffer irreparable harm absent interim relief; (C) that the balance of equities between or among the parties tips in the plaintiff's favor; and (D) that providing the requested relief will not harm the public interest." *Anderson v. Trident Eng'g & Inspection Corp.*, 2021 WL 2478438, at *2 (D. Me. June 17, 2021) (citing *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015)). Plaintiff easily satisfies each of these elements factually and legally. (Plaintiff incorporates by reference the allegations of the Verified Complaint, filed simultaneously herewith, as their statement of facts in support of this Motion.)

## ARGUMENT

**I.  The Church is likely to succeed on the merits of its Equal Protection and Free Exercise claims.**

The Church is likely to succeed on the merits of its claims under Fourteenth Amendment Equal Protection Clause and the First Amendment Free Exercise Clause. For all the reasons argued below, the Church is likely to prevail on these claims, and immediate relief is needed to preserve the status quo and ensure the Church can continue to exercise its constitutional rights to be free from religious discrimination. The Constitution demands a TRO while the Church's claims proceed.

**A.  The Church is likely to prevail on its Equal Protection claim because Defendants have discriminated against it on the basis of religion.**

The Church is likely to prevail on the merits of its claim that Defendants intentionally discriminated against it on the basis of religion in violation of Fourteenth Amendment's Equal Protection Clause. Under the Fourteenth Amendment, no State may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "An equal protection claim may challenge legislation or the conduct of individual state actors." *Fox v. Makin*, 2023 WL 5279518, at *10 (D. Me. Aug. 16, 2023) (quoting *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021)). "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, *religion*, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"

3

*Davis v. Coakley*, 802 F.3d 128, 132–33 (1st Cir. 2015) (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)) (emphasis added). Here, the Church easily demonstrates religious discrimination under the Equal Protection Clause.

1. **The Church is similarly situated to the other respondents.**

The Church is similarly situated to the other non-religious respondents to the RFP. For equal protection purposes, an individual is "similarly situated" to others when "a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." *Barrington Cove Ltd. P'ship v. Rhode Island Hous. & Mortgage Fin. Corp.*, 246 F.3d 1, 8 (1st Cir. 2001) (quoting *Dartmouth Review v. Dartmouth Coll.*, 889 F.2d 13, 19 (1st Cir. 1989)). Here, the Church and the other respondents all submitted proposals to purchase the same property, the Hutchinson Center, under the same terms of RFP 2024-048. (V. Compl. ¶¶ 33-39.) The RFP required all respondents to propose a purchase price and address specific criteria. (*Id.*) Each respondent, including the Church, was evaluated based on these uniform criteria. (*Id.*) No material difference exists between the Church's bid and those submitted by other non-religious entities when it comes to the core requirements set forth in the RFP. And, under the fair process undertaken under the first RFP, the Church prevailed in its bid. (*Id.*, ¶47.) Thus, the Church and the other respondents are similarly situated in all relevant respects.

2. **Defendants' rescission of the Church's award was motivated in part by religious animus.**

Under the sworn allegations of the Church's Complaint and the record evidence before the Court, Defendants' rescission of its award to negotiate the sale of

4

the Hutchinson Center with the Church was unquestionably motivated by a "[religiously] discriminatory intent or purpose." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). In assessing discriminatory intent, courts may consider both direct and circumstantial evidence. *See Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 374 (D. Mass. 2022). Circumstantial evidence may include the "historical background of the decision," *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 355 n.17 (D. Me. 2017) (quoting *Arlington Heights*, 429 U.S. 252 at 267–68), "the context in which the decision was made," *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014), and whether "legislators bowed to an impermissible community animus, most commonly manifested by an unusual level of constituent pressure," *Scott-Harris v. City of Fall River*, 134 F.3d 427, 438 (1st Cir. 1997), *rev'd on other grounds sub nom. Bogan v. Scott-Harris*, 523 U.S. 44 (1998). All considerations demonstrate that the rescission of the Church's award was pretextual and intended to mask the unconstitutional religious discrimination against the Church.

