UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CALVARY CHAPEL BELFAST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00392-SDN |
| | ) | |
| UNIVERSITY OF MAINE SYSTEM, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER

Calvary Chapel Belfast ("the Church") brought an eight count Verified Complaint (ECF No. 1) against the University of Maine System ("the System"), its Board of Trustees, and four University of Maine administrators in their official capacities seeking injunctive relief to enjoin Defendants from moving forward with negotiations to sell the Hutchinson Center to another purchaser, specific performance requiring Defendants to proceed with negotiating the sale with the Church, and other relief the Court may find necessary and proper. Before the Court is the Church's Motion for Temporary Restraining Order[1] under Fed. R. Civ. P. 65. The Court heard oral argument on the matter on January 6, 2025. For the reasons set forth below, the Church's motion is denied.

## I.     Factual Background

The Court draws the facts from the Verified Complaint, the parties' declarations, and the attached exhibits.

---

[1] The Church's motion requests both a temporary restraining order and a preliminary injunction. Mot. TRO Prelim. Inj. ("Church's Motion"), ECF No. 3. In this order, the Court addresses only the Church's motion for a temporary restraining order, not its motion for a preliminary injunction. An evidentiary hearing on the motion for preliminary injunction will be scheduled as soon as practicable for the Court and the parties.

This matter arises out of the System's efforts to sell its Hutchinson Center property in Belfast, Maine. The Hutchinson Center opened in 2000 and served over 16,000 students at its height, but the center closed in 2023 after several years of declining use. Decl. Gretchen Catlin ("Catlin Dec.") ECF No. 38-1, at ¶ 3. The System decided to sell the Hutchinson Center using its procurement process. *Id.*

The System issued RFP #2024-048, University of Maine, Hutchinson Center Real Estate Offer, on January 17, 2024. Catlin Dec. ¶ 6; Verified Compl. (ECF No. 1) at ¶ 33 and Ex. A (ECF No. 1-1). The purpose of the RFP was to solicit interest in the Hutchinson Center property, and the System was willing to consider purchase and sale offers, lease offers, and creative real property offers. Ex. A; Catlin Dec. ¶ 6. The bid process for RFP #2024-048 was structured on a 100-point scale, which the System used to evaluate the degree to which each submitted proposal met specific criteria set forth by the System. Verified Compl. ¶ 34; Ex. A. The System would award the winning bidder the right to negotiate a final contract for the sale, lease, or other property offer. Catlin Dec. ¶ 7. Section 2.4 of RFP #2024-048 provides: "[s]uch negotiations may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." Ex. A at ¶ 2.4. It further provides, "the University may cancel the RFB, at its sole discretion." *Id.*

The System follows an internal, administrative appeal process for procurement awards, set forth in the System's Administrative Practice Letter VII-A. *See* Catlin Dec. ¶ 12; Status Report Nov. 21, 2024 (ECF No. 16) at ¶ 3 and Ex. 1 (ECF No. 16-2). The appeals process has two levels, and the second level is final. *See* Catlin Dec. ¶ 5; Decl. Ryan Low ("Low Dec.") ECF No. 38-2, at ¶ 5. Gretchen Catlin, the System's Chief Facilities and General Services Officer, normally serves as the decisionmaker at the second level of

procurement awards appeals. *See* Catlin Dec. ¶ 5; Low Dec. ¶ 5. However, because she was heavily involved in developing RFP #2024-048, Ms. Catlin preemptively recused herself from serving as the decisionmaker in the second level of appeal for this RFP in February of 2024. Catlin Dec. ¶¶ 1, 4-5. Due to Ms. Catlin's recusal, Ryan Low, the System's Vice Chancellor for Finance and Administration, served as the final decisionmaker for the appeal of RFP #2024-048. Catlin Dec. ¶ 5. As soon as Ms. Catlin recused herself, Vice Chancellor Low stopped participating in all System discussions and meetings about the Hutchinson Center. Low Dec. ¶ 6.

The System issued Addendum 4 to RFP #2024-048 on April 18, 2024. Catlin Dec. ¶ 8 and Ex. 1. Addendum 4 addressed the Networkmaine regional internet hub located within the Hutchinson Center. Catlin Dec. ¶ 8 and Ex. 1. The internet hub facilitates regional internet access to public and private educational institutions in the Belfast, Camden, and Rockland areas. Catlin Dec. ¶ 8 and Ex. 1. Addendum 4 required relocating the internet hub from within the Hutchinson Center to an external purpose-built utility building. Catlin Dec. ¶ 8 and Ex. 1. On May 30, 2024, the System circulated a draft lease for its continued access to the internet hub in the purpose-built utility building and within the Hutchinson Center while relocation to the purpose-built building was in process. Catlin Dec. ¶ 9.

