# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| CALVARY CHAPEL BELFAST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:24-cv-00392-SDN** |
| | ) | |
| UNIVERSITY OF MAINE SYSTEM; | ) | |
| BOARD OF TRUSTEES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' POST-HEARING BRIEF
## IN OPPOSITION TO PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Having lost its attempt to obtain a temporary restraining order after failing to demonstrate either a likelihood of success on the merits or the existence of irreparable injury, Plaintiff Calvary Church Belfast ("Calvary" or "Church") is back before this Court requesting that it enter a preliminary injunction to prevent the University of Maine System (the "System" ) from negotiating an agreement for the sale of the Hutchinson Center and then consummating that agreement. At the preliminary injunction hearing, Calvary's counsel acknowledged that the Court gave Calvary its "homework" and announced that it would show:

> [N]ot only were there procedural anomalies, the University of Maine System blew up the entire procedure.  Halfway through the procedure the University of Maine System ignored the strict and explicit requirements of RFP 2024-048, ignored their own Administrative Practice Letters, ignored the fact that they didn't even have authority under RFP 2024-048 to even consider the appeals that were presented to them by the disappointed bidders.

(Motion Hearing Transcript, March 4, 2025 ("Tr.") 7:10-18). Thus, Calvary's current theory is that the Award Protests that were submitted were Specification Protests and, as such, were submitted too late to be considered, and notwithstanding the terms of Addendum 4, there was

1

always an option to leave the hub in Room 100Y. The problem with Calvary's new theory is that the issue is not whether the System should have granted the appeal but, rather, whether its decision to grant the appeal was motivated by discriminatory animus. Calvary does not understand what a Specification Protest is, and why the protest that Ryan Low, the final decisionmaker, granted was an Award Protest. And regardless of how a third party with no experience in procurement might define Specification and Award Protests, or what the literal language of the proposed lease might say about the location of the hub, all of the evidence at the hearing established that all of the parties involved believed they were involved in an Award Protest and that the hub would move out of the Hutchinson Center. There is no evidence here of pretext.

In addition to failing to introduce evidence of pretext, the Church once again failed to introduce evidence connecting the negative comments about the Church to the System, let alone Mr. Low. And, as Calvary Pastor Huston testified, no one from the System who was involved with this process has ever said anything indicating that there was an objection to Calvary's status as a church. (Tr. 51:4-20). In fact, everything the System said was to the contrary. It acknowledged its obligation not to discriminate on the basis of religion, and specifically rejected protests based on Calvary's status as a religious organization, characterizing them as having "no merit" and "entirely unsubstantiated." (Joint Exhibit ("Ex.") 13 at pp. 2, 3). In the end, as this Court held in its order on Calvary's motion for a temporary restraining order, Calvary has failed to establish a reasonable likelihood of success on the merits.

Calvary has also failed to show that it will suffer irreparable injury in the absence of an injunction. Following this Court's denial of its motion for a temporary restraining order, it refined its theory on irreparable harm and claims now that the harm it seeks to prevent is the loss

of its ability to advance its religious mission. As Pastor Huston conceded, however, that alleged harm will continue unless and until Calvary purchases the Hutchinson Center. (Tr. 44:21-25). The proposed injunction cannot, however, relieve Calvary from the alleged harm.

For the reasons set forth below, and the reasons previously set forth in the System's Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF Doc. 38), which is expressly incorporated herein by reference, Plaintiff's motion for a preliminary injunction should be denied.

## **FACTS**

### I.    **Request for Proposal**

The transaction at issue in this case is governed by RFP # 2024-048 (the "RFP"), which includes language standard to all of the System's bid documents as well as information specific to this transaction. (Ex. 2.) The RFP is split into three parts, each addressing a different subject matter: Part 1 sets forth information and requirements pertaining to pre-submission matters; Part 2 addresses evaluation of submissions and the award; and Part 3 provides instruction about the format of responses. (Ex. 2.)

Under the procedure set forth in the RFP, interested bidders, called "Respondents", have two opportunities to submit protests. First, there is an opportunity at the beginning of the process to protest bid specifications that limit competition. Thus, Section 1.8, which is located in the pre-submission portion of the RFP, provides as follows:

1.8    Specification Protest Process and Remedies:

If a Respondent feels that the specifications are written in a way that limits competition, a specification protest may be sent to the Office of Strategic Procurement to the email address provided on the cover page of this document. Specification Protests will be responded to within five (5) business days of receipt. Determination of protest validity as at the sole discretion of the University. . . . Specification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to

3

the Deadline for Proposal Submission noted in Section 1.7.1. No protest against the award due to the specifications shall be considered after this deadline.

The purpose of a Specification Protest is to allow a Respondent to raise issues about the RFP's requirements that might prevent it from submitting a bid before submissions are made so that the System can correct those issues if justified. Rachel Piper, the Director of Strategic Procurement and Services,[1] the only witness with experience and knowledge of Specification Protests testified:

> So a specification protest is if a potential respondent who is interested in providing a response to a solicitation sees something that is written within the RFP specifications that would prohibit them from submitting and, therefore, limit competition, this allows them the opportunity to reach out to the University Strategic Procurement office and identify which areas they feel are restrictive in competition.

(Tr. 202:1- 8). The example she gave of how a specification might limit competition was a fictitious RFP for office supplies that included the requirement that delivery trucks be yellow and picture a man with a mustache – a requirement that has no substance but has the effect of eliminating all potential respondents except one. Under this hypothetical, a bidder with white delivery trucks could bring this as a specification protest to the Office of Strategic Procurement, by sending an email to the Strategic Sourcing Manager, at least five days before the time for submission of bids so that it could be addressed.

The second type of protest provided for in the RFP is an Award Protest. The provision pertaining to the Award Protest is included in the evaluation and award process section of the RFP, in part 2, and provides:

> Respondents may appeal the award decision by submitting a written protest to the University of Maine System's University of Maine System's Executive Director of Strategic Procurement and Services within five (5) business days of the date of the award notice, with a copy of the protest to the successful Respondent. The protest must contain a statement of the basis for the challenge.

---

[1] Ms. Piper is generally very experienced with procurement as she has more than 11 years of experience in procurement at the System and 32 years of experience in procurement total. (Tr. 198:2-10; 200:4-8).

The RFP goes on to provide a link to further information about the Award Protest process.

The RFP was issued on January 17, 2024, and was amended several times by Addenda issued by the System. Most relevant to this case was Addendum 4, which provided, in part:

> The Hutchinson Center presently serves as the home to one of several University of Maine System connectivity hubs, strategically located to support internet connectivity across the state. . . . Currently situated within the Hutchinson Center in room 100Y, the hub is backed up by a generator located external to the building. Relocating this critical infrastructure entails a significant financial investment for the University of Maine System.
>
> To ensure the continued provision of connectivity services to the greater coastal area, the University proposes the relocation of the hub from its current site within the Hutchinson Center to a purpose-built utility building. This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site.

(Ex. 2 at p. UMS_005836-5837).

## II.    The Respondents' Submissions

Calvary first became aware that the hub was an issue when it received Addendum 4. (Tr. 46:5-8). Addendum 4 did not make leaving the hub in room 100Y an option, (Ex. 2 at p. UMS_005836; Tr. 48:24-25), and it was always the intention of the System to move the hub out of the Hutchinson Center, (Tr. 207:16-18). The System let potential respondents know that, (Tr. 207:18-21), and Pastor Huston understood that the hub would be moved from Room 100Y inside the Hutchinson Center to an outside location, (Tr. 49:16-18).

Calvary was one of three respondents submitting a bid. (Ex. 3). The Future of the Hutchinson Center, Waterfall Arts ("FHC-WA") and Waldo Community Action Partners ("WCAP") were the other two respondents. (Exs. 4 and 5). On August 18, 2024, the System issued its Award, giving Calvary the right to negotiate a final agreement. (Ex. 6). The System spelled out its consensus scoring of each proposal in the Award Deck. (Ex. 6).

After Calvary was awarded the right to negotiate, FHC-WA and WCAP both submitted protests. FHC-WA submitted its protest on August 19, 2024. (Ex.7). The protest was titled "Notice of Protest – Hutchinson Center RFP 2024-048 Award" and was sent to the Executive Director of Strategic Procurement and Services (where Respondents are directed to send Award Protests), and not to the Office of Strategic Procurement (where Respondents are directed to send Specification Protests). FHC-WA summarized the basis of its appeal as follows:

> The other proposers each offered $1 million with no added value to the University. Using the above numbers, our proposal offers the University at least $1.9 million. This includes $1 million in cash and savings on the internet hub of at least $900,000 in strategic value that can pay real dividends to the University in the future.

(Ex. 7 at p. 3).

WCAP submitted its protest, captioned "WCAP Appeal for RFP 2024-48, University of Maine, Hutchinson Center Real Estate Offer" on August 20, 2024, and stated that it was "submitting this letter as a formal appeal of the decision to move forward with negotiations with Calvary Chapel Belfast (CCB) in protest." (Ex. 8). WCAP, like FHC-WA, sent its appeal to the Executive Director for Strategic Procurement and Services, not the Office of Strategic Procurement. In its appeal, WCAP raised several issues about the validity of the scoring.

On August 30, 2024, Ms. Piper issued her decisions, entitled "Response to Award Protest to RFP 2024-048" denying both appeals. (Exs. 11 and 12). Both FHC-WA and WCAP submitted appeals of her decision, which were considered by the System's Vice Chancellor for Finance and Administration and Treasurer, Ryan Low. In his letter to FHC-WA dated September 12, 2024, Mr. Low described his decision as follows:

> While I found the university's process had full transparency and integrity and adhered to long-standing public procurement policies, after a thorough review, I agree with your assertion that the evaluation criteria did not allow for due consideration of all materially relevant financial details associated with both the

real property sale and the maintenance in perpetuity of the Networkmaine internet hub.

(Ex. 13 at p. 3). Mr. Low went on to note that:

> Specifically, in Addendum 4, the University of Maine System (UMS) stated that in the event of a real property sale, its existing Networkmaine hub within the Hutchinson Center would need to be relocated to a secured purpose-build utility building on the property in order to maintain internet connectivity for midcoast institutions. As the addendum noted, "This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site." While other Respondents proposed favorable lease arrangements and access to the property, FHC-WA's creative alternative offer to allow the hub to permanently remain within the existing building would significantly reduce the cost of site work, new construction and relocation for the System.

(Ex. 13 at p. 3). Mr. Low then addressed why his determination was different than Ms. Piper's:

> In ruling on your Aug. 19, 2024 protest as it relates to this point, the Executive Director of Strategic Procurement dismissed FHC-WA's claim about "its value-added proposition" because the university's original RFP and related evaluation criteria had not taken so-called cost avoidance into consideration. While that is true, as vice Chancellor for Finance & Administration, I uniquely appreciate that the avoidance of hundreds of thousands of dollars in relocation expenses presents clear financial and operational benefits that are decidedly in the best interests of the System and thus should have been valued in the criteria by which all proposals were scored.

(Ex. 13 at p. 3).

After the original award was overturned on appeal, the System issued a new RFP. The provisions of the second RFP with regard to location of the hub were the polar opposite of the first. As Pastor Huston testified:

> Q. So in the first RFP, the provision was that [the hub] would move outside the building, correct?
> A. Yeah.
> Q. And the second RFP was that it would stay within the building, right?
> A. Yes.

(Tr. 49:16- 21).

All three of the initial Respondents responded to the second RFP which was awarded to WCAP, as WCAP's offer was $1.26 million higher than FHC-WA's offer and $2 million higher

than the Church's offer. Following Calvary's unsuccessful appeal, it filed this lawsuit, together with a motion for temporary restraining order and preliminary injunction, and a Notice of Lis Pendens. While the Church may have done some "homework" after being denied the temporary restraining order, it did not do enough to meet its burden for a preliminary injunction.

## ARGUMENT

### I.    Standard for Injunctive Relief

This Court considers four factors when considering a request for a preliminary injunction: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Calvary Chapel of Bangor v. Mills*, 459 F. Supp. 3d 273, 282 (D. Me. 2020) (quoting *Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006)). While the Church asserted eight claims in its Complaint, it based its motion for a preliminary injunction on two—its Free Exercise[2] and Equal Protection claims. The Church cannot show a likelihood of success on the merits of either of these claims and, thus, is not entitled to relief. Even if it could show a likelihood of success, there is no irreparable harm, and the balance of the equities and public interest weigh against injunctive relief.

### II.    The Church Does Not Have a Likelihood of Success on the Merits

The Church failed to introduce evidence at the hearing showing selective treatment or discriminatory intent by the System and, therefore, cannot establish a likelihood of success on its

---

[2] As set forth in detail in the System's Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF Doc. 38, PageID #: 284-285), and incorporated herein by reference, this is simply not a Free Exercise case where there is no law that has or could unfairly burden the Church's religion. Even if it were, the same analysis discussed below for the Equal Protection claim would apply, and the Church's claim would fail.

Equal Protection claim (Count I). Under the Equal Protection Clause, "similarly situated persons are to receive substantially similar treatment from their government." *Davis v. Coakley*, 802 F.3d 128, 132 (1st Cir. 2015) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)). "To establish an equal protection claim, a plaintiff needs to allege facts showing that '(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 133 (quoting *Rubinovitz v. Rogato,* 60 F.3d 906, 910 (1st Cir.1995)). "Plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression." Order Denying Motion for Temporary Restraining Order (ECF Doc. 48, PageID #: 397) (hereinafter, "TRO Order") (quoting *Buchanan v. Maine*, 464 F. 3d 158, 178 (1st Cir. 2006) (quoting *Rubinovitz*, 60 F.3d at 910) (emphasis in *Buchanan*) (alteration and omission in *Rubinovitz*).

Here, although the Church was similarly situated to the other respondents, WCAP and FHC-WA, the Church failed to introduce any evidence to show that the System engaged in selective treatment or acted with discriminatory intent. Instead, as evidenced at the hearing, the System treated all respondents equally throughout the RFP process. The Church could have met its burden with direct or circumstantial evidence of discriminatory intent. TRO Order (ECF Doc. 48, PageID #: 398) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977)). In a case such as this, where there is no direct evidence of discriminatory intent, circumstantial evidence of discriminatory intent may include "'[t]he historical background of the decision,' '[t]he specific sequence of events leading up to the challenged decision,' '[d]epartures

from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" TRO Order (ECF Doc. 48, PageID #: 398) (quoting *Valentin v. Town of Natick*, 633 F. Supp. 3d 366, 374 (D. Mass. 2022) (quoting *Vill. of Arlington Heights*, 429 U.S. at 267-68)). In its attempt to show circumstantial evidence of discriminatory intent, the Church introduced testimony and documents relating to alleged procedural irregularities in the System's RFP process and comments from the public and other respondents about the Church. However, the evidence at the hearing showed that the System followed its RFP process, including properly treating WCAP's and FHC-WA's protests as Award Protests, and that no one involved in the RFP process, including the final decisionmaker Mr. Low, made any negative comments about the Church and, in fact, rejected all such comments from the public and respondents.

### A. The System Followed the Proper Procedure

The evidence at the hearing clearly established that that the System followed its RFP process, including treating WCAP's and FHC-WA's protests as Award Protests, and that when Mr. Low made his decision, he believed it was necessary to save the System $500,000.

### i. The Award Protests

After the System awarded the RFP to the Church, FHC-WA and WCAP submitted Award Protests pursuant to Section 2.5 of the RFP. In an attempt to show procedural irregularity, the Church erroneously asserts that the protests were Specification Protests under Section 1.8 of the RFP and, thus, were untimely and should not have been considered. This assertion is based on the Church's fundamental misunderstanding of a Specification Protest. Moreover, it ignores Mr. Low's correct and genuine understanding that the protests were Award Protests.

First, under the plain language of Section 1.8, a Specification Protest is appropriate if it relates to a specification that limits competition. Section 1.8 provides, in pertinent part, "[i]f a

Respondent feels that the *specifications are written in a way that limits competition*, a specification protest may be sent to the Office of Strategic Procurement to the email address provided on the cover page of this document." (Ex. 2, at p. UMS_005631) (emphasis added). Ms. Piper, the only witness with experience and knowledge related to Specification Protests, explained at the hearing "it might be challenging for folks who don't live with this language every day to understand that the specification protest is a clause within the RFP that is set up specifically to prohibit or allow people to bring forward to the University concerns where they feel that the specifications are limiting competition." (Tr. 190:20-25). After Ms. Piper explained that a specification protest must be about a specification that limits competition, the Church's counsel suggested "all specifications of the RFP are specifically tailored to competition because the request for proposal is a competitive process…" to which she responded, "[n]o, I don't agree with what you're saying." (Tr. 175:5-9).[3]

Under the Church's theory, all protests relate to the terms, conditions, or specifications of an RFP, and would be Specification Protests because the RFP process is a competitive process. This theory is plainly incorrect under the language of the RFP in Section 1.8 and Section 2.5. Whether intentionally or unintentionally, the Church refuses to acknowledge that FHC-WA's appeal was based on the scoring committee's application of the scoring criteria to its submission. Specifically, it was not until after the award was made that FHC-WA knew, or could have known, that it would not be awarded any points for cost avoidance measures included in its

---

[3] *See also* Tr. 203:15-18 (When asked if either or both protests should have been treated as a Specification Protest, Ms. Piper answered "[a]bsolutely not"); Tr. 190:8-11 ("It was clear to me that these letters that I received were valid award protests and would not – were not protests that would be categorized as specification protests."); Tr. 191:5-8 ("I don't believe that the award – I'm sorry, the protests that were received were specification protests as they are defined in our APL in our use and practice in the work that we do at the University."); Tr. 203:18-25 ("I don't think that either of the protests that were received met the definition of a specification protest. … It had to do with the award and the evaluation. And those are things that were unknown to all respondents until the award was made and subsequent material and how the award was made public to the parties who inquired.").

submission. Because FHC-WA could not have known this information five days prior to the submission deadline, it could not have filed a protest on that basis. (Tr. 204:1-19) (Ms. Piper explaining when a respondent agrees to the scoring criteria, they are not agreeing to how the scoring criteria is going to be applied as they would not know how it is going to be applied until after the proposals are scored and an award is made). Moreover, the fact that scoring criteria does not take into account cost avoidance measures does not limit competition within the meaning of a Specification Protest. As evidenced by Ms. Piper's example, a specification that limits competition is a requirement, such as that all vendors drive a yellow van, that would preclude vendors with white vans from responding to the RFP even if they were otherwise qualified to perform under the RFP.

Second, Mr. Low, the final decisionmaker, believed that the protests were Award Protests under Section 2.5 and that they were properly before him for consideration. (Tr. 103:13-18; 106:9-12; Tr. 107:6-11). Indeed, everyone believed that FHC-WA's and WCAP's protests were Award Protests. This is evidenced by the fact that the Award Protests were submitted in accordance with the Award Protest procedure (i.e. they were submitted to Ms. Piper as the System's Executive Director of Strategic Procurement and Services within five days of the award and were not submitted to Ms. Cyr the Strategic Sourcing Manager), and the language used in the protests and the responses to the protests. *See, e.g.*, (Tr. 178:7-11) (Ms. Piper explaining she "received two award protests after the award notification"); (Ex. 7, at p. 1) ("This letter is notice of written protest of the award decision issued on August 14, 2024.); (Ex. 9, at p. 1) ("This letter is a second notice of written protest of the award decision issued on August 14, 2024, regarding the Hutchinson Center in Belfast."); (Ex. 11, at p. 1) ("I am responding to your letter received on August 19, 2024 representing The Future of the Hutchinson Center Steering

Committee and Waterfall Arts, regarding the protest of the award for RFP 2024-048: University of Maine Hutchinson Real Estate Offer."). These were the materials that Mr. Low had before him at the time he considered the protests. (Tr. 102-106). Thus, even if the appeals were Specification Protests—which they were not—there is no evidence that anyone at the System, let alone Mr. Low, understood that at the time or intentionally treated them incorrectly.

### ii.    Mr. Low's Decision

Mr. Low granted FHC-WA's award protest to avoid the approximate $500,000 cost of moving the internet hub out of Room 100Y in the Hutchinson Center. (Ex. 14, at p. 4; Tr. 74: 16-19). In a further attempt to show procedural irregularity, the Church focuses on the word "option" as it appears one time in the lease associated with Addendum 4, and completely disregards the fact that the System, including Ms. Piper and Mr. Low, and the respondents, including the Church, understood that under the terms of the RFP, the internet hub was going to be moved outside of the Hutchinson Center.

As Mr. Low testified, at the time he decided on the protests, it was his understanding "[t]hat we were going to proceed in two phases, an initial phase where were going to stay in 100Y but then, ultimately, move to a location outside of the Hutchinson Center." (Tr. 109:10-13). *See also* (Tr. 109:20-24) ("My understanding was that we were proceeding at some point to phase 2 and moving the data center out of room 100Y to an off-site location."); (Tr. 110:11-16) (explaining that at the time he made his decision, based on the lease, he understood "[t]hat in the short term [the data hub] would be in room 100Y, and then it would move to a site outside of the Hutchinson Center building."). When asked about the "option" language in the lease, Mr. Low testified that the first time he understood that to mean a possible relocation of the internet hub was at his deposition. (Tr. 110:21-24); (Tr. 62:11-21) ("Q. And just like with the option to extend

the lease term that we looked at a few minutes ago, sir, you understood what the 'option to permanently relocate' the internet hub meant in this context, didn't you? A. No. I'm going to say – when I reviewed the materials, when I sat down to look at this, everything in the materials that I review[ed] led me to believe that there was going – this was going to move to phase 2. So, I mean, I understand the word 'option.' I see what it literally says. But my thinking was all this was moving towards phase 2."). While the Church wants to suggest that this could not be so, the evidence shows that everyone, including the Church, shared this belief. When Pastor Huston was questioned on direct about the lease, he testified that he understood the lease to mean "[t]hat the hub would stay there [in Room 100Y] until it was moved at a certain point." (Tr. 27:17-20). Then again, during cross-examination, Pastor Huston testified that when he received Addendum 4, he understood that, ultimately, the hub would be moved outside. (Tr. 49:4-8). Pastor Huston further testified that the internet hub was treated differently in the first RFP than in the second RFP and, specifically, that the first RFP provided for the internet hub to be moved outside of the Hutchinson Center, and that the second RFP provided for the internet hub to stay within the Hutchinson Center. (Tr. 49:9-21).[4]

Because it was Mr. Low's understanding at the time that the RFP required the internet hub to be moved outside of the Hutchinson Center, he believed that he needed to grant FHC-WA's protest for the System to avoid the $500,000 cost. Notwithstanding the Church's adamance that the lease allowed the System to keep the internet hub in Room 100Y inside the Hutchinson Center for the term of the lease (as opposed to, for example, giving the System the

---

[4] At the hearing, the Church's counsel tried to suggest that the lease should be given more weight than all of the other documents because the lease is what the parties would have signed. Yet, as Ms. Piper pointed out, the lease was a draft lease and not a final lease, (Tr. 211:4-10, 214:4-10), and the language in Addendum 4, which was copied and pasted into the Award Deck, was very clear that the internet hub was going to be moved in Phase 2, (Ex. 2, UMS_005836; Ex. 6 UMS_005848).

option to move the internet hub from Room 100Y to a purpose-built utility building *on* the Hutchinson Center property rather than from Room 100Y to a location *off* of the Hutchinson Center property—which Addendum 4 and the lease both referenced as being a costlier option), at the time the decision was made, Mr. Low, along with Ms. Piper and the RFP respondents, believed it was going to be moved. The fact that Mr. Low held that belief, and acted pursuant to that belief, is not evidence of procedural irregularity.

After Mr. Low reviewed FHC-WA's appeal, including its proposal to keep the internet hub inside the Hutchinson Center to avoid the $500,000 costs, he "reviewed the other proposals to see if [he] could understand how that was being handled across all three proposals." (Tr. 111:4-11). Mr. Low did not see anything in the other proposals committing to leaving the internet hub inside the Hutchinson Center. (Tr. 111:19-22).[5] Thus, as was true at the temporary restraining order stage, "[t]here is no evidence at this stage to suggest any party, let alone the System – the party in charge of the RFP and owner of the property – had ever contemplated leaving the hub in place indefinitely until FHC-WA proposed it by way of its appeal to the original RFP." TRO Order (ECF Doc. 48, PageID #: 404).

---

[5] While the Church appears to suggest that it did agree to keep the internet hub inside the Hutchinson Center, there was nothing in the materials submitted to Mr. Low, or submitted as evidence to the Court, reflecting that agreement. First, the press release that the Church asked about at the hearing noting that the Church agreed to lease "a carve-out of space" in perpetuity was not specific to inside the Hutchinson Center, but instead reflected the reality that all respondents were required to agree to enter into a lease with the System to ensure the System could access the internet hub in perpetuity, which everyone understood would occur outside of the building. (Ex. 20.) Second, the email exchange between Mr. Stutheit and Ms. Cyr shows that the Church was negotiating the placement of the internet hub outside of the Hutchinson Center, including things like shrubs to improve the appearance of the purpose-built utility building that was going to be constructed on the property. (Ex. 21.) Third, the award deck does not show that the Church agreed to keep the internet hub inside the Hutchinson Center, whereas it does show that FHC-WA agreed to do so. (Ex. 6, UMS_005844 & UMS_005846). The Church made much of the fact that the Award Deck noted FHC-WA's agreement to negotiate Phase 1 shared space to effectively meet the needs of both parties was listed under key considerations, but really, what the Award Deck shows is that FHC-WA was the only respondent that offered to keep the internet hub in Room 100Y yet it was not awarded any points for the cost avoidance associated with that offer.

Where Mr. Low, and the System, operated with the understanding that under the first RFP the internet hub was going to be moved from Room 100Y, it was not something that could be negotiated with the winning bidder. Section 2.4 of RFP # 2024-048 provides "negotiations [with the successful bidder] may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." (Ex. 2, at p. UMS_00563). As this Court previously noted, "[n]ot only would suddenly housing the Networkmaine hub in the Hutchinson Center for the life of the lease itself been a material change to the project (and thus the RFP), the estimated cost savings of $500,000 would have significantly changed the proposal and therefore also been a violation of the RFP's directive to disallow any significant term changes." TRO Order (ECF Doc. 48, PageID #: 404). Moreover, after FHC-WA raised the cost avoidance measure, it would have been unfair for the System to adopt its recommendation but fail to evaluate its proposal with the cost avoidance measure factored into the scoring.

Ultimately, even if the System could have kept the internet hub inside Room 100Y indefinitely, no one participating in the RFP process understood that to be the case. Accordingly, Mr. Low granted the protest and the System issued a second RFP that clearly and expressly provided for the internet hub to remain in Room 100Y for the life of the lease. As this Court previously concluded, "[r]ather than indicating the Networkmaine hub issue was used a pretext for religious discrimination as the Church posits, the System's decision to issue the second RFP, RFP #2025-031, instead demonstrates that leaving the hub in place indefinitely to save $500,000 was the actual and not the pretextual reason for the System to overturn its original decision granting the Church the winning bid." TRO Order (ECF Doc. 48, PageID #: 405). Indeed, "[b]y incorporating FHC-WA's idea on the hub location (and not simply awarding the bid to FHC-WA

then or later) the System's use of a second RFP gave respondents a chance to make a new proposal that included leaving the hub in its position inside the Hutchinson Center." TRO Order (ECF Doc. 48, PageID #: 405). As Ms. Piper testified, the System's appeals process worked "exactly how its [sic] set up to work." (Tr. 224:7-23).

### B.  The System's Decision was Not Affected by Impermissible Animus

The evidence at the hearing clearly established that neither the System nor Mr. Low made any negative comments about the Church and that both the System and Mr. Low rejected all such comments from the public and respondents.

As this Court previously noted, under the applicable case law, "impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share them." TRO Order (ECF Doc. 48, PageID #: 401). This Court further noted, "[h]owever, it is equally clear there must be some showing connecting the animus in the community to the government action." TRO Order (ECF Doc. 48, PageID #: 401) (citing *A.F.P.S.*, 740 F. Supp. at 105; *Town of Clarkton*, 682 F.2d at 1066; *Jesus Christ is the Answer Ministries, Inc.*, 915 F. 3d at 263-65; and *Valentin*, 633 F. Supp. 3d at 375).

The Church did not introduce evidence at the hearing connecting the animus in the community to Mr. Low's decision. Though Plaintiff's counsel reviewed several emails from citizens, former employees, legislators, and donors with Ms. Cyr, none of the emails were sent to Mr. Low or included in the materials he reviewed in making his decision. (Exs. 16, 17, 18, 19; Tr. 107:23-108:4). As Mr. Low testified, the materials he reviewed in making his decision on the appeals included the RFP, the Addenda including Addendum 4, the submissions, the appeals, and Ms. Piper's decision on the appeals. (Tr. 107:23-108:4). As soon as Mr. Low learned that he

was going to serve as the final decisionmaker for the RFP he removed himself from all conversations about the Hutchinson Center and did not read news articles about the Hutchinson Center. (Tr. 100: 4-15). The only impermissible comments that Mr. Low reviewed were in WCAP's and FHC-WA's appeals, which he expressly rejected and determined had no merit. (Ex. 13 at p. 1 ("I find no merits in the arguments presented and must deny the requested appeal."); *Id.* at p.3 ("Though I found your other assertions to be *entirely unsubstantiated*, I am obligated to rescind the original award [because of the cost savings analysis].") (Emphasis added)). Further, the System expressly rejected impermissible comments from the Community. In its August 22, 2024, press release, the System wrote "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." (Ex. 20). Pastor Huston testified that he never heard anyone from the System who was responsible for the RFP process say anything negative about the Church. (Tr. 50:4-11). Instead, he testified that he assumed that the decision to grant the appeal was because of religious discrimination. (Tr. 50:16-19).

These facts are readily distinguishable from the facts in cases where courts concluded there was evidence to support an inference of discriminatory animus. *See* TRO Order (ECF Doc. 48, PageID #: 401-402) (discussing *A.F.P.S.*, 740 F. Supp. at 105; *Town of Clarkton*, 682 F.2d at 1066; *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 263-65; and *Valentin*, 633 F. Supp. 3d at 375). As this Court previously held, "[n]one of the Church's cited authorities stand for the proposition that the Court can conclude solely from public opposition that the System violated the Equal Protection Clause for following its own stated procedures to rescind the award to the Church. The fact that there was religious animosity present in the community and even argued to the System as a basis for appeal cannot mean that the System is locked into a decision that it

18

determined would result in a substantial net financial loss for it when there is no other evidence to suggest it acted on impermissible motives." TRO Order (ECF Doc. 48, PageID #: 407).

### III.   The Church Will Not Suffer Irreparable Harm

This Court previously held that "any alleged injury happened at the moment the System rescinded its initial award of the RFP to the Church" and the Church's counsel agreed with that characterization. TRO Order (ECF Doc. 48, PageID #: 409). However, at the hearing on the preliminary injunction, the Church identified a new alleged injury: because the Church is not in the Hutchinson Center, it has space constraints that prevent the Church from spreading its religious mission as much as it would like. Notwithstanding Pastor Huston's testimony to this effect, he also testified some people are "not excited about being crammed in a room, so they'll watch online instead." (Tr. 40:10-14). Pastor Huston also confirmed that "[w]e supply our out-of-state attendees with live-stream and radio option for our gatherings on Sundays and Thursdays. These options are also heavily utilized with the local community who are unable to make it in to the service." (Tr. 39:24-40:5). Thus, the Church's own testimony undercuts any argument that it is unable to spread its religious mission due to space constraints.

Even if the Court were persuaded that there is some limitation on the Church's ability to spread its religious mission and that limitation constitutes an irreparable injury, the injunction that the Church requested would not remedy that injury. As set forth in its prior motion, "[t]he Church respectfully asks this Court to issue an injunction preventing UMS from awarding or transferring ownership of the Hutchinson Center to any other bidder or purchaser while this litigation proceeds." (ECF Doc. 3, PageID #: 178.) Such an injunction would not remedy the Church's alleged injury. Instead, all it would do is further harm the System by preventing the System from negotiating with the rightful winner of the RFP for the Hutchinson Center to close

on the sale of the property in exchange for the $3 million offer—money that the System is entitled to and desperately needs. In a case such as this, where the requested injury is not likely to remedy the alleged irreparable harm, an injunction is inappropriate and should not be granted. "To show irreparable harm, a plaintiff must 'demonstrate that irreparably injury is *likely* in the absence of an injunction', not merely that it is a possibility." *Crosspoint Church v. Makin*, 719 F. Supp. 3d 99, 125 (D. Me. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis in original).

Finally, with respect to the sale of the property, this Court has already held that by virtue of the Notice of Lis Pendens filed in the Waldo County Registry of Deeds, the Church has given purchasers notice of this dispute and "[i]f the Church ultimately prevails on the merits and the Court determines appropriate relief requires unwinding of any sale between the System and WCAP, it can do so." TRO Order (ECF Doc. 48, PageID #: 409) (citing *Forest City Chevrolet v. Waterford of Portland*, 172 F. Supp. 2d 227, 231 (D. Me. 2001)). The status quo with respect to the sale of the Hutchinson Center will be preserved by virtue of the Notice of Lis Pendens regardless of whether the System proceeds with the negotiation and sale and there is no reason for the Court to exercise its equitable powers.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, the Church is not entitled to injunctive relief and its motion for a preliminary injunction should be denied.

Dated: March 31, 2025

/s/ Jeana M. McCormick
Jeana M. McCormick
Melissa A. Hewey
*Attorneys for Defendants*

**DRUMMOND WOODSUM**

84 Marginal Way, Suite 600
Portland, Maine 04101-2480
(207) 772-1941
jmccormick@dwmlaw.com
mhewey@dwmlaw.com