UNITED STATES DISTRICT COURT
DISTRICT OF MAINE
Bangor Division

| | |
|---|---|
| CALVARY CHAPEL BELFAST, | |
| *Plaintiff*; | |
| v. | Case No. 1:24-cv-392-SDN |
| UNIVERSITY OF MAINE SYSTEM, et al., | **INJUNCTIVE RELIEF SOUGHT** |
| *Defendants*. | |

## PLAINTIFF'S POST-HEARING PRELIMINARY INJUNCTION BRIEF

Plaintiff Calvary Chapel Belfast, pursuant to the Court's Order (dkt. 59) and March 17 Entry, submits this post-hearing brief in support of its motion for preliminary injunction (Dkt. 3).

### INTRODUCTION

Based on the limited record before it, the Court concluded in its Order denying Calvary Chapel's Motion for Temporary Restraining Order (dkt. 48, "TRO Order") that "suddenly housing the Networkmaine hub in the Hutchinson Center for the life of the lease" would have "itself been a material change to the project (and thus the RFP)." (TRO Order, 18.) The Court noted that "[t]here is no evidence at this stage to suggest any party, let alone the System – the party in charge of the RFP and owner of the property – *had ever contemplated leaving the hub in place indefinitely until FHC-WA proposed it*." (*Id.* (emphasis added).) The record evidence presented to the Court at the preliminary injunction hearing now confirms that, not only did UMS contemplate housing the Networkmaine hub indefinitely in  its current location, but UMS explicitly drafted for itself the option to do just that, and included that option in a Lease Agreement that it made a material term and condition of RFP 2024-048. And, because that option to keep the hub in place indefinitely was included in a Lease Agreement that became a term of RFP 2024-048, all bidders knew about it, acknowledged it, and were required to accept it. Moreover, UMS's officials reviewing the

responses to RFP 2024-048 used Calvary Chapel's offer to leave the Networkmaine hub in place "in perpetuity" as a "key consideration" in their rationale for awarding it to Calvary Chapel in the first place. Nevertheless, despite all of this, Defendant Low maintains that his sole rationale for rescinding Calvary Chapel's award was the purported "cost savings" of being able to leave the Networkmaine hub in place for the life of the Lease – *an option that UMS already had contractually reserved for itself and made part of the RFP*. The undisputed evidence therefore confirms that Defendant Low's rationale was not necessary, and was therefore pretextual.

And, that pretextual basis manifested in Low granting an appeal that Low himself admitted he had no authority to even consider under the plain terms of RFP 2024-048:

> Q.   *And because FHC-WA's objection to cost avoidance measures, or the lack thereof, was not timely submitted, under Section 1.8 of the RFP, the University could not consider those objections when they were ultimately submitted after the fact. Isn't that a fact, sir*?
>
> A.   *If they had not challenged the cost avoidance five days before, yes. I agree*.
>
> Q.   *Thank you, sir. And yet you not only considered FHC-WA's appeal as to cost avoidance measures, but you ultimately granted it and you rescinded the award to Calvary Chapel on that basis. Isn't that true*?
>
> A.   **That's correct**.

(Dkt. 60, Tr., 90:22–92:2 (emphasis added).)

There is no dispute in the record that there was significant community opposition to Calvary Chapel's award under RFP 2024-048, and that the opposition was solely based on its religious beliefs. This Court recognized it. (TRO Order, 19-21.) The appeals to the initial award all included the Church's religious beliefs as a basis for rescinding the award. (Dkt. 1-4, 1-5.) UMS was forced to respond to the significant community opposition to Calvary Chapel's religion. (Dkt. 1-6.) The record evidence demonstrates that the religious opposition manifested in the form of long-time donors (some of whom contribute significantly to UMS) explicitly threatening to withhold financial support from UMS if it did not rescind the award to Calvary Chapel, from

decades-long employees, from legacy alumni, and from legislators in Maine who threatened to without legislative support for UMS if it did not rescind the award. (Evidentiary Hearing Joint Exhibits, "J. Ex.," 16-19.)

Finally, in its TRO Order, the Court indicated—based on a limited record—that Calvary Chapel had not demonstrated ongoing irreparable injury. (TRO Order, 21-22.) The undisputed record evidence now before the Court confirms that Calvary Chapel is suffering irreparable constitutional injury to its religious mission *each day* that it is not put back in its rightful place as the awardee under RFP 2024-048. Calvary Chapel is severely hindered in its religious exercise and mission by its inability to conduct that exercise and mission in the adequate facilities that it had won the right to purchase, and by having to use inferior and inadequate facilities instead. No amount of financial relief, and not even a rightful change of ownership, at the end of protracted litigation could ever restore what Calvary Chapel is losing now, each and every day. Immediate relief is therefore necessary to forestall additional, ongoing, and irreparable harm. The preliminary injunction motion should therefore be granted.

## ARGUMENT

## I.    Calvary Chapel Has Demonstrated A Likelihood Of Success On The Merits.

In the equal protection context, "[t]he specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977). "Departures from the normal procedural sequence" can show "evidence that improper purposes are playing a role." *Id.* "Substantive departures too may be relevant." *Id.*[1] Here, the undisputed record now before the Court demonstrates that Defendant Low's decision to rescind Calvary Chapel's award included

---

[1] Calvary Chapel hereby incorporates the legal and substantive arguments of its Motion for Preliminary Injunction (dkt. 3) and its Reply in Support of Preliminary Injunction. (Dkt. 45.)

both substantive departures, including ignoring the explicit terms of RFP 2024-048 that already addressed and remedied his purported rationale for rescinding Calvary Chapel's award, and procedural departures, including ignoring the fact that UMS was prohibited from considering the untimely appeals submitted to the terms, conditions, and specifications of RFP 2024-048.

Defendant Low's undisputed sworn testimony confirms that he rescinded Calvary Chapel's award on the basis of an appeal he was explicitly prohibited from even considering.

**A.    The undisputed evidence in the record demonstrates that Defendant Low's decision to rescind Calvary Chapel's award substantively departed from RFP 2024-048 because UMS never faced any actual requirement to expend any money moving the internet hub.**

**1.    The undisputed evidence in the record shows that UMS had contemplated leaving the hub in place indefinitely, and included a provision in the Lease to give itself the sole and unquestioned option to keep the internet hub in place for 60 years without incurring any moving costs.**

RFP 2024-048 explicitly and unequivocally provided that UMS had sole and unquestioned discretion to leave the network hub in place for 60 years–the life of the Lease agreement included with the RFP–without ever spending a dime to move it. (*See* J. Ex., 2, at UMS005658 ("Term: The term of this Lease shall be from July 1, 2024 until June 30, 2044. At the expiration of the base term of his Lease, the term may be extended at the option of the [University] in a writing signed by both parties, for 2 additional term(s) of 20 years each.").) The undisputed sworn testimony from every UMS witness demonstrated that UMS had given itself this unfettered discretion, that UMS knew about it, and that the parties agreed to it:

Q.    So this lease that the University made part of the RFP had an initial 20-year term until 2044?
A.    That's correct.
Q.    And at the expiration of that term, the University would have the option to extend this lease for another 20 years and then the option to extend it for yet another 20 years after that, correct?
A.    Correct.

Q.      Now, when you reviewed this document to decide the appeal, you understood what the "option to extend" meant?

A.      Correct.

Q.      You understood that the University had the option to extend, which meant that it could extend the agreement for up to 60 years, but it was not obligated to actually do so? You understood that the University could choose to let the lease expire after the first 20 years in 2044?

A.      Could it have done that? Yes.

Q.      Or it could choose to go until 2064?

A.      Correct.

Q.      Or to go -- it could chose to extend it until 2084?

A.      Also correct.

Q.      So you understood the option to extend or the decision to extend belonged exclusively to the University, correct?

A.      Correct.

Q.      And so you understood that it was entirely up to the University to decide whether to exercise that option or not?

. . .

A.      Sure, yes.

(Tr., 56:24–58:25.) Indeed, as Low confirmed,

Q.      So the University could, *but was not obligated to*, proceed to phase 2 and to actually relocate the hub. Isn't that a fact?

A.      That is what the language says, yes.

Q.      The University had the right, in its discretion, to keep the internet hub in the exact same location where it was in the phase 1 status for the entire initial 20-year term of the lease. Isn't that a fact?

A.      It could have done that, yes.

Q.      *And then, if the University chose to extend the lease for two additional 20-year terms, the University had the discretion and the option to maintain the internet hub in that phase 1 status and its current location for a total of 60 years, correct?*

A.      *Also correct.*

Q.      *So under the lease agreement that the University made part of the RFP and required all bidders to accept, the University retained the right for itself to keep the internet hub in its current site for the entire 60-year life of the lease?*

A.      *That is what the term says it could do.*

Q.      And it was solely in the University's discretion as to when it would ever move from phase 1 to phase 2, and that period could be up to 60 years?

A.      Correct.

Q.      *Now, the terms of this lease agreement that the University included in the RFP, then, made it completely within the University's control to extend the internet hub in its current location for that long, for the entire life of the lease?*

5

A.    *I agree that's what the language would allow.*
Q.    *And the ultimate determination of whether the University should keep the internet hub in its current location for the 60-year life of the lease or to instead spend up to $500,000 to move it to a different location lies solely in the hands of the University, correct?*
A.    *According to this language, yes. Correct.*

(Tr., 67:10–69:24 (emphasis added).)

Defendant Piper likewise testified that UMS reserved for itself the option, in the terms of RFP 2024-048, to leave the Networkmaine hub in place for up to 60 years without incurring a dime to move it. (Tr., 210:9–211:21; Tr. 212:8-–212:13.) And Defendant Cyr, as the facilitator of all information for RFP 2024-048, also confirmed it. (Tr., 147:12–148:24.)

> **2.    The undisputed evidence in the record demonstrates that, not only did UMS include for itself the option to leave the hub in place for 60 years, UMS officials viewed Calvary Chapel's offer to leave it in place "in perpetuity" as a "key consideration" in granting it the award.**

In addition to the record evidence now showing that RFP 2024-048 already contemplated UMS having the option to leave the Networkmaine hub in place for 60 years, the evidence also shows that Calvary Chapel's offer to leave the hub in place "in perpetuity" was a "key consideration" in granting it the initial award. (*See* J. Ex. 20, dkt. 1-6, Press Release ("The top-scoring proposal offered a $1 annual lease agreement *in perpetuity* for carve-out space so that UMS can continue to maintain internet connectivity.") (emphasis added).) Defendant Low testified that, contrary to prior assumptions (TRO Order, 18), FHC-WA was not the first (or only) proposal to offer keeping the Networkmaine hub in place for the life of the lease. (Tr., 119:2–120:7.) UMS's own Award Deck noted that the proposals concerning the Networkmaine hub were "key considerations" in granting the initial award to RFP 2024-048. (J. Ex. 6, at 6.) Defendant Cyr's undisputed sworn testimony confirmed that Calvary Chapel's offer to keep the Networkmaine hub in place in perpetuity was a "key consideration" in granting the award to Calvary Chapel. (Tr.,

150:5–151:1.) Thus, the record evidence has demonstrated that not only did the parties contemplate leaving the hub in place, and not only had Calvary Chapel already proposed leaving the Networkmaine hub in place, but that UMS officials believed that was a "key consideration" in grating it the award. As such, the record has now provided the Court's with evidence that FHC-WA was not the first to propose the "cost-savings approach." (Tr., 119:2–120:7.)

### 3. Defendant Low admitted that his sole basis for rescinding Calvary Chapel's award was the "cost-savings" rationale.

Defendant Low, the individual given sole authority to adjudicate final appeals over RFP 2024-048, admitted that his sole basis for rescinding Calvary Chapel's award under RFP 2024-048 was the purported "cost savings" rationale.

> Q.   I'm going to read along your testimony, and then I'll ask you if I read it correctly. Paragraph 12. "Although I similarly saw no merit to most of the points in the appeal filed by FHC-WA, I was intrigued by one point made relative to placement the of the regional Networkmaine internet hub. Although the RFP, in addendum 4, specified that the internet hub would be relocated from its current site within the Hutchinson Center to a purpose-built utility building outside of the Hutchinson Center, FHC-WA proposed leaving the internet in its current site for the life of its lease. FHC-WA characterized this as a 'value-added proposition' but it appeared to me that if it was possible to do as FHC-WA proposed, it would result in cost savings to the System of approximately $500,000, based on the System's previous estimates of the cost for relocation of the hub. . . ."
> Sir, did I read your testimony to this Court correctly?
> A.   You did.
> Q.   And this was the one and only ground upon which you rescinded RFP 2024-048, correct?
> A.   That is correct.
> Q.   FHC-WA proposed leaving the internet hub in its current site for the 60-year life of the lease, thereby saving the University $500,000 in relocation costs. That was your understanding?
> A.   Correct.
> Q.   *And you found this proposal intriguing, even though the lease agreement that the University made part of RFP 2024-048 already allowed the University to keep the internet hub in its current site for the 60-year life of the lease, correct*?
> A.   *Correct.*

> Q. *And you found this proposal intriguing even though the University was already under no legal obligation to incur any expense to relocate the hub because the lease agreement that it drafted would have allowed it to keep it in place in the first place, correct*?
>
> A. *If we would have exercised that option, then that's absolutely correct.* It was my belief that that was not what the intent was. But under your reading, could we have literally done that? Yes.
>
> Q. *But it was solely within the University's discretion whether it would exercise that option. Nobody was forcing the University to exercise that option, correct*?
>
> A. *Correct.*
>
> Q. *If the University wanted to keep it in place, which is ultimately what it did, the University could have done that under the terms of the lease agreement that it made part of the initial RFP, correct*?
>
> A. *It looks like we could have done that, yes.*

(Tr., 74:5–76:8 (emphasis added).)

### 4. Because Low's sole basis for rescinding Calvary Chapel's award was already addressed in RFP 2024-048, his rescission on that basis was plainly pretextual.

Because the undisputed sworn testimony of every UMS witness confirmed that the plain terms of RFP 2024-048 never required UMS to expend a copper penny, much less $500,000, to move the hub, Low's rescission of Calvary Chapel's award was plainly pretextual. His undisputed sworn testimony confirmed this at the hearing:

> Q. And what FHC-WA said here, under "Use of the Existing Hub," it said, "The other proposals acknowledge the University's intent to build a phase 2 hub outside of the existing building. FHC-WA is the only proposal that encourages the University to continue to use the existing hub for the life of the lease." Do you see that?
>
> A. I do.
>
> Q. You testified earlier that Calvary Chapel had already offered the University to keep the hub in place in perpetuity for $1 a year, correct?
>
> A. I did see that in the Award Deck, I think.
>
> Q. *And so FHC-WA was not the only proposal that encourages the University to continue to use the existing hub for the life of the lease, correct*?
>
> A. *That looks to be correct.*
>
> Q. Now, they continue on and they say, "We have considered this carefully, believe it can work well, have proposed certain agreement clauses to support this, and have expressed our commitment to work with the University for the benefit of both parties." Do you see that?

A.   I do.

Q.   *In proposing and offering to the University the ability to keep its internet hub in place in perpetuity, Calvary Chapel had done exactly the same thing, had it not*?

A.   *That's what you said, yes. Yup.*

Q.   *Now, they say, "No other proposals have expressed this commitment." Do you see that*?

A.   *I do.*

Q.   *That's not true, is it*?

A.   *No.*

Q.   Then they go on to say, "Our proposal means that the University can stop spending its time and money developing plans for moving the hub." Do you see that?

A.   I do.

Q.   *Of course, under the lease agreement that we spent a lot of time on today, the University already could stop spending its time and money developing plans for moving the hub because it was not actually legally required to move the hub, correct*?

A.   *Correct.*

. . .

Q.   *Of course, if the University had accepted the Church's offer to keep the hub in place in perpetuity and exercise its right under the contract to do so, the University would not have had to spend the so-called $500,000, correct*?

A.   *Correct.*

(Tr., 119:2–121:8 (emphasis added).)

As this undisputed sworn testimony confirms, the purported "problem" Defendant Low's stated rationale was designed to correct *did not exist*. Calvary Chapel proposed saving UMS that money "in perpetuity," and UMS gave itself the right to do just that. FHC-WA was admittedly not the only entity to offer this solution–by Low's clear admission, Calvary Chapel had also offered it, and did so first, at the time of the RFP. There was no reason to rescind Calvary Chapel's award to accomplish that which was already done. As such, his reasons were unnecessary, not based on the terms of RFP 2024-048, and were plainly pretextual.

**B.     Even if UMS had not already contracted for itself the right not to move the internet hub for 60 years, which it did, Low's sworn testimony demonstrates procedural departures from RFP 2024-048 because he was prohibited from even considering the alleged cost-saving premise of the appeals.**

**1.     RFP 2024-048 prohibited UMS, Defendant Low, and Defendant Piper from even considering the disappointed bidders' untimely appeals to the terms and conditions of RFP 2024-048.**

The plain text of RFP 2024-048 required that any protests to the specifications of RFP 2024-048 be submitted at least five days prior to any response, and it prohibited UMS from considering any protests to the specifications after that deadline. Specifically, it stated:

> Specification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal Submission noted in Section 1.7.1. *No protest against the award due to the specifications shall be considered after this deadline*.

(J. Ex. 2, at 5 §1.8 (emphasis added).)

Moreover, Section 1.9 of RFP 2024-048, which governs all responses submitted to RFP 2024-048 (*see* J. Ex. 2 at 6 ("General Submission Provisions")), including Calvary Chapel and the disappointed bidders, outlines the process for submitting responses, how responses are reviewed, and prohibiting certain challenges for respondents who submitted a response to RFP 2024-048.

> By submitting a response, the Respondent agrees and assures that the specifications are adequate, and the Respondent accepts the terms and conditions herein. *Any exceptions should be noted in your response*.

(J. Ex. 2, at 6, §1.9.4 (emphasis added).)

UMS now takes issue with "specification appeals," and claims they are something else (dkt. 61, UMS Br., 1, 10-17), but UMS does not and cannot take issue with Section 1.9.4 of RFP 2024-048, which, *independent of any specification appeal*, *still* required exceptions to the terms and conditions of the RFP to be stated with the responses thereto. No exceptions to the Lease terms of the RFP, allowing UMS the option to maintain the hub in place for 60 years, were submitted

10

with any responses to the RFP. (Tr., 84:13–84:21; 161:20–162:18.) Exceptions stated after the fact, after Calvary Chapel won the first bid, were untimely and could not have been considered, pursuant to the plain terms of the RFP. (J. Ex. 2, at 6, §1.9.4.)

Low's sworn testimony before the Court confirms that RFP 2024-048 prohibited UMS, Defendant Low, and Defendant Piper from considering any protests *not only to the specifications*, but also to the *terms* and *conditions* of the RFP, after a Respondent submitted a response to RFP 2024-048. Defendant Low testified that these requirements of the text of RFP were binding on UMS and himself as a decisionmaker. (Tr. 81:15–83:19.)

Defendant Cyr likewise testified that protests to the terms, conditions, and specifications, of RFP 2024-048 were required to be submitted prior to the responses or in the responses, at the latest. Ms. Cyr testified:

> Q.    And isn't it true, Ms. Cyr, that RFP respondents are encouraged to seek clarity about the RFP specifications and terms and conditions and evaluation criteria because if they don't, they are precluded from objecting to it after submitting a response?
> A.    That is a clause in the RFP, yes.
> Q.    And specifically, it says, which you would know as a drafter of the RFP, that if those objections are not presented in a timely manner, that the University will not consider protests to those type of objections, correct?
> A.    That is correct.
> Q.    In fact, you're prohibited from doing so?
> A.    I guess you could do so, but we would -- we would --
> Q.    You would violate the plain terms of the RFP, which is reliant upon the procedures articulated in the Administrative Practice Letters, where the University officials are tasked with reviewing objections to an award decision, if they base that award on specifications, terms, conditions, or evaluation criteria that were not submitted prior to a response?
> A.    Correct.

(Tr., 159:3–159:22.)

Defendant Piper confirmed the same.

> Q.    And if we turn to the next page, UMS_005971, the second sentence at the top of the page says, "All potential respondents were permitted to ask

> questions and seek clarity about scoring and performance metrics through the duration of the RFP process." Did I read that correctly?
>
> A.    That's correct.
>
> Q.    And what you're telling them was, isn't it true, that the criteria was provided to you and if you had an objection or a need for a clarification, the RFP required you to seek clarity prior to submitting a response; isn't that correct?
>
> A.    Yes. In this I was reminding them if they had questions, that they had a chance to do that through the RFP process, yes.
>
> Q.    In other words, if they had an objection to the RFP specifications or the evaluation criteria, they were required to seek or object to it prior to submitting a response, correct?
>
> A.    If they had questions about those two items, that's correct, they had a chance to ask clarifying questions.

(Tr., 187:6–187:25.)

> Q.    . . . if you received a specification protest and it was untimely, the rules prohibit the University, yourself, or any second appeal from reviewing them, correct?
>
> A.    That's correct.

(Tr., 222:15–222:19.)

**2.    The sworn testimony before this Court demonstrates that no Respondent submitted objections to the specifications, terms, or conditions of RFP 2024-048 either prior to or in their responses.**

The undisputed sworn testimony before the Court also demonstrates that no respondent submitted a protest or challenge to the terms, conditions, or specifications of RFP 2024-048 prior to submitting their responses. Defendant Low's unrefuted sworn testimony demonstrates that no protests were submitted prior to the responses.

> Q.    Neither WCAP nor FHC-WA submitted any objections to the terms and specifications of RFP 2024-048 at least five business days before the deadline for submitting responses, correct?
>
> A.    Correct.
>
> Q.    Neither WCAP nor FHC-WA included any objections to the RFP terms, conditions, or specifications with their responses to the RFP, correct?
>
> A.    Also correct.

(Tr., 84:13–84:21.)

Defendant Cyr, the facilitator of information for RFP 2024-048 and the "gatekeeper" of all information, confirmed there were no protests prior to the responses. (Tr., 161:20–162:18.) Defendant Piper likewise confirmed no protests were received prior to the responses. (Tr., 189:10–190:1.)

### 3. Defendant Low's sworn testimony demonstrates that his sole basis for rescinding Calvary Chapel's award, the purported "cost-saving" rationale, was a term, condition, and specification of RFP 2024-048.

As demonstrated *supra* Section I.A.3, Defendant Low's undisputed sworn testimony admitted that his sole reason for rescinding Calvary Chapel's award was the purported cost-saving rationale for moving the hub. (*See also* Tr., 74:5–76:8; 118:19–118:23.) Defendant Low's undisputed sworn testimony also demonstrates that his sole basis for rescinding Calvary Chapel's award, which was the purported "costs-saving" rationale, was a term and condition of RFP 2024-048. He testified:

Q.  Well, my question is simple, and I'll ask you again. You consider cost avoidance measures to be specifications to the extent that they are included in an RFP?

A.  If cost avoidance is in an RFP, yes, that would be a specification.

Q.  And if it's not included, that means the RFP would lack that specification?

A.  Potentially, yeah. I mean, if it's not in there, it's not in there.

Q.  Okay.

A.  Yeah.

Q.  So, then, the answer to my question -- Do you consider cost avoidance measures generally to be part of the specifications of an RFP? -- the answer to that would be, yes, you do, correct?

A.  Probably. It's literally the first time I've ever thought about it. I think it makes sense.

Q.  Well, I don't think it's the first time, sir. Would you please turn in to your deposition transcript at page 174?

A.  All set when you are.

Q.  I'm going to start reading your sworn testimony to this Court on page 174, line 19. And I'm going to go over to page 175, line 19.
QUESTION: You said, in denying FHC-WA's initial protest, Ms. Piper, the System's Chief Procurement Officer and Executive Director of Strategic Procurement, reasoned that the RFP did not ask for cost avoidance measures

and thus did not consider cost avoidance measures in its scoring criteria."
Page 175, line 1: "Did I read that correctly?
ANSWER: Yes, you did.
QUESTION: And I will not go down the road, but I will ask: Do you consider that a specification criteria?
ANSWER: I do.
QUESTION: Okay. So it's a term of the RFP. And then I'm going to skip over the next few lines because we're just reading to you your testimony from your declaration on paragraph 15. So jumping back in at line 16: "And again, cost avoidance measures being a specification. Would you agree with that?"
Answer on line 19: "Yes." Sir, that was your testimony.

A.    Yeah.
Q.    Correct?
A.    Correct.
Q.     It was your testimony then and it's your testimony today?
A.    Yes.
Q.    *Cost avoidance measures are part of the specifications of an RFP*?
A.    *In my mind, yes*.

(Tr., 87:9–89:13.) He also stated that, because of his position with UMS, he understood that cost-saving consideration to be a specification of RFP 2024-048.

Q.    And so you, as the treasurer of the University and the final decision-maker for this appeal, the person who rescinded the Church's contract or ability to enter into a contract, *you understand that cost avoidance measures are part of an RFP specifications, correct*?
A.    *I think that's correct*.

(Tr., 90:16–90:21 (emphasis added).)

The testimony of Defendants Cyr and Piper likewise confirms that the "cost-savings" rationale was a protest to the terms, conditions, and specifications of RFP 2024-048. (Tr., 156:14–156:22; 162:19–162:22.)

Defendant Piper, who reviewed the first rounds of appeals submitted in response to Calvary Chapel's award under RFP 2024-048, confirmed the appeals were to the specifications, terms, and conditions:

Q.    Okay. Let us scroll down to about halfway down the page. You wrote the following: "The following provides a review of the facts concerning the

letter representing The Future of the Hutchinson Center Steering Committee and Waterfall Arts protest of the award and the RFP process and specifications." Did I read that correctly?

A.    You did.

Q.    You're noting here that FHC's protest is to the award and the specifications and the RFP process, correct?

A.    Yes.

. . .

Q.    So, in other words -- and this is what you wrote. What you are providing in this letter is a response to The Future of the Hutchinson Center Steering Committee and Waterfall Arts protest of the award in the RFP process and the specifications, correct?

A.    Yes.

(Tr., 181:24–183:15.)

Q.    Right. But they -- so FHC-WA described, and you repeated in your letter, that their primary concern was to the scoring system? Yes or no?

A.    Yes. One of their primary concern was that the scoring system failed, yes.

Q.    The system. And what they said was that the system didn't reflect the substance of their offer, correct? Yes or no?

A.    Yeah, the scoring system failed to reflect the substance of their offer.

Q.    So that's a yes?

A.    Yes.

Q.    Not that they didn't get a certain amount of points under the system. Yes or no?

A.    They did not use those words.

Q.    Okay. It was the system objection as we...  And notwithstanding all of that, and leaving aside for a moment your statement that specifications are only those to limit competition, would you -- *it's true, isn't it, Ms. Piper, that the evaluation criteria and the scoring system were terms and conditions of the RFP, correct?*

A.    *Yeah, I would say that they were terms and conditions of the RFP.*

Q.    *So under Section 1.9.4, by submitting a response to RFP 2024-048, FHC-WA accepted and agreed and assured that the terms and conditions and the specifications were fair and they had no problem with them, correct? That's the plain interpretation of 1.9.4?*

A.    *I agree with that.*

(Tr., 195:10–196:13 (emphasis added).)

Q.    Ms. Piper, you denied both appeals that were submitted to you; isn't that true?

A.    I did.

Q. *On the basis that the terms, the conditions, the specifications, whatever bases were articulated in the protest to you, you denied them as insufficient; isn't that true?*

A. *I did.*

Q. And believe the award should have been upheld based on the following: the terms, the conditions, the specifications, and all the things that were in the RFP, correct?

A. That's correct.

(Tr., 209:6–209:16 (emphasis added).)

As every UMS witness confirmed in undisputed sworn testimony at the hearing, the appeals submitted to Calvary Chapel's award under RFP 2024-048 were to the terms, conditions, and specifications of RFP 2024-048. And each of those respondents who submitted appeals were precluded from raising, and UMS was prohibited from considering, those appeals because they were not timely submitted.

> **4.    Because Defendant Low admitted that his sole basis for rescinding Calvary Chapel's award, the purported "cost-saving" rationale, was a term and condition and specification of RFP 2024-048, he was prohibited by the plain terms of the RFP from even considering it.**

Because Low's sworn testimony demonstrates that his purported rationale for rescinding the award to Calvary Chapel was on the basis of an appeal to the terms, conditions, and specifications of RFP 2024-048, and because no appeal had been submitted prior to any respondent submitting their responses to the RFP, UMS was prohibited from considering such objections:

Q. I'm going to read to you again your sworn testimony at your deposition, starting on page 149, line 7. If you could follow along with me.
QUESTION: You ultimately rescinded the award under 2024-48?
ANSWER: I did.
QUESTION: On the basis of an appeal?
ANSWER: I did.
QUESTION: An appeal that was to the terms and specifications of RFP 2024-048?
ANSWER: *It was related to one of the terms, yes, absolutely*."
Sir, did I read that correctly?

A. You did.

Q.    You used the term "absolutely." It wasn't my term. It was your term, correct?

A.    It was, yup.

Q.    *And the reason that the appeal that you ultimately granted was related to the terms and specifications of RFP 2024-048 is because you consider the placement of the internet hub to be a specification of the RFP, correct*?

A.    *The placement of the hub, yes*.

Q.    *And so you agree that if FHC-WA had an objection to the placement of the regional network internet hub, whether it would be in its current position in phase 1 or whether it would be moved at the University's option later and how that is dealt with, it would have been required to raise that objection five days before the RFP response deadline, correct*?

A.    *If they were challenging the criteria, yes*.

Q.    And, in fact, FHC-WA did not submit its objection or appeal to the specifications of RFP 2024-048 five days before the RFP response deadline. I think we've established that, correct?

A.    Correct.

Q.    According to the RFP itself, then, because FHC-WA did not submit its objections to the specifications of RFP 2024-048 five days before the RFP response deadline, it was precluded from raising that objection subsequently, was it not?

A.    I think I disagree on this one. We had a healthy exchange on this one. I think the question is if they are protesting the criteria itself, absolutely. But you don't lose the ability to appeal on the points that you were awarded.

Q.    I wasn't asking you about the points that you're awarded. *I was asking about their appeal as to the terms and specifications of the RFP that we've agreed was included. They -- by not presenting those objections five days before the deadline, they were precluded from ever presenting them, were they not*?

A.    *If they were going to make criteria changes, yes, they needed to make them five days in advance*.

(Tr. 84:25–87:8 (emphasis added.)

Q.    And so *putting the two together, that would mean by definition that objections to cost avoidance criteria or measures would have to be made five days prior to the RFP submission deadline, correct*?

A.    *Yes. If someone wanted to challenge cost avoidance as a criteria*.

Q.    FHC-WA did not submit any objections to the RFP's cost avoidance measures, or lack thereof, at least five days before the RFP response deadline, correct?

A.    Correct.

Q.    *Now, the appeal that FHC-WA eventually submitted to the award was an appeal regarding the purported lack of cost avoidance measures in the RFP, correct*?

A.    *That's correct*.

Q.    *The appeal was not submitted five days before the RFP response deadline. Instead, it was submitted after the award was already given to Calvary Chapel. Isn't that a fact?*

A.    *That's correct.*

Q.    ***And because FHC-WA's objection to cost avoidance measures, or the lack thereof, was not timely submitted, under Section 1.8 of the RFP, the University could not consider those objections when they were ultimately submitted after the fact. Isn't that a fact, sir?***

A.    ***If they had not challenged the cost avoidance five days before, yes. I agree.***

Q.    ***Thank you, sir. And yet you not only considered FHC-WA's appeal as to cost avoidance measures, but you ultimately granted it and you rescinded the award to Calvary Chapel on that basis. Isn't that true?***

A.    ***That's correct.***

(Tr., 90:22–92:2 (emphasis added).)

Because Low admitted that (a) the "costs savings" issues were part of the terms, conditions, and specifications of RFP 2024-048 and (b) no objections had been lodged with UMS prior to responses being submitted to RFP 2024-048, Low was prohibited from considering those appeals, *and he admitted this much under oath. Yet he considered and granted one anyway.* In other words, Low's decision to rescind Calvary Chapel's award took a procedural and substantive wrecking ball to RFP 2024-048's mandatory process.

## II.    Calvary Chapel Has Demonstrated Irreparable Harm.

In its TRO Order, the Court indicated–based on the limited record before it–that Calvary Chapel had not demonstrated irreparable constitutional injury. (TRO Order, 21-22.) The undisputed record evidence before the Court now confirms that Calvary Chapel is suffering irreparable constitutional injury each day. As the Supreme Court has made clear, government action that restricts a church's ability to provide religious worship services or that has the effect of significantly restricting the capacity of a church to provide its religious worship services unquestionably constitutes irreparable injury. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("There can be no question that the challenged restrictions, if enforced, will

18

cause irreparable harm."). A church is "irreparably harmed by the loss of free exercise rights for even minimal periods of time." *Tandon v. Newsom*, 593 U.S. 61, 64 (2021). Here, every day that passes, and every Sunday that goes by, Calvary Chapel is losing out on the ability to fulfill its mission, is seeing people turn away, and losing the opportunity to exercise its sincere religious convictions, mandate, and mission to minister to those people. (Tr., 18:24–19:14.) Everything that Calvary Chapel does, from worship services, to educational programs, to community outreach, to addiction recovery, is done pursuant to its religious mission. (Tr., 18:9–18:20.) Because the award has been unlawfully rescinded, every ministry of Calvary Chapel has suffered as have its First Amendment rights. Calvary Chapel's educational ministries are suffering each day. (Tr., 38:13–39:5.) Calvary Chapel's addiction ministry is suffering each day. (Tr., 39:6–39:8.) Calvary Chapel's childcare ministry for families in need in its community is suffering each day. (Tr., 39:9–39:19.) Calvary Chapel's religious worship services are suffering each day. (Tr., 40:23–41:18.)

The Court also found, on the limited TRO record, that Calvary Chapel's injuries were not "ongoing." (TRO Order, 23.) The undisputed record evidence presented at the evidentiary hearing demonstrates that its First Amendment injury is continuing each day it is not restored to its rightful place under RFP 2024-048. (Tr., 33:13–33:15 (noting that Calvary Chapel's loss of its award under RFP 2024-048 has caused it to suffer harm in having inferior facilities that do not meet its needs).) (Tr., 45:1–45:6.) Indeed, if UMS had not rescinded the award, Calvary Chapel would not be suffering the space limitations on its religious mission and ministry right now, and each day that passes the problem and restriction on its religious mission is hampered. (Tr., 34:25–36:25.)

The lis pendens currently in place, and the availability of theoretical relief at the end of protracted litigation that might undo the unlawful sale of the auditorium and finally give it to the Church, does not diminish the fact that the Church is being harmed *currently*, each and every day

it is precluded from having access and ownership to the superior facilities that it sought to purchase, and that it would have purchased but for the unlawful discrimination. The testimony cited in this section is undisputed that Calvary Chapel is being harmed by not being able to conduct its mission and activities in the new auditorium, and by being forced to conduct them in substandard and inadequate facilities that do not meet its needs. (Tr., 33:13–33:15.) No amount of monetary relief at the end of the litigation, and even a rightful change of ownership, would make up for the weeks, months, and perhaps years of the Church's missed opportunities to fully carry out its religious mission in the space to which it is rightfully entitled. (Tr., 18:21–20:9.) Immediate relief is critically necessary to restore the Church to its rightful place, and to forestall the daily occurrence of additional, incalculable, and irreparable harm to its mission and religious exercise.

UMS now contends that injunctive relief would not remedy Calvary Chapel's irreparable injury. (Dkt. 61, UMS Br., 19.) This is incorrect. From the very first pleading filed in this case, Calvary Chapel made clear that it was seeking a restoration of the *status quo ante*. (Dkt. 1, V. Compl., ¶14 ("Issuing a temporary restraining order against the new FRP process, and halting the property sale to WCAP, is the only available option to restore the status quo–*the Church's rightful status as the winning bidder entitled to negotiate the purchase of the Hutchinson Center*." (emphasis added).) In its TRO and PI papers, Calvary Chapel likewise asked for a restoration of the status quo. (Dkt. 3, at 2; dkt. 45, at 15-16 (requesting injunctive relief to preclude the ongoing irreparable constitutional injury).) An injunction to restore the *status quo ante* would put Calvary Chapel back where it was before the discriminatory rescission, and allow it to go forward with its religious mission.

## CONCLUSION

Because Defendant Low took a wrecking ball–both procedurally and substantively–to RFP 2024-048, granted an appeal he had no authority to even consider, and rescinded Calvary Chapel's award on grounds that were already provided for in RFP 2024-048, and because Calvary Chapel is suffering irreparable harm each day, the preliminary injunction should issue.

Dated: March 31, 2025                           Respectfully submitted,

/s/ Stephen C. Whiting                          /s/ Daniel J. Schmid
Stephen C. Whiting                              Horatio G. Mihet*
(ME Bar No. 559)                                Daniel J. Schmid*
THE WHITING LAW FIRM                            Richard L. Mast*
75 Pearl Street, Suite 207                      LIBERTY COUNSEL
Portland, ME 04101                              P.O. Box 540774
(207) 780-0681                                  Orlando, FL 32854
steve@whitinglawfirm.com                        (407) 875-1776
                                                court@lc.org
                                                hmihet@lc.org
                                                dschmid@lc.org
                                                rmast@lc.org
                                                *Admitted *pro hac vice*

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 31st day of March, 2025, I caused a true and correct copy of the foregoing to be electronically filed with this Court. Service will be effectuated on all counsel of record via this Court's ECF/electronic notification system.

/s/ Daniel J. Schmid
Daniel J. Schmid
*Attorney of Plaintiff*