Here, the circumstances surrounding UMS's decision to rescind the Church's award demonstrates that religious animus was a motivating factor for Defendant Low's decision to rescind the original award and for UMS to deny the Church's second proposal. "[P]articularly relevant to this case, a government decision influenced by community members' religious bias is unlawful, even if the government decisionmakers display no bias themselves." *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty.*, 915 F.3d 256, 263 (4th Cir. 2019). "Such impermissible

5

influence may be inferred where expressions of community bias are followed by irregularities in government decision-making." *Id*. In this case, the Church's proposal was initially accepted, and UMS publicly announced that the Church was the highest-scoring respondent. (V. Compl. ¶¶47-48.) Yet, immediately after the award, community members and the two disappointed bidders began exerting significant pressure on UMS to reconsider the award to the Church. (*Id.*, ¶¶51-81.) This pressure was not based on any legitimate concerns about the RFP but on the Church's religious beliefs and practices. (*Id.*) Evidence of the animus against the Church is well-documented: Both disappointed bidders attacked the Church's religious beliefs in their bid protest letters (*id.*), and numerous comments expressed outrage over the Church's Christian views, particularly on social issues such as marriage. (*Id.*)

Specifically, FHC-WA—one of the disappointed bidders—stated that the Church should not be awarded the Hutchinson Center because its religious views necessarily precluded it from being nondiscriminatory, and that the Church's website included quotations from Scripture that FHC-WA viewed as "problematic." (*Id.*, ¶¶51-57.) In its second appeal to Defendant Low, FHC-WA was even more explicit, stating that UMS's decision to award the bid to the Church resulted in "tempers and frustrations" in the community, and that Defendant Low needed to "ameliorate the situation" of a religious entity being awarded the bid. (*Id.*, ¶¶73-75.) FHC-WA went farther, stating that UMS's decision was "patently absurd" and demonstrated a "stubborn closemindedness in the service of an institution with an opposite mission."

(*Id.*, ¶76.) The institution was, of course, the Church, and its opposite mission was, of course, its religious status, beliefs, and views.

WCAP's religious discrimination was even more explicit. WCAP's Board member, State Senator Curry explicitly stated that it was "completely inappropriate" for UMS to award the Hutchinson Center bidding to "any religious organization," (*Id.*, ¶64.) WCAP argued that a Church, "by its very design," must be excluded from the bidding process because its religious beliefs would not comport with WCAP's purported "efforts toward diversity and inclusion." (*Id.*, ¶¶60-61.) And, WCAP continued its expressions of religious animosity by claiming that a Church winning the bidding process was not "what is best for the community." (*Id.*, ¶79.)

Members of the community followed the lead of State Senator Curry and the two disappointed bidders by claiming the Church was just "a religious cult" and a "little fascist factory." (*Id.*, ¶63.) UMS even clarified that it had received 135 community comments objecting to the Church receiving the bidding award. (*Id.*, ¶69.) The sole basis for these comments was the Church's religious views.

To be sure, "[t]he Constitution cannot control such prejudices but neither can it tolerate them." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Id*. Yet, that is precisely what Defendant did here. It is no coincidence that Defendant Low's decision to rescind the award came after this sustained public outcry. (V. Compl. ¶¶101-102.) *Cf. Smith v. Town of Clarkton*, 682 F.2d 1055, 1066–67 (4th Cir. 1982) ("There can be no doubt that the defendants knew that a significant

7

portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition."). Religious discrimination in the community simply cannot serve as the basis for a government official's decision. Here, it did.

The "procedural anomalies" surrounding UMS's decision-making process further demonstrate the discriminatory nature of Defendant Low's actions. (*E.g.*, V. Compl. ¶¶88-133.) *See Scott-Harris*, 134 F.3d at 438. For example, despite the Church's offering to negotiate lease terms for the data hub and actually offering concrete and viable solutions to the purported problem, UMS abruptly cut off negotiations without exploring reasonable alternatives. (V. Compl. ¶¶114-121.) In contrast, UMS's willingness to negotiate with other respondents under the new RFP (*id.*, ¶¶140-145), on the very issues used as a pretext to rescind the award to the Church, shows that UMS's earlier actions were not motivated by genuine concerns about the network hub but rather by the impermissible influence of community animus toward the Church's religious beliefs. What Defendant Low treated as insurmountable obstacles turned out to be nothing more than pretextual reasons to cave to public pressure and rescind the Church's award on the basis of religion.

In sum, Defendants' recission of the award to the Church is tainted by discriminatory intent, given that it was influenced by community opposition, including that of elected officials who happen to sit on competing bidders' boards, to the Church's religious identity and mission. *Cf. Assoc. of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Reglamentos y Permisos*, 740 F. Supp. 95, 103 (D.P.R. 1990) ("[A] decisionmaker has

a duty not to allow illegal prejudices of the majority to influence the decision making process.... [I]f an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter."). Even if Defendants themselves harbored no animosity toward the Church, a proposition that the Church's Complaint calls into significant question (V. Compl. ¶¶83-85), the record indicates that they acted "simply in order to appease the discriminatory viewpoints of private parties," and therefore their decision "becomes tainted with discriminatory intent." *A.F.A.P.S.*, 740 F. Supp. at 103. The Equal Protection Clause requires more than mere neutrality in words; it requires that government decisions not be guided by or defer to the biases of others. Defendants' treatment of the Church and its rescission of the bidding award on the basis of community and political backlash reflects unconstitutional religious discrimination.

### 3. UMS's concerns about the financial cost of relocating the network hub are pretextual.

Once discriminatory intent is shown to have been a "substantial or motivating factor" in a state actor's decision, which the Church's Complaint plainly does, the burden shifts to that actor to demonstrate that the decision would have been made regardless of the discriminatory motive. *See Snyder v. Louisiana*, 552 U.S. 472, 485 (2008) (citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)). Here, UMS's stated reason for rescinding the award to the Church—that the original RFP failed to adequately consider the cost of relocating the network hub (V. Compl. ¶113)—is transparently pretextual. At the outset, UMS's refusal to engage in negotiations with

9

the Church over the network hub issue (*Id.*, ¶¶114-121), despite having the authority under RFP 2024-048 to explore alternative solutions, demonstrates the pretextual nature of the decision. (*Id.*) The RFP explicitly allowed UMS the flexibility to negotiate terms with the highest-ranked respondent to finalize a contract, and the Church demonstrated an extraordinary willingness to reach a workable solution on that precise issue under its award. (*Id.*, ¶118.) And, the Church proposed such solutions and offered to negotiate the precise solutions that UMS subsequently stated acted as a barrier to proceeding under the original RFP award to the Church. (*Id.*, ¶¶114-121.) Instead, UMS seized upon the network hub as an excuse to terminate the Church's award without even attempting to collaboratively resolve the issue. Indeed, despite the Church's clear willingness to negotiate, and despite the actual negotiations between the parties, UMS later used the hub relocation issue as a pretext to cover its religious discrimination against the Church and to rescind the award to the Church. (*Id.*, ¶119.) Defendant Low's refusal to engage with the Church—despite the RFP's provision for negotiating with the winning respondent and the actual negotiations that took place—demonstrates that his stated rationale for rescinding the award was pretextual and designed to mask the religious discrimination against the Church.

The newly issued RFP further exposes UMS's previous concerns about the network hub as pretextual because it reflects UMS's starkly different approach to the issue. (V. Compl. ¶¶135-141.) In RFP 2025-031, UMS expressed a willingness to negotiate the network hub space with prospective respondents, a position

diametrically opposed to its rigid stance with the Church. (*Id.*, ¶142.) UMS's newfound readiness to negotiate the location of the network hub—an option it refused to consider with the Church—reveals that Defendants' decision was driven not by genuine logistical concerns but by discriminatory intent cloaked as concerns about a deficiency in the original RFP.

In light of these facts, UMS cannot credibly demonstrate that the network hub cost alone would have led to the rescission absent discriminatory intent. By failing to explore straightforward, less restrictive alternatives, UMS's actions instead reflect a decision influenced by religious animosity and discrimination masked as a concern about a deficiency in RFP 2024-048. UMS's failure to genuinely negotiate with the Church about the network hub demonstrates that Defendant Low's stated reasons for rescission are pretextual, crafted to disguise a decision made substantially—if not entirely—on the basis of the Church's religious status and beliefs.

### B. The Church is likely to prevail on its Free Exercise claim because Defendants targeted it for special disabilities based on its religious status and beliefs.

The Church is likely to prevail on its Free Exercise claim because UMS failed to act neutrally toward the Church's religious beliefs when it rescinded the bid award. Government action that proceeds in a manner that is neither neutral nor generally applicable is subject to strict scrutiny under the Free Exercise Clause. *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). Defendants' treatment of the Church was not neutral of religion and therefore triggers strict scrutiny under the Free Exercise Clause. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (a failure to satisfy either neutrality or general applicability triggers strict scrutiny).

11

"Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citations omitted). Defendants "[were] obliged under the Free Exercise Clause to proceed in a manner neutral toward and tolerant of [the Church's] religious beliefs." *Masterpiece Cakeshop v. Colorado C.R. Comm'n*, 584 U.S. 617, 638 (2018). Discriminatory exclusion of religious participants, such as the Church, from a program for which it was otherwise qualified, "[is] odious to our Constitution and [can]not stand." *Carson v. Makin*, 596 U.S. 767, 779 (2022).

Defendants violated the Free Exercise Clause's neutrality requirement when Defendant Low rescinded the Church's award in response to community animus to the Church's religious beliefs. "Here, as in equal protection cases, we may determine the [government actor's] object from both direct and circumstantial evidence. *Lukumi*, 508 U.S. at 540 (citing *Arlington Heights*, 429 U.S. at 266)). In this case, the historical background of the decision and sequence of events show that the Church was not simply denied a governmental benefit; it was singled out and treated differently based on its religious status and beliefs. (V. Compl. ¶¶51-81; *see also supra* Section I.A.) Defendants rescinded the Church's award after vocal objections from the community—objections that that were explicitly rooted in hostility toward the Church's religious views. (V. Compl. ¶¶51-81.) Defendants' actions did not arise from general concerns about the proposal's merits but from the Church's religious identity and the Biblical values it espouses. (*Id.*) Indeed, State Senator Curry—who sits on the Board of WCAP (which won the second, rigged FRP process)—specifically noted

that awarding the bid to "any religious organization" was "completely inappropriate," (*id.*, ¶64), and others expressed the view that UMS could not be "closeminded" by awarding the Hutchinson Center to a religious entity that was not focused on "diversity and inclusion." (*Id.*, ¶¶76, 51-57). Other disappointed bidders explicitly stated that the Church, "by its very design" would be perceived by the community as non-inclusive. (*Id.*, ¶59.) The community took those cues and engaged in vigorous opposition to the Church designed to effectuate a heckler's veto. (*Id.*, ¶¶62-63.)

As in *Masterpiece Cakeshop*, where the Court held that government decision-makers failed to act with neutrality toward the religious beliefs a Christian baker, *see* 584 U.S. at 638, Defendants bowed to anti-religious community pressure and applied UMS's procurement policies to rescind the Church's award under the pretext of a cost issue with the Networkmaine data hub. (V. Compl. ¶¶99-119.) Consequently, Defendants targeted the Church because of its religious beliefs, which is a per se violation of the Free Exercise Clause. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 466 n.14 (2017) (noting that "a law targeting religious beliefs as such is never permissible") (quoting *Lukumi*, 508 U.S. at 533).

### C. Defendants' decision to rescind the Church's award cannot withstand strict scrutiny.

Because UMS targeted and intentionally discriminated against the Church based on its religious beliefs, UMS's decision fails strict scrutiny.[1] To survive strict

---

[1] Defendants' actions are subject to strict scrutiny under both the Equal Protection and Free Exercise Clauses. *Cf. Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019) ("[W]e apply strict scrutiny under the Equal Protection Clause where (as here) the challenged action interferes with a fundamental right," "[a]nd '[u]nquestionably, the free exercise of religion is a fundamental constitutional right.'" (quoting *Johnson v. Robison*, 415 U.S. 361, 375 n.14 (1974));

13

scrutiny, the challenged government action must be narrowly tailored to further a compelling government interest. *Lukumi*, 508 U.S. at 546. "That standard is not watered down; it really means what it says." *Tandon*, 593 U.S. at 65. This is "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 US. 507, 534 (1997), which is rarely passed. *See Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("[W]e readily acknowledge that a law rarely survives such scrutiny . . . ."). This is not that rare case. UMS's decision to rescind the Church's award cannot meet that demanding standard.

First, discriminating against the Church advances no compelling interest. UMS's purported reason for the rescission—concerns over the relocation costs of the network hub—fails to rise to the level of an essential governmental interest that could justify religious discrimination. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972) (holding that "[o]nly those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion"). Indeed, UMS's purported concerns are even less defensible given the Church's willingness to negotiate terms that would have preserved the network hub at minimal expense to UMS. (V. Compl. ¶¶113-122.) Beyond that, circumstantial evidence shows that UMS's actions were influenced not by logistical considerations but by pressure from community members opposed to the Church. (*Id.*, ¶¶51-81.) Appeasing anti-religious opponents in the community is not a compelling government interest.

---

*Lukumi*, 508 U.S. at 546 (stating that, under the Free Exercise Clause, "[a] law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny").

Second, even if the rescission served a legitimate interest, it is not narrowly tailored to that end. Narrow tailoring requires that "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. To meet this burden, the government must show it "*seriously* undertook to address the problem with less intrusive tools readily available to it," *McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (emphasis added), "show either that substantially less-restrictive alternatives were tried and failed, or that the alternatives were closely examined and ruled out for good reason," *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016), and that other options "would fail to achieve the government's interest, not simply that the chosen route was easier.'" *McCullen*, 573 U.S. at 495.

Here, UMS could have engaged in straightforward negotiation with the Church to address the network hub's location—a solution that the Church had already proposed and that the parties had previously contemplated. (V. Compl. ¶¶113-120.) Instead, UMS opted for the most restrictive and punitive measure: complete rescission of the bid award. And, Defendants did so to ease the burden of community pressure and make their job easier. "But that is not enough to satisfy the First Amendment." *McCullen*, 573 U.S. at 495. This sweeping response was far from the "least restrictive means" of addressing UMS's concerns. In light of the Church's willingness to negotiate the network hub's location, Defendants' decision to rescind the award was not intended to address an objective concern but rather to gerrymander the Church out of the purchasing process.

**II. The Church will be irreparably harmed absent an injunction.**

Defendants' decision to discriminate against the Church has caused the Church irreparable harm, and it will continue to suffer irreparable harm absent injunctive relief. Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). It is well settled that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Given that the Church is likely to succeed on the merits of its Equal Protection and Free Exercise claims, the Church will continue to suffer irreparable harm absent an injunction. *Cf. We the People PAC v. Bellows*, 519 F. Supp. 3d 13, 52 (D. Me. 2021), *aff'd*, 40 F.4th 1 (1st Cir. 2022) ("The Plaintiffs have shown a likely deprivation of their First Amendment rights and the Court concludes this continuing deprivation acts as an irreparable harm."); *accord Opulent Life Church v. City of Holly Springs*, 697 F.3d 279 (5th Cir. 2012) (holding that Christian congregation established that it would suffer irreparable harm absent preliminary injunction prohibiting enforcement of municipal ordinance restricting religious land use in zoning district, where congregation alleged violations of its First Amendment and RLUIPA rights based on denial of land use and building renovation permits for newly acquired property").

Moreover, the Church will face irreparable harm if UMS proceeds with awarding the Hutchinson Center to another bidder under the latest RFP. A disappointed bidder is immediately harmed when a contracting authority is allowed

to complete or transfer the contract under dispute. *See Cont'l Servs. Grp., Inc. v. United States*, 132 Fed. Cl. 191, 193 (2017). Here, UMS's decision to move forward with the sale of the Hutchinson Center to another bidder will effectively moot the Church's bid protest and render its rights meaningless, despite having been the rightful awardee under the prior RFP. This is not merely a setback that could be remedied by monetary compensation; it's a direct and enduring loss of an opportunity to acquire a unique piece of property that cannot be duplicated. Thus, injunctive relief is necessary to prevent UMS from awarding the Hutchinson Center to another bidder, which would irreparably harm the Church by stripping it of its fair and legitimate opportunity to purchase the property solely on the basis of its religion. *Cf. Cont'l Servs. Grp.*, 132 Fed. Cl. at 193 (finding that disappointed bidders for Department of Education's award of contract for collection of student loans would be immediately and irreparably injured in absence of preliminary injunction preventing Department from allowing continued performance on task orders issued under solicitation or transferring work to another contracting vehicle to circumvent or moot bid protest).

## III. The balance of equities tips and public interest favor the Church.

The balance of the equities and public interest also favor the Church. In a suit against the government, these factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both are satisfied here. On one hand, the Church faces the ongoing harm of being excluded from the RFP process and denied the opportunity to purchase the Hutchinson Center based solely on its religious identity. That kind of harm strikes at the very heart of the First and Fourteenth Amendments' protections. On the other hand, any harm to Defendants is speculative at best. Preventing Defendants from

17

discriminating against the Church does not hinder the RFP process or undermine the University's interest in selling the Hutchinson Center. Indeed, Defendants would merely be required to uphold their constitutional obligations, which cannot reasonably be characterized as a burden.

Moreover, the public interest is further advanced when government entities, such as UMS, comply with the Constitution and conduct their operations in a fair and nondiscriminatory manner. Indeed, "[i]t is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Dorce v. Wolf*, 506 F. Supp. 3d 142, 145 (D. Mass. 2020) (quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Thus, the balance of equities and public interest tips decidedly in the Church's favor, and injunctive relief is necessary to prevent violations of its constitutional rights.

## REQUESTED SCOPE OF INJUNCTIVE RELIEF

The Church respectfully asks this Court to issue an injunction preventing UMS from awarding or transferring ownership of the Hutchinson Center to any other bidder or purchaser while this litigation proceeds. The scope of the requested injunction rests on well-established legal grounds: Courts routinely enjoin government agencies from proceeding with procurement decisions and awarding contracts that are based on discriminatory or otherwise improper grounds. *See, e.g.*, *D.J. Miller & Assocs., Inc. v. Ohio Dep't of Admin. Servs.*, 115 F. Supp. 2d 872, 883 (S.D. Ohio 2000) (finding that minority-owned business both established a prima facie case of race discrimination in connection with termination of government contract and rebutted agency's proffered non-discriminatory reason, and therefore demonstrated a high likelihood of success on merits of its Title VI claim for purposes

of obtaining temporary restraining order and preliminary injunction); *Acct. Control Tech., Inc. v. United States*, 132 Fed. Cl. 188 (2017) (granting preliminary injunction to prevent government agency from allowing continued performance on task orders issued under solicitation or transferring work to another contracting vehicle to circumvent or moot bid protest); *Cohen Fin. Servs., Inc. v. United States*, 110 Fed. Cl. 267 (2013) (granting preliminary injunction preventing Federal Deposit Insurance Corporation (FDIC) from awarding contract to provide business operations support after FDIC violated solicitation and acquisition regulations).

Courts also routinely issue injunctive relief to churches who are discriminated against in land use and real estate decisions. *See, e.g.*, *Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203, 1225 (C.D. Cal. 2002) (issuing preliminary injunction after finding that church demonstrated fair probability of success on merits of First Amendment claim that city's denial of conditional use permit required for building of church on property and exercise of eminent domain, were specifically aimed at discriminating against owner's religious uses); *Christian Fellowship Centers of New York, Inc. v. Vill. of Canton*, 377 F. Supp. 3d 146, 157 (N.D.N.Y. 2019) (issuing preliminary injunction after finding that church was likely to succeed on merits of RLUIPA challenge to village's zoning ordinance that prohibited operation of houses of worship in downtown retail commercial district); *Digrugilliers v. Consol. City of Indianapolis*, 506 F.3d 612 (7th Cir. 2007) (finding that district court's denial of a preliminary injunction against city was erroneous given that pastor's claim that zoning code requiring church to obtain variance to make

religious use of land located in city district zoned commercial office-buffer violated RLUIPA had "at least some, and possibly great, merit").

Here, the requested injunction is essential to prevent irreparable harm to the Church's interests, protect its constitutional rights, and uphold public confidence in the integrity of the procurement process. The Court's power to grant this relief is well within the scope established by prior decisions involving discriminatory conduct and procurement violations, ensuring that the Church's claims can be adjudicated without the risk of irreversible harm through UMS's transfer of the Hutchinson Center to another entity.

## CONCLUSION

The Church has satisfied the factors for injunctive relief. Therefore, the Court should GRANT the Church's motion for a temporary restraining order and preliminary injunction.

Dated: November 19, 2024

Respectfully submitted,

/s/ Stephen C. Whiting
Stephen C. Whiting
(ME Bar No. 559)
THE WHITING LAW FIRM
75 Pearl Street, Suite 207
Portland, ME 04101
(207) 780-0681
steve@whitinglawfirm.com

/s/ Daniel J. Schmid
Horatio G. Mihet*
Daniel J. Schmid*
Richard L. Mast*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
dschmid@lc.org
rmast@lc.org
*pro hac vice certifications forthcoming

*Attorneys for Plaintiff*