The Church prepared a proposal for RFP #2024-048 led by a Church congregant, Jason Stutheit. Verified Compl. ¶ 44. The Church began to liquidate assets to make a competitive offer, including selling its current property, a utility trailer, and a shipping container for a total of $115,000 in June 2024. Verified Compl. ¶ 44. On August 1, 2024, TD Bank informed the Church it would provide financing for $750,000 to acquire the

Hutchinson Center. Verified Compl. ¶ 44. The Church timely submitted its proposal to RFP #2024-048. Verified Compl. ¶ 45.

Robyn Cyr, the System's Director of Strategic Sourcing, contacted Jason Stutheit, the Church's liaison for the RFP, on April 18, 2024 to inquire whether Addendum 4 would necessitate any changes to the Church's submission. Verified Compl. ¶ 115 and Ex. K (ECF No 1-11) at 3. Mr. Stutheit responded, "[i]t does not change our submission. As you had stated in a previous bid meeting this would be negotiated with the winning proposal. I am happy to lease the future space and also provide 24 h[ou]r access in the interim." Verified Compl. ¶ 116 and Ex. K at 2.

The System received three offers in response to RFP #2024-048: a purchase and sale offer from the Church, a purchase and sale offer from Waldo Community Action Partners ("WCAP"), and a creative real property offer from Future of the Hutchinson Center Steering Committee/Waterfall Arts ("FHC-WA"). Catlin Dec. ¶ 10. By letter dated August 14, 2024, Ms. Cyr notified the Church that the System was awarding the Church the right to negotiate terms and conditions for the purchase of the Hutchinson Center because it produced the top scoring response. Catlin Dec. ¶ 11. The letter further states:

> This award notice does not constitute an agreement and does not obligate the University to enter into any agreement with the awardee or any other vendor. Any actual contract executed by the University pursuant to the RFP is contingent on the ability of the parties to reach agreement on final terms and conditions and approval by the initiative sponsor. The University will proceed with the present award so long as it determines, in its sole discretion, that doing so is in the best interest of the University.

Verified Compl. Ex. B (ECF No. 1-2); Catlin Dec. ¶ 11. The System publicly announced its decision to sell the Hutchinson Center to the Church in a press release issued on August 15, 2024. Verified Compl. ¶ 48 and Ex. C (ECF No. 1-3). In the press release, the System stated the key factors distinguishing the Church's winning proposal included the Church's

offer of a $1 annual lease agreement in perpetuity for the Networkmaine hub, the Church's waiver of its right to have the property inspected, and the Church's offer of $250,000 in earnest money. Verified Compl. ¶ 49.

On August 19, 2024, FHC-WA timely submitted a Notice of Protest to the System's Executive Director of Strategic Procurement and Services, Rachel Piper. Verified Compl. ¶ 50 and Ex. D (ECF No. 1-4); Catlin Dec. ¶ 12. In its protest letter, FHC-WA argued that the System should have scored its bid higher because of FHC-WA's proposal to allow the System to maintain the existing Networkmaine internet hub within the Hutchinson Center for the life of the lease, saving the System the costs of moving the internet hub. Ex. D at 2. FHC-WA's protest letter also asserts the hub lease is "problematic" for the Church because the draft lease agreement requires the lessor to refrain from discriminating on the basis of protected classes including sex and sexual orientation, and the Church and its "parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage." *Id.* Ms. Piper denied FHC-WA's protest, stating that if the System had planned to consider the cost avoidance, it would have been reflected in the point scale. Catlin Dec. ¶ 14 and Ex. 2.

On August 20, 2024, WCAP timely submitted a protest letter to Ms. Piper. Verified Compl. ¶ 58 and Ex. E (ECF No 1-5). WCAP's protest letter contains a bulleted list of bases for its appeal, including the following: "[a] Church by its very design could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intentions as outlined in the nondiscrimination section of the lease." Ex. E at 3. Ms. Piper denied WCAP's protest. Catlin Dec. ¶ 15.

Members of the public made negative comments regarding the System's award of RFP #2024-048 to the Church, including on social media in response to a news article

about the System's decision. Verified Compl. ¶ 63. On August 21, 2024, Maine State Senator Chip Curry, a Democrat who represents Belfast and sits on WCAP's Board of Directors, publicly criticized the award to the Church, stating that transferring the Hutchinson Center from public access and "gifting" it to a religious organization seems "completely inappropriate." Verified Compl. ¶ 64. On August 22, 2024, the System posted another press release announcing it had denied the two protests and was moving ahead with its negotiations with the Church. Verified Compl. ¶ 66 and Ex. F (ECF No. 1-6). The press release also stated the System had received "at least 135 citizen comments" about the pending sale, and further stated that "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." Ex. F at 2.

Both WCAP and FHC-WA timely submitted second appeals of the RFP award to Vice Chancellor Low on September 3, 2024. Verified Compl. ¶ 71; Catlin Dec. ¶¶ 16, 18. WCAP's second protest letter included an appeal to the System to consider "what is best for the community," and "adherence to the University's mission to public education and accessibility for all supporting diversity and inclusion." Verified Compl. ¶ 79 and Ex. H (ECF No 1-8) at 3. Vice Chancellor Low saw no merit in WCAP's second appeal and denied it. Low Dec. ¶ 11; Catlin Dec. ¶ 19.

FHC-WA's second appeal letter specifically noted that "tempers and frustrations with the award decision are running high in the community," and expressed hope that a reversal of the award would "ameliorate this situation and put the community and the University back on the same path together." Verified Compl. ¶ 74 and Ex. G (ECF No 1-7) at 1. Vice Chancellor Low saw no merit to most of the points in FHC-WA's appeal but was intrigued by one point related to the Networkmaine hub. Low Dec. ¶ 12. Contrary to the

RFP in Addendum 4, which specified that the Networkmaine hub be relocated from within the Hutchinson Center to a purpose-built utility building outside of the Hutchinson Center, FHC-WA proposed leaving the Networkmaine hub in its current location within the Hutchinson Center for the life of the lease. Low Dec. ¶ 12. It appeared to Vice Chancellor Low that if it was possible to adopt FHC-WA's proposal to leave the Networkmaine hub in place, the System would save about $500,000 in the costs that the System would otherwise incur in building a new facility and relocating the hub. Low Dec. ¶ 12. Vice Chancellor Low asked Dr. Robert Placido, the System's Chief Information Officer, if the proposal was possible and workable for the System. Low Dec. ¶ 13. Dr. Placido told Vice Chancellor Low that such an arrangement was realistic and that Dr. Placido would be comfortable with that arrangement. Low Dec. ¶ 13. Vice Chancellor Low was generally aware that the RFP was a topic of discussion in the community and articles in the local press but tried to distance himself from those discussions and articles as much as possible. Low Dec. ¶ 7.

Vice Chancellor Low disagreed with Ms. Piper's rationale that the RFP process should not have considered cost avoidance measures, instead reasoning that "[i]f the System could avoid the $500,0000 cost of moving the [Networkmaine] hub, then [the System] would be significantly better off." Low Dec. ¶ 14. Vice Chancellor Low further reasoned that, if the System went ahead with the Church's bid of $1 million and incurred the unnecessary costs of $500,000 to move the internet hub, the value to the University would be reduced to $500,000, less than the System's approximately $900,000 debt remaining on the Hutchinson Center. Low Dec. ¶ 14. On September 12, 2024, Vice Chancellor Low issued a letter to each bidder explaining his decision to rescind the award to the Church. Verified Compl. ¶ 86 and Ex. I (ECF No. 1-9). In his Declaration submitted

7

to this Court, Vice Chancellor Low specifically declares the fact that the Church is a religious organization, its religious status and beliefs, its religious expression, and the community comments played no role in his decision to grant FHC-WA's appeal and rescind the award to the Church. Low Dec. ¶¶ 17-20.

The System issued a new RFP for the sale of the Hutchinson Center, RFP #2025-031, on October 4, 2024, with responses due November 1, 2024. Verified Compl. ¶¶ 135-36 and Ex. N (ECF No 1-14). The new RFP solicited only real property offers. Catlin Dec. ¶ 23. It also outlined a mandatory leaseback provision for the Networkmaine hub, requiring the winning bidder to lease back 120 square feet of closet space to the System for an annual fee of no more than $3,000. Verified Compl. ¶ 138. The lease term would extend for five years, with potential renewals upon mutual agreement. *Id.* RFP #2025-031 assigned the following point values: eighty-five points for purchase price, ten points for contingencies, and five points for Networkmaine Lease Cost. Verified Compl. ¶ 137.

On October 17, 2024, the System released a questions and answers sheet entitled "Addendum 2" to RFP #2025-031. Verified Compl. ¶ 139 and Ex. O (ECF No. 1-15). Addendum 2 addresses a question about the apparent discrepancy between the 120 square feet called for in the lease for the Networkmaine hub and the building drawings, which show the closet where the hub is located to contain 248 square feet of space. Ex. O at 1. In response, the System clarified the closet has 248 square feet of space, but the Networkmaine hub equipment only requires 120 square feet, therefore the System "is willing to share the space with the new owner." *Id.* Addendum 2 further states "[t]he final terms of the lease will be negotiated with the awarded respondent." *Id.*

The System received three bids in response to RFP #2025-031 from the same three bidders that responded to the first RFP, the Church, FHC-WA, and WCAP. *See* Catlin Dec.

¶ 25. The Church submitted a new bid in response to the second RFP, this time offering a purchase price of $1.1 million, a free lease to the System of the data closet space, and to pay for all utilities relating to the Networkmaine hub. Verified Compl. ¶¶ 155-58. The System awarded the right to negotiate a final agreement for the sale of the Hutchinson Center to WCAP, which bid a purchase price of $3.06 million, more than $ 1 million higher than any other bid and almost $2 million higher than the Church's bid, and which scored the highest based on the selection criteria. Verified Compl. ¶¶ 159-60; Catlin Dec. ¶ 26; Low Dec. ¶ 25 and Ex. 3. The System notified the Church of this decision by letter dated November 15, 2024. Verified Compl. ¶ 159.

The Church submitted a protest of the award to WCAP to Ms. Piper on November 20, 2024. Status Report (ECF No. 19) at ¶ 1. Ms. Piper denied the protest on December 2, 2024. *Id.* ¶ 3. Vice Chancellor Low received the Church's appeal of Ms. Piper's denial on December 5, 2024. Low Dec. ¶ 21. Vice Chancellor Low denied the Church's appeal because he "did not find any errors in the process for RFP #2025-031 and, thus, determined the award was appropriately granted to WCAP based on the substantial profit differential." Low Dec. ¶ 24.

## II.    Procedural History

The Church commenced this action on November 19, 2024, by filing its Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction (ECF Nos. 1, 3). The Court held a Telephone Conference of Counsel on November 20, 2024, at which the parties agreed to delay these proceedings while the Church protested the award decision through the System's internal appeal process (*see* ECF No. 15). The Court ordered the parties to file status reports every three weeks and ordered Defendants to notify the Court of any appeal determinations within forty-eight hours of such

determination (ECF No. 18). On December 17, 2024, the Church filed a Notice of Final Denial of Calvary Chapel Belfast's Administrative Appeal and Motion for Hearing on Motion for Temporary Restraining Order (ECF No. 28). The Court held a Telephone Conference of Counsel on December 18, 2024, at which the parties agreed to a briefing schedule and date for oral argument on the instant Motion (ECF Nos. 32, 36).

### III.   Discussion

### A.  Legal Standard

A temporary restraining order operates to "preserve the status quo, freezing an existing situation" allowing the Court to provide an effective remedy upon full adjudication of the merits. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). However, "[i]njunctive relief is an extraordinary and drastic remedy that is never awarded as of right." *Calvary Chapel of Bangor v. Mills*, 459 F.Supp.3d 273, 282 (D. Me. 2020) (quoting *Monga v. Nat'l Endowment for the Arts*, 323 F.Supp.3d 75, 82 (D. Me. 2018)). When evaluating whether to grant a temporary restraining order, the Court applies the same four-factor analysis as that used for a preliminary injunction. *Monga*, 323 F.Supp.3d at 82. It is Plaintiff's burden to establish: "[1] [it] is likely to succeed on the merits, [2] [it] is likely to suffer irreparable harm, [3] the balance of the equities tip in [its] favor, and [4] that the injunction is in the public interest." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc.*

*v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

## B. Likelihood of Success on the Merits

Although the Church brings eight counts in its Verified Complaint, it seeks a Temporary Restraining Order only as to its Equal Protection and Free Exercise claims. Mot. TRO Prelim. Inj. ("Church's Motion"), ECF No. 3, at 3. The Court considers each in turn.

### 1. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment demands that "similarly situated persons are to receive substantially similar treatment from their government." *Davis v. Coakley*, 802 F.3d 128, 132 (1st Cir. 2015) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)). The elements of an equal protection claim are: "(1) the [party], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 132-33 (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). "Plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.'" *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (quoting *Rubinovitz*, 60 F.3d at 910) (alteration and omission in *Rubinovitz*) (emphasis in *Buchanan*).

The System agrees the Church was similarly situated to the other bidders, WCAP and FHC-WA. Defs.' Mem. Law Opposing Pl.'s Mot. TRO Prelim. Inj. ("Opp'n") ECF No.

38 at 11. The System argues the Church has put forth no evidence of selective treatment or discriminatory intent and that all bidders were treated equally throughout the process. *Id.* To the Church, the System's entire course of conduct is probative of discriminatory intent and Vice Chancellor Low's decision to grant FHC-WA's second appeal and rescind the Church's award must be viewed as only part of the equal protection violation.

The Court is mindful that direct evidence of discriminatory intent is rarely available. *See Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection."). However, "proof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory purpose need not be the sole, dominant, or primary concern to demonstrate a violation; such purpose is impermissible if it was a "motivating factor" behind a government action. *See id.* at 265-66. Discriminatory purpose may be shown by circumstantial as well as direct evidence. *Id.* at 266. Circumstantial evidence of discriminatory purpose may include "'[t]he historical background of the decision,' '[t]he specific sequence of events leading up to the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" *Valentin v. Town of Natick*, 633 F.Supp.3d 366, 374 (D. Mass. 2022) (quoting *Vill. of Arlington Heights*, 429 U.S. at 267-68).

The Church argues the comments of the public and the other bidders, combined with what the Church alleges were procedural anomalies in the System's process, demonstrate the System made its decision to rescind its initial award to the Church

because of the Church's religious status and views, and therefore violated the Equal Protection Clause. To support this argument, the Church highlights case law where public pressure combined with procedural anomalies were held sufficient to show discriminatory purpose.

In *Ass'n of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Regalamentos & Permisos (A.R.P.E.)*, the court found discriminatory intent in violation of the Fair Housing Act after trial where the A.R.P.E. denied a special use permit for the operation of a hospice center for AIDS patients. 740 F.Supp. 95, 104-05 (D.P.R. 1990). The hospice center faced local opposition including "petitions, picket lines, graffiti, an administrative complaint, letters to various public bodies, a local court action, . . . appearances on local television programs," and even threats to supporters of the hospice center. *Id.* at 99. The A.R.P.E. ultimately denied the special use permit purportedly because the land was zoned for agricultural use. *Id.* at 100. The court found discriminatory intent and the justification for denying the permit due to the agricultural zoning classification was pretextual because: (1) "local opposition was duly noted by A.R.P.E. decisionmakers, one of whom publicly remarked that community opinion would play a role in the decision;" (2) "prior to the denial of the use permit there is no evidence that the [agricultural] zoning classification was a factor in A.R.P.E.'s decisonmaking;" (3) the "A.R.P.E. clearly had authority to grant the special use permit if it wished to;" and (4) the zoning regulations were selectively enforced against the hospice center. *Id.* at 105. In its analysis, the court stated that while "a decisionmaker is not to be saddled with every prejudice and misapprehension of the people [they serve,] . . . **a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decisionmaking process**." *Id.* at 104 (emphasis in original). The

court further stated, "if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter." *Id.*

In *Smith v. Town of Clarkton*, the Fourth Circuit upheld a district court's finding that municipal officials' decision to block development of an affordable housing project was racially motivated in violation of the Equal Protection Clause. 682 F.2d 1055, 1065-67 (4th Cir. 1982). In that case, there was evidence that the defendant government officials themselves had made racially "camouflaged" statements. *Id.* at 1066. Further, the government officials conducted an unprecedented "opinion poll" immediately after "expressions of racial oppositions . . . surfaced." *Id.* The court concluded "[t]here c[ould] be no doubt that the defendants knew that a significant portion of the public opposition was racially inspired, and their public acts were a direct response to that opposition." *Id.*

In *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, the Fourth Circuit held the plaintiffs stated a plausible claim for relief of religious discrimination under the Religious Land Use and Institutionalized Persons Act (RLUIPA) at the motion to dismiss stage. 915 F.3d 256, 263 (4th Cir. 2019), *as amended* (Feb. 25, 2019). There, the Fourth Circuit observed "[d]epartures from normal procedures can suggest that the decision was based on unlawful motives, as can '[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.'" *Id.* (quoting *Vill. of Arlington Heights*, 429 U.S. at 267). The Fourth Circuit highlighted that "a government decision influenced by community members' religious bias is unlawful, even if the government decisionmakers display no bias themselves." *Id.* (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 448

(1985)). Under the motion to dismiss standard of review, the Fourth Circuit determined the plaintiffs adequately stated a claim of discriminatory intent where neighbors' expressions of animus preceded irregularities in the board's decision-making process when the board denied a zoning application for the church despite the county official showing no opposition and where neighbors made ethnically and religiously disparaging remarks during the board hearing. *Id.* at 263-65.

In *Valentin v. Town of Natick*, the plaintiffs' Equal Protection Clause claim survived a motion to dismiss when their special permit application for a condominium development with affordable housing units was denied amid racist public backlash and procedural hurdles raised by the Planning Board. 633 F.Supp.3d at 375. The plaintiffs in that case were subjected to twenty-nine public hearings over sixteen months in contrast to a comparator project the board had approved after only ten hearings over six months. *Id.* at 372. The *Valentin* court cited to *LeBlanc-Sternberg v. Fletcher* for the proposition that a plaintiff can establish a prima facie showing of discriminatory intent "by showing that animus against the group 'was a significant factor in the position taken' by . . . decision-makers themselves <u>or by those to whom the decision-makers were knowingly responsive</u>." *Id.* at 375 (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d Cir. 1995)) (emphasis in *Valentin*).

From these cases it is clear that impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share them. However, it is equally clear there must be some showing connecting the animus in the community to the government action. *See A.F.P.S.*, 740 F.Supp. at 105 (finding discriminatory intent where there is public opposition on impermissible grounds and a

decisionmaker stated that public opinion would be taken into account, there was a pretextual reason for denying the application that had not been raised previously, and the agency could have granted the application if it wanted to); *Town of Clarkton*, 682 F.2d at 1066 (finding discriminatory intent where decisionmakers themselves made racially charged comments and decisionmakers conducted an unprecedented public opinion poll after race-based opposition surfaced); *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 263-65 (finding plaintiffs stated a plausible claim of officials' discriminatory animus where the decision-making board denied a zoning application for its church even though the county official in charge of planning did not oppose it and after opposed neighbors made ethnically and religiously disparaging remarks during the board hearing); *Valentin*, 633 F.Supp.3d at 375 (finding plaintiffs adequately stated a claim of discriminatory intent where their permit was denied amid racist public backlash and unusual procedural hurdles raised by the Planning Board). Often, the connection between the community animus and the government action is a procedural irregularity or hurdle that deviates from the procedural norms. *See Town of Clarkton*, 682 F.2d at 1066 (deployment of a never before used public opinion poll); *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 264-65 (the Board did not follow the recommendations and positions of two county officials with expertise); *Valentin*, 633 F.Supp.3d at 375 (subjecting plaintiffs to an excessive number of public hearings). Sometimes the government officials themselves make statements that indicate they are taking the public animosity into account in their decision-making or the officials themselves share in the animosity. *See A.F.P.S.*, 740 F.Supp. at 105 (decisionmaker stated public opinion would play a role in the decision-making); *Town of Clarkton*, 682 F.Supp.2d at 1066 (defendants themselves made racially "camouflaged" statements).

16

### a. Alleged Procedural Irregularity

The Church argues that the public opposition to its initial award of the Hutchinson Center "infected the entire process" as evidenced by the alleged procedural irregularity of the RFP and award process. The Church argues the procedural irregularity in this case occurred when the System decided to rescind its initial award rather than negotiate the Networkmaine hub remaining in place indefinitely with the Church.[2] Church's Motion at 8. The System contends that keeping the Networkmaine hub in the Hutchinson center would have significantly altered the original RFP, running afoul of the RFP's terms. Opp'n at 11-12. Section 2.4 of RFP #2024-048 provides "negotiations [with the successful bidder] may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." Ex. A at 11, ¶ 2.4. The Church replies that the parties had already begun to negotiate the location of the hub even before the System rescinded the award. Reply Supp. Church's Motion ("Reply") ECF No. 45 at 9.

This reply argument is based on Jason Stutheit's April 2024 email exchange with Robyn Cyr regarding the hub. Reply at 9. However, the April 2024 email exchange between Mr. Stutheit and the System was in the context of the System's Addendum 4, which proposed the System leasing the Hutchinson Center closet space for the Networkmaine hub while it constructed an outside purpose-built structure on the property for the hub. Mr. Stutheit's email stated, "[Addendum 4] does not change our submission. As you had stated in a previous bid meeting this would be negotiated with the winning proposal. I am happy to lease the future space and also provide 24 h[ou]r

---

[2] Counsel for the Church clarified at the January 6, 2025 oral argument on its motion that it does not contend that the second RFP process, RFP #2025-031, and ultimate award to WCAP was discriminatory. Rather, it argues the second RFP process never should have occurred in the first place.

access *in the interim*." Verified Compl. ¶ 116 and Ex. K at 2 (emphasis added). But this exchange and any final negotiations were based solely on the System's plan to ultimately relocate the hub to a purpose-built structure at an estimated System expense of $500,000. Negotiation on these terms – keeping the hub in the Hutchinson center "in the interim" while the new structure was built – would not have run afoul or been a material change to the original RFP, as such a leasing structure was specifically provided for in the RFP by way of Addendum 4. There is no evidence at this stage to suggest any party, let alone the System – the party in charge of the RFP and owner of the property – had ever contemplated leaving the hub in place indefinitely until FHC-WA proposed it by way of its appeal to the original RFP. Under the specific terms of the original RFP, there could be no significant changes to the RFP terms. Ex. A at ¶ 2.4. Not only would suddenly housing the Networkmaine hub in the Hutchinson Center for the life of the lease itself have been a material change to the project (and thus the RFP), the estimated cost savings of $500,000 would have significantly changed the proposal and therefore also been in violation of the RFP's directive to disallow any significant term changes. Moreover, nothing in the current record, including Mr. Stutheit's email, indicates the Church necessarily would have agreed to such a material change, certainly not that the System could rely on it at a risk of $500,000. Additionally, it would have been unfair to FHC-WA to adopt its cost-savings approach but fail to evaluate its proposal with the cost-savings factored in.

Rather than indicating the Networkmaine hub issue was used as a pretext for religious discrimination as the Church posits, the System's decision to issue the second RFP, RFP #2025-031, instead demonstrates that leaving the hub in place indefinitely to save $500,000 was the actual and not pretextual reason for the System to overturn its

original decision granting the Church the winning bid. By incorporating FHC-WA's idea on the hub location (and not simply awarding the bid to FHC-WA then or later) the System's use of a second RFP gave all bidders a chance to make a new proposal that included leaving the hub in its position inside the Hutchinson Center.[3]

The Church also alleges the fact that the System assigned a relatively low point value to "Networkmaine Lease Cost" in the scoring criteria for RFP #2025-031 after overturning the initial award is evidence that the purported purpose of rescinding the initial award (the location of the hub) was pretextual, and the true reason was religious bias. RFP #2025-031 assigned eighty-five points for purchase price, ten points for contingencies, and five points for "Networkmaine Lease Cost," and required the Networkmaine hub lease to cost no more than $3,000 per year. Ex. N at 7. The Court does not view the point value assigned to the lease cost in the second RFP as unusual or evidence of pretext, however. Once the RFP incorporated the cost savings measure into all bids by requiring the hub to stay in place at a cost to the System of no more than $3,000 per year, the differences between bids on that score was limited to a relatively small universe of proposals. In all the bids under the second RFP, the System was "saving" $500,000. Heavily weighting purchase price to favor the proposal that resulted in the highest financial gain to the System does not indicate pretext.

### b.  Alleged Religious Bias

Having examined the evidence the Church argues demonstrates there were procedural anomalies in the way the System handled the RFP process for the Hutchinson

---

[3] The Church further argues that the timing of Ms. Catlin's recusal as the decisionmaker at the second level appeal is another procedural anomaly. However, the only evidence before the Court on the timing of her recusal shows that she preemptively recused herself in February of 2024, Catlin Dec. ¶ 5, long before the initial award to the Church and long before the community backlash. The Court finds no anomaly in the timing of her recusal.

Center and finding none, the only evidence the Church produces that demonstrates religious bias comes wholly from parties outside the University of Maine System. However, unlike the cases cited, rather than *adopting* the community's animosity toward the Church, the System here specifically rejected such bias. The System, in its August 22, 2024 press release, responded to the comments expressing religious animosity as follows: "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." Ex. F at 2; *Accord Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The Constitution cannot control such prejudice, but neither can it tolerate it. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). Rather than taking community opposition into consideration, the System expressly rejected any community opposition based on religious bias. Additionally, Vice Chancellor Low tried to distance himself from community conversations and articles as much as possible. Low Dec. ¶ 7. He soundly rejected FHC-WA's and WCAP's arguments that did not concern Addendum 4, including arguments about the Church's religious status. Ex. I at 2 ("I find no merits in the arguments presented and must deny the requested appeal.") and 3 ("Though I found your other assertions to be *entirely unsubstantiated*, [because of the cost savings analysis], I am obligated to rescind the original award.") (emphasis added). Vice Chancellor Low did not review the 135 citizen comments the System received about the award to the Church. Low Dec. ¶ 20.

None of the Church's cited authorities stand for the proposition that the Court can conclude solely from public opposition that the System violated the Equal Protection Clause for following its own stated procedures to rescind the award to the Church. The fact that there was religious animosity present in the community and even argued to the

System as a basis for appeal cannot mean the System is locked into a decision that it determined would result in a substantial net financial loss for it when there is no other evidence to suggest it acted on impermissible motives. This is particularly true when here, as the evidence demonstrates, the System directly disavowed the religious animosity. Ex. F at 2; Ex. I at 2-3. In sum, the Church has not produced enough probative circumstantial evidence of impermissible religious bias for the Court to conclude that it is likely to succeed on the merits of its Equal Protection Clause claim for relief.

### 2. Free Exercise

Under the Free Exercise Clause, governmental bodies must act neutrally toward religious beliefs and "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Governmental actions that are not neutral "trigger strict scrutiny under the Free Exercise Clause." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

The Church's arguments that it will likely succeed on its Free Exercise Clause claim rely on the same arguments it makes in support of its Equal Protection Clause claim. Specifically, the Court would have to conclude based on the present record that the decision to rescind the Church's award was made because of religious animosity. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 540 (1993) (applying the equal protection direct and circumstantial evidence analysis from *Vill. of Arlington Heights* to determine the "object" of a law under the Free Exercise Clause). The Church does not make any different arguments or highlight any different evidence in its arguments under its Free Exercise Clause claim that the system was motivated in whole

or in part to rescind the award because of the Church's religious status, practices, or beliefs. As discussed in detail above, though there is evidence of religious hostility from the community and from the disappointed bidders, there is no evidence of any animus on behalf of any defendant, nor are the alleged procedural anomalies merely pretext to cover for such animus or to bow to public pressure. Indeed, there is evidence the system specifically rejected the community hostility. The Court cannot conclude based on the actions of third parties alone that the System or any defendant took the actions it did because of the Church's religion. For these reasons, the Church has not carried its burden to demonstrate that it is likely to succeed on the merits of its Free Exercise Clause claim.

### C.  Irreparable Harm

Having concluded that the Church has not carried its burden to demonstrate it is likely to succeed on the merits of either claim on which it bases its motion for a temporary restraining order, the "remaining factors [are now] matters of idle curiosity." *New Comm Wireless Servs., Inc.*, 287 F.3d at 9 (1st Cir. 2002) (citing *Weaver*, 984 F.2d at 12). The Court briefly addresses irreparable harm, but having concluded the Church is unlikely to succeed on the merits, does not address the remaining two factors.

"'Irreparable injury' . . . means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). The Church argues that its injury is both constitutional and ongoing, therefore its harm is per se irreparable, citing to First Circuit case law for the proposition that "[i]t is well established that the loss of first amendment freedoms constitutes irreparable injury." *Maciera v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981). Even assuming for the purpose of this analysis that the Church has been injured at all, which it

has not established for purposes of a temporary restraining order, the injury is not ongoing. Here, any alleged injury happened at the moment the System rescinded its initial award of the RFP to the Church.[4] This is unlike a case where a plaintiff is under a continuing threat of being terminated from employment for refusing to align with a political party. *See Elrod v. Burns*, 427 U.S. 347, 351, 374 (1976).

Further, the Church has filed a Notice of Lis Pendens in the Waldo County Registry of Deeds and in this Court, giving subsequent purchasers notice of this dispute over the Hutchinson Center real estate. *See Forest City Chevrolet v. Waterford of Portland*, 172 F.Supp.2d 227, 231 (D. Me. 2001). If the Church ultimately prevails on the merits and the Court determines appropriate relief requires the unwinding of any sale between the System and WCAP, it can do so. *Id.* at 230-31. In sum, the Court cannot conclude the Church would suffer irreparable harm in the absence of extraordinary injunctive relief.

## IV.    Conclusion

"[Injunctive relief] is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank*, 672 F.3d at 8 (quoting *Voice of the Arab World, Inc.*, 645 F.3d at 26). In the absence of any direct or circumstantial evidence to connect community animus to the System's actions that would enable the Court to conclude the Church is likely to succeed on the merits of its Equal Protection Clause or Free Exercise Clause Claims due to defendants' religious discrimination, the Church's motion for a temporary restraining order is DENIED.

**SO ORDERED.**

Dated this 10th day of January, 2025.

---

[4] Counsel for the Church agreed with this characterization of the timing of the alleged injury at the January 6, 2025 oral argument on this motion.

/s/ STACEY D. NEUMANN
**STACEY D. NEUMANN**
**UNITED STATES DISTRICT JUDGE**