UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| CALVARY CHAPEL BELFAST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00392-SDN |
| | ) | |
| UNIVERSITY OF MAINE SYSTEM, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Calvary Chapel Belfast ("the Church") seeks a preliminary injunction to restore its winning bid for the purchase of the Hutchinson Center, a property owned by the University of Maine System ("the System"). The Church alleges the System discriminated against the Church in violation of the Equal Protection Clause and the Free Exercise Clause when the System cancelled and restarted the bidding process. After first awarding the Church's bid, the System issued a second request for proposal ("RFP") and ultimately awarded the bid to another entity (*see* ECF No. 3). On a limited paper record, the Court previously denied the Church's request for a temporary restraining order, concluding the Church had not demonstrated a likelihood of success on the merits or irreparable harm (*see* ECF No. 48). The Court held an evidentiary hearing on March 4, 2025, where it received the testimony of Greg Huston (the Church's Pastor), Defendant Ryan Low (the System's Vice Chancellor of Finance and Administration), Defendant Robyn Cyr (the System's Senior Director for Strategic Sourcing), and Defendant Rachel Piper (the System's Strategic Director for Procurement/Chief Procurement Officer) (*see* ECF No.

56). The Court found all witnesses credible. After carefully considering the evidence and arguments presented by the parties, the Court DENIES the Church's Motion for Preliminary Injunction (ECF No. 3), concluding the Church has not demonstrated a likelihood of success on the merits of its equal protection and free exercise claims.

## I.    Factual Background

The Court repeats the facts as recited from its Order on Motion for Temporary Restraining Order (ECF No. 48, "TRO Order"), adding to those facts where appropriate based on the evidence presented at the March 4, 2025, hearing.

This matter arises out of the System's efforts to sell its Hutchinson Center property located in Belfast, Maine. The Hutchinson Center opened in 2000 and served over 16,000 students at its height, but the Center closed in 2023 after several years of declining use. Decl. Gretchen Catlin ("Catlin Dec.") ECF No. 38-1, at ¶ 3. The System decided to sell the Hutchinson Center using the System's procurement process. *Id.*

The Church is led by Pastor Greg Huston, who has served in that role for eight years. Hr'g Tr. 13:21-14:2. Pastor Huston is also the Chief Executive Officer of the Church, overseeing church operations and preaching on Sunday mornings. Hr'g Tr. 14:3-11. The Church does not currently own a building, but instead rents various facilities to conduct its services and ministries. *See* Hr'g Tr. 18:21-23. The Church holds multiple gatherings every week with hundreds of people in attendance. Hr'g Tr. 14:12-24. The weekly worship gathering is at full capacity in its current rental facility, and the parking lot is full, so the Church has been shuttling people in from other facilities. H'rg Tr. 19:5-9. Pastor Huston testified that the cramped environment is uncomfortable for newcomers to the Church and that new people walk into the Church or drive into the parking lot, see how crowded it is, and leave before the service—leaving the Church unable to fulfill its mission to

minister to as many people as possible. Hr'g Tr. 19:10-13, 36:18-22. The Church has new people attempting to join the congregation every week. Hr'g Tr. 34:19-21. Every year, the Church rents out a local school for its Easter service and sees the congregation almost double. Hr'g Tr. 36:2-7. Additionally, the Church livestreams and radio broadcasts its services for out-of-state attendees, but those services are also heavily utilized by local community members who are unable to make it to the service or who are uncomfortable being crammed in the Church's current facility. Hr'g Tr. 39:24-40:14. The Church's ability to fulfill its religious mission of providing counsel and help to all who seek its services is hampered by its inadequate rental space. *See* Hr'g Tr. 40:7-45:6.

The Church runs a cooperative program for homeschooled students that it has had to cap at 100 students and run out of a separate facility due to space concerns. Hr'g Tr. 19:15-18. The homeschool cooperative program has a waiting list for families the Church currently is unable to accommodate. Hr'g Tr. 43:14-22. The Church also runs programming for those in recovery from addiction and for families with children and those programs are also negatively affected by issues with the Church's current physical space. Hr'g Tr. 41:1-42:21.

In January 2024, the Church learned the System was planning to sell the Hutchinson Center and was excited about the opportunity to purchase it. Hr'g Tr. 14:25-15:5. The Church had rented the Hutchinson Center in the past and ran all its services and additional ministries through the Center for three years. Hr'g Tr. 15:6-20. The Church was familiar with the space and saw its potential to meet the Church's growing needs to accommodate its congregation and ministries. *See* Hr'g Tr. 15:16-16:1.

The System issued RFP #2024-048, University of Maine, Hutchinson Center Real Estate Offer, on January 17, 2024. Catlin Dec. ¶ 6; Verified Compl. (ECF No. 1) at ¶ 33 &

Ex. A (ECF No. 1-1); Joint Hr'g Ex. 2. The purpose of the RFP was to solicit interest in the Hutchinson Center property, and the System was willing to consider purchase and sale offers, lease offers, and creative real property offers. Ex. A; Catlin Dec. ¶ 6; Joint Hr'g Ex. 2. The bid process for RFP #2024-048 was structured on a 100-point scale, which the System used to evaluate the degree to which each submitted proposal met specific criteria set forth by the System. Verified Compl. ¶ 34; Ex. A; Joint Hr'g Ex. 2. The System would award the winning bidder the right to negotiate a final contract for the sale, lease, or other property offer. Catlin Dec. ¶ 7; Joint Hr'g Ex. 2.

Section 2.4 of RFP #2024-048 provides: "Such negotiations may not significantly vary the content, nature or requirements of the proposal or the University's Request for Proposals to an extent that may affect the price of goods or services requested." Ex. A at ¶ 2.4; Joint Hr'g Ex. 2 at § 2.4. It further provides: "[T]he University may cancel the [RFP] at its sole discretion." Ex. A at § 2.4; Joint Hr'g Ex. 2 at § 2.4.

Section 1.8 of the RFP provides the process and remedies for "specification protests." Joint Hr'g Ex. 2 at § 1.8. A respondent to the RFP may submit a "specification protest" if the respondent "feels that the specifications are written in a way that limits competition." *Id*. According to the language of RFP #2024-048, "[s]pecification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal . . . . No protest against the award due to the specifications shall be considered after this deadline." *Id*. Defendant Rachel Piper, the System's Strategic Director for Procurement/Chief Procurement Officer, testified that specification protests are appropriate when a "potential respondent who is interested in providing a response to a solicitation sees something that is written within the RFP specifications that would prohibit them from submitting and, therefore, limit

4

competition." Hr'g Tr. (ECF No. 60) 202:1-5. Specification protests give potential respondents "the opportunity to reach out to the University Strategic Procurement office and identify which areas they feel are restrictive in competition." Hr'g Tr. 202:5-8. As an example of a specification protest, Ms. Piper provided a hypothetical RFP for office supply delivery that specified the office supplies should be delivered in a yellow truck with a man with a mustache on it. Hr'g Tr. 202:9-19. In this hypothetical, Staples and OfficeMax would be unable to respond despite being able to deliver office supplies in a white van. Hr'g Tr. 202:20-24.

The System follows an internal, administrative appeal process for procurement awards, set forth in the System's Administrative Practice Letter VII-A. *See* Catlin Dec. ¶ 12; Status Report Nov. 21, 2024 (ECF No. 16) at ¶ 3 and Ex. 1 (ECF No. 16-2); Joint Hr'g Ex. 1. The appeals process has two levels, and the second level is final. *See* Catlin Dec. ¶ 5; Decl. Ryan Low ("Low Dec.") ECF No. 38-2, at ¶ 5; Joint Hr'g Ex. 1 at 6-7. Gretchen Catlin, the System's Chief Facilities and General Services Officer, normally serves as the decisionmaker at the second level of procurement awards appeals. *See* Catlin Dec. ¶ 5; Low Dec. ¶ 5; Joint Hr'g Ex. 1 at 6-7. However, because she was heavily involved in developing RFP #2024-048, Ms. Catlin recused herself from serving as the decisionmaker in the second level of appeal for this RFP in February of 2024, long before proposals were due. Catlin Dec. ¶¶ 1, 4-5. Due to Ms. Catlin's recusal, Ryan Low, the System's Vice Chancellor for Finance and Administration, served as the final decisionmaker for the appeal of RFP #2024-048. Catlin Dec. ¶ 5. As soon as Ms. Catlin recused herself, Vice Chancellor Low stopped participating in all System discussions and meetings about the Hutchinson Center. Low Dec. ¶ 6.

5

The System issued Addendum 4 to RFP #2024-048 on April 18, 2024. Catlin Dec. ¶ 8 and Ex. 1; *see* Joint Hr'g Ex. 2. Addendum 4 addressed the Networkmaine regional internet hub located within the Hutchinson Center. Catlin Dec. ¶ 8 and Ex. 1; Joint Hr'g Ex. 2. The internet hub facilitates regional internet access to public and private educational institutions in the Belfast, Camden, and Rockland areas. Catlin Dec. ¶ 8 and Ex. 1; Joint Hr'g Ex. 2. Addendum 4 required relocating the internet hub from within the Hutchinson Center to an external purpose-built utility building. Catlin Dec. ¶ 8 and Ex. 1; Joint Hr'g Ex. 2. On May 30, 2024, the System circulated a draft lease for its continued access to the internet hub in the eventual purpose-built utility building to be built on the Hutchinson Center property and for within the Hutchinson Center while relocation to the purpose-built building was in process. Catlin Dec. ¶ 9; *see* Joint Hr'g Ex. 2. The draft lease contains the following language:

> Currently located within the Hutchinson Education Center, the University will continue to operate the hub in room 100Y Phase 1 plan noted below with an option to permanently relocate the hub as outlined in the Phase 2 plan below.
>
> **PHASE 1:**
> Currently proposed to continue the operation of the hub within the Hutchinson Center in a room labeled as room 100Y on Appendix A.
>
> The University of Maine System requires a ["]carve out" that will include room 100Y and the external generator, shown on the first-floor plan to house data communications equipment servicing community anchor institutions throughout the greater Belfast, Camden, and Rockland regions in Maine. This distribution hub is maintained by the University of Maine System IT Department.
>
> **PHASE 2:**
> To ensure the provision of connectivity services to the greater coastal area, the University proposes the relocation of the hub from its current site within the Hutchinson Center to a purpose-built utility building. This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site.

The proposed pre-fabricated equipment shelter of concrete/fiberglass construction, measuring approximately 20 feet by 12 feet, will be situated within a fenced area approximately 45 feet by 45 feet. This relocation will grant the University uninterrupted access to the hub, 24 hours a day, 7 days a week, 365 days a year.

To facilitate this relocation, the University of Maine System seeks to establish a lease agreement or easement to house an equipment shelter adjacent to the barn located on the northeast corner of the Hutchinson Center property along with an easement that allows for access for utility trucks and University vehicles to gain access to the fenced in area. The equipment shelter will be independently connected to power, complete with its own meter, and data lines, run aerially and perhaps underground, from the main road. Furthermore, the University will install a new generator to ensure continued operation of the hub during power outages. Negotiations may include the transfer of the existing diesel generator, which has a limited runtime and was solely dedicated to supporting the connectivity hub within the building, to the new owners of the Hutchinson Center.

Until all site prep work, shelter placement and connectivity hub equipment relocation is completed, the University will need to retain 24x7x365 access to room 100Y in the Hutchinson Center and have 24x7 access to the facility to support the network.

Joint Hr'g Ex. 2.

Jason Stutheit, a Church congregant, led the preparation of the Church's proposal for RFP #2024-048, which the Church submitted on March 28, 2024. Verified Compl. ¶ 44; Joint Hr'g Ex. 3. The Church began to liquidate assets to make a competitive offer, including selling its current property (a utility trailer and a shipping container) for a total of $115,000 in June 2024. Verified Compl. ¶ 44. On August 1, 2024, TD Bank informed the Church it would provide financing for $750,000 to acquire the Hutchinson Center. Verified Compl. ¶ 44.

Robyn Cyr, the System's Director of Strategic Sourcing, contacted Mr. Stutheit on April 18, 2024, to inquire whether Addendum 4 would necessitate any changes to the Church's submission. Verified Compl. ¶ 115 and Ex. K (ECF No 1-11) at 3; Hr'g Ex. 21. Mr. Stutheit responded via email, "It does not change our submission. As you had stated in a

7

previous bid meeting this would be negotiated with the winning proposal. I am happy to lease the future space and also provide 24 h[ou]r access in the interim." Verified Compl. ¶ 116 and Ex. K at 2; Hr'g Ex. 21.

The System received three offers in response to RFP #2024-048: a purchase and sale offer from the Church, a purchase and sale offer from Waldo Community Action Partners ("WCAP"), and a creative real property offer from Future of the Hutchinson Center Steering Committee/Waterfall Arts ("FHC-WA"). Catlin Dec. ¶ 10; Joint Hr'g Exs. 3-5. By letter dated August 14, 2024, Ms. Cyr notified the Church that the System was awarding the Church the right to negotiate terms and conditions for the purchase of the Hutchinson Center because it produced the top scoring response. Catlin Dec. ¶ 11. The letter further states:

> This award notice does not constitute an agreement and does not obligate the University to enter into any agreement with the awardee or any other vendor. Any actual contract executed by the University pursuant to the RFP is contingent on the ability of the parties to reach agreement on final terms and conditions and approval by the initiative sponsor. The University will proceed with the present award so long as it determines, in its sole discretion, that doing so is in the best interest of the University.

Verified Compl. Ex. B (ECF No. 1-2); Catlin Dec. ¶ 11. The System publicly announced its decision to sell the Hutchinson Center to the Church in a press release issued on August 15, 2024. Verified Compl. ¶ 48 and Ex. C (ECF No. 1-3). In the press release, the System stated the key factors distinguishing the Church's winning proposal included the Church's offer of a $1 annual lease agreement in perpetuity for the Networkmaine hub, the Church's waiver of its right to have the property inspected, and the Church's offer of $250,000 in earnest money. Verified Compl. ¶ 49.

On August 19, 2024, FHC-WA timely submitted to the System's Executive Director of Strategic Procurement and Services, Rachel Piper, a Notice of Protest appealing the

8

award of the bid. Verified Compl. ¶ 50 and Ex. D (ECF No. 1-4); Catlin Dec. ¶ 12; Hr'g Ex. 7. In its protest letter, FHC-WA argued that the System should have scored its bid higher because FHC-WA proposed to allow the System to maintain the existing Networkmaine internet hub within the Hutchinson Center for the life of the lease, saving the System the costs of moving the internet hub. Ex. D at 2; Joint Hr'g Ex. 7 at 2. FHC-WA's protest letter also asserts the hub lease is "problematic" for the Church because the draft lease agreement requires the lessor to refrain from discriminating on the basis of protected classes including sex and sexual orientation, and FHC-WA claimed in its letter that the Church and its "parent and sister organizations have advocated on their websites against non-male/female sexual relationships and marriage." Joint Hr'g Ex. 7 at 2. Ms. Piper denied FHC-WA's protest, stating that if the System had planned to consider cost avoidance, the point scale would have reflected cost avoidance. Catlin Dec. ¶ 14 and Ex. 2; Joint Hr'g Ex. 11.

On August 20, 2024, WCAP timely submitted to Ms. Piper a protest letter appealing the award of the bid. Verified Compl. ¶ 58 and Ex. E (ECF No 1-5); Joint Hr'g Ex. 8. WCAP's protest letter contains a bulleted list of bases for its appeal, including the following: "A Church by its very design could be perceived as limiting to some in the community (real or perceived) and not in alignment with the University's intentions as outlined in the nondiscrimination section of the lease." Ex. E at 3; Joint Hr'g Ex. At 3. Ms. Piper denied WCAP's protest. Catlin Dec. ¶ 15; Joint Hr'g Ex. 12.

Following the public announcement of the Church as the winning bidder, members of the public made negative comments regarding the System's award of RFP #2024-048 to the Church, including on social media in response to a news article about the System's decision. Verified Compl. ¶ 63. On August 21, 2024, a Maine State Senator who represents

Belfast and sits on WCAP's Board of Directors publicly criticized the award to the Church, stating that transferring the Hutchinson Center from public access and "gifting" it to a religious organization seemed "completely inappropriate." Verified Compl. ¶ 64. On August 22, 2024, the System posted another press release announcing it had denied the two protests and was moving ahead with its negotiations with the Church. Verified Compl. ¶ 66 and Ex. F (ECF No. 1-6); Joint Hr'g Ex. 20. The press release also stated the System had received "at least 135 citizen comments" about the pending sale, and further stated that "[t]he university cannot discriminate, including on the basis of religion. Doing so would be against the law and inconsistent with the university's commitment to inclusion." Ex. F at 2; Joint Hr'g Ex. 20 at 2.

On September 3, 2024, both WCAP and FHC-WA timely submitted to Vice Chancellor Low second appeals of the RFP award. Verified Compl. ¶ 71; Catlin Dec. ¶¶ 16, 18; Joint Hr'g Exs. 9-10. WCAP's second protest letter included an appeal to the System to consider "what is best for the community," and "adherence to the University's mission to public education and accessibility for all supporting diversity and inclusion." Verified Compl. ¶ 79 and Ex. H (ECF No 1-8) at 3; Joint Hr'g Ex. 10 at 3. Vice Chancellor Low saw no merit in WCAP's second appeal and denied it. Low Dec. ¶ 11; Catlin Dec. ¶ 19; Joint Hr'g Ex. 13 at 2.

FHC-WA's second appeal letter specifically noted that "tempers and frustrations with the award decision are running high in the community," and expressed hope that a reversal of the award would "ameliorate this situation and put the community and the University back on the same path together." Verified Compl. ¶ 74 and Ex. G (ECF No 1-7) at 1; Joint Hr'g Ex. 9 at 1. Vice Chancellor Low saw no merit to most of the points in FHC-WA's appeal but was intrigued by one point related to the Networkmaine hub. Low Dec.

¶ 12; *see* Joint Hr'g Ex. 13 at 3. Contrary to Addendum 4 of the RFP, which specified that the Networkmaine hub would be relocated from within the Hutchinson Center to a purpose-built utility building outside of the Hutchinson Center, FHC-WA proposed leaving the Networkmaine hub in its current location within the Hutchinson Center for the life of the lease. Low Dec. ¶ 12; *see* Joint Hr'g Ex. 9 at 2-3. It appeared to Vice Chancellor Low that if it were possible to adopt FHC-WA's proposal to leave the Networkmaine hub in place, the System would save about $500,000 in costs that the System would otherwise incur in building a new facility and relocating the hub. Low Dec. ¶ 12. Vice Chancellor Low asked Dr. Robert Placido, the System's Chief Information Officer, if the proposal to leave the hub in place was possible and workable for the System. Low Dec. ¶ 13. Dr. Placido told Vice Chancellor Low that such an arrangement was realistic and that Dr. Placido would be comfortable with that arrangement. Low Dec. ¶ 13. Vice Chancellor Low was aware generally that the RFP was a topic of discussion in the community and in the local press but tried to distance himself from those discussions and articles as much as possible. Low Dec. ¶ 7; Hr'g Tr. 100:4-15.

Vice Chancellor Low disagreed with Ms. Piper's rationale that the RFP process should not have considered cost avoidance measures, instead reasoning that "[i]f the System could avoid the $500,0000 cost of moving the [Networkmaine] hub, then [the System] would be significantly better off." Low Dec. ¶ 14. Vice Chancellor Low further reasoned that, if the System went ahead with the Church's bid of $1 million and incurred the unnecessary cost of $500,000 to move the internet hub, the value to the University of the Church's bid would be reduced to $500,000, less than the System's approximately $900,000 debt remaining on the Hutchinson Center. Low Dec. ¶ 14. Before rescinding the Church's award and beginning the RFP process anew, Vice Chancellor Low conferred

with the System's general counsel because he wanted to make sure he was following the appropriate steps. Hr'g Tr. 112:16-113:8. On September 12, 2024, Vice Chancellor Low issued a letter to each bidder explaining his decision to rescind the award to the Church. Verified Compl. ¶ 86 and Ex. I (ECF No. 1-9); Joint Hr'g Ex. 13. Vice Chancellor Low testified that the Church's status as a religious organization and the community opposition did not have any role in his decision. Hr'g Tr. 116:19-25.

The System issued a new RFP for the sale of the Hutchinson Center, RFP #2025-031, on October 4, 2024, with responses due November 1, 2024. Verified Compl. ¶¶ 135-36 and Ex. N (ECF No 1-14); Joint Hr'g Ex. 23. The new RFP solicited only real property offers. Catlin Dec. ¶ 23; Joint Hr'g Ex. 23 at 3. It also outlined a mandatory leaseback provision for the Networkmaine hub, requiring the winning bidder to lease back 120 square feet of closet space to the System for an annual fee of no more than $3,000. Verified Compl. ¶ 138; Joint Hr'g Ex. 23 at 3. The lease term would extend for five years, with potential renewals upon mutual agreement. *See* Joint Hr'g Ex. 23 at 3. RFP #2025-031 assigned the following point values: eighty-five points for purchase price, ten points for contingencies, and five points for Networkmaine Lease Cost. Verified Compl. ¶ 137; Joint Hr'g Ex. 23 at 7.

On October 17, 2024, the System released a questions and answers sheet entitled "Addendum 2" to RFP #2025-031. Verified Compl. ¶ 139 and Ex. O (ECF No. 1-15). Addendum 2 addresses a question about the apparent discrepancy between the 120 square feet called for in the lease for the Networkmaine hub and the building drawings, which show the closet where the hub is located measured 248 square feet. Ex. O at 1. In response, the System clarified the closet has 248 square feet of space, but the Networkmaine hub equipment only requires 120 square feet, therefore the System "is

willing to share the space with the new owner." *Id.* Addendum 2 further states, "The final terms of the lease will be negotiated with the awarded respondent." *Id.*

The System received three bids in response to RFP #2025-031 from the same three bidders that responded to the first RFP: the Church, FHC-WA, and WCAP. *See* Catlin Dec. ¶ 25. The Church submitted a new bid in response to the second RFP, this time offering a purchase price of $1.1 million, a free lease to the System of the data closet space, and payment of all utilities relating to the Networkmaine hub. Verified Compl. ¶¶ 155-58. The System awarded the right to negotiate a final agreement for the sale of the Hutchinson Center to WCAP, which bid a purchase price of $3.06 million—more than $1 million higher than any other bid and almost $2 million higher than the Church's bid—and which scored the highest based on the selection criteria. Verified Compl. ¶¶ 159-60; Catlin Dec. ¶ 26; Low Dec. ¶ 25 and Ex. 3. The System notified the Church of this decision by letter dated November 15, 2024. Verified Compl. ¶ 159 and Ex. R (ECF No. 1-18).

On November 20, 2024, the Church submitted a protest to Ms. Piper appealing the System's decision to award the bid to WCAP. Status Report (ECF No. 19) at ¶ 1. Ms. Piper denied the protest on December 2, 2024. *Id.* ¶ 3. Vice Chancellor Low received the Church's appeal of Ms. Piper's denial on December 5, 2024. Low Dec. ¶ 21. Vice Chancellor Low denied the Church's appeal on December 17, 2024 because he "did not find any errors in the process for RFP #2025-031 and, thus, determined the award was appropriately granted to WCAP based on the substantial profit differential." Low Dec. ¶ 24.

## II.    Procedural History

The Church commenced this action on November 19, 2024, by filing its Verified Complaint and Motion for Temporary Restraining Order and Preliminary Injunction

(ECF Nos. 1, 3). The Court held a telephone conference of counsel on November 20, 2024, at which the parties agreed to delay these proceedings while the Church protested the award decision through the System's internal appeal process (*see* ECF No. 15). The Court ordered the parties to file status reports every three weeks and ordered Defendants to notify the Court of any appeal determinations within forty-eight hours of such determination (ECF No. 18). On December 17, 2024, the Church filed a Notice of Final Denial of Calvary Chapel Belfast's Administrative Appeal and Motion for Hearing on Motion for Temporary Restraining Order (ECF No. 28). The Court held oral argument on the Motion for Temporary Restraining Order on January 6, 2025, (ECF No. 47) and issued its Order denying the Motion for Temporary Restraining Order on January 10, 2025 (ECF No. 48).

Thereafter, the Court held an evidentiary hearing on the Church's Motion for Preliminary Injunction on March 4, 2025 (ECF No. 56). The parties filed post-hearing briefs on the Motion for Preliminary Injunction on March 31, 2025, (ECF Nos. 61, 62), and the matter is now ripe for decision.

### III.    Discussion

### A.    Legal Standard

The Court applies the same legal standard to determine whether to issue a preliminary injunction as it used on the Motion for Temporary Restraining Order, albeit now with the benefit of a more developed factual record. *See Monga v. Nat'l Endowment for the Arts*, 323 F.Supp.3d 75, 82 (D. Me. 2018) ("To determine whether to issue a temporary restraining order, the Court applies the same four-factor analysis used to evaluate a motion for preliminary injunction."). "The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation" and allowing the Court to

provide an effective remedy upon full adjudication of the merits. *CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 48 F.3d 618, 620 (1st Cir. 1995). However, "[i]njunctive relief is an extraordinary and drastic remedy that is never awarded as of right." *Calvary Chapel of Bangor v. Mills*, 459 F.Supp.3d 273, 282 (D. Me. 2020) (quoting *Monga*, 323 F.Supp.3d at 82). The Church has the burden to establish: (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm," (3) "the balance of the equities tip in [its] favor," and (4) "the injunction is in the public interest." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)). "The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citing *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)).

### B.    Likelihood of Success on the Merits

Although the Church brings eight counts in its Verified Complaint, it seeks a preliminary injunction only as to its equal protection and free exercise claims. Mot. TRO Prelim. Inj. ("Church's Motion"), ECF No. 3, at 3. The Court considers each in turn.

### 1.    Equal Protection

The Equal Protection Clause of the Fourteenth Amendment demands that "similarly situated persons are to receive substantially similar treatment from their government." *Davis v. Coakley*, 802 F.3d 128, 132 (1st Cir. 2015) (quoting *Tapalian v. Tusino*, 377 F.3d 1, 5 (1st Cir. 2004)). The elements of an equal protection claim are: "(1) the [party], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race,

15

religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 132-33 (quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995)). "Plaintiffs claiming an equal protection violation must first 'identify and relate *specific instances* where persons *situated similarly in all relevant aspects* were treated differently, instances which have the capacity to demonstrate that [plaintiffs] were singled . . . out for unlawful oppression.'" *Buchanan v. Maine*, 469 F.3d 158, 178 (1st Cir. 2006) (quoting *Rubinovitz*, 60 F.3d at 910) (alteration in original).

Direct evidence of discriminatory intent is rarely available. *See Dailey v. City of Lawton*, 425 F.2d 1037, 1039 (10th Cir. 1970) ("If proof of a civil right violation depends on an open statement by an official of an intent to discriminate, the Fourteenth Amendment offers little solace to those seeking its protection."). However, some "[p]roof of . . . discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Discriminatory purpose need not be the sole, dominant, or primary concern to demonstrate a violation; such purpose is impermissible if it was a "motivating factor" behind a government action. *See id.* at 265-66. Discriminatory purpose may be shown by circumstantial as well as direct evidence. *Id.* at 266. Circumstantial evidence of discriminatory purpose may include "'[t]he historical background of the decision,' '[t]he specific sequence of events leading up to the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'contemporary statements by members of the decisionmaking body.'" *Valentin v. Town of Natick*, 633 F.Supp.3d 366, 374 (D. Mass. 2022) (quoting *Vill. of Arlington Heights*, 429 U.S. at 267-68) (alterations in original). Substantive departures from normal procedures may also be relevant evidence of discriminatory purpose, "particularly if the factors usually considered important by the

decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267.

In its Order on Motion for Temporary Restraining Order, the Court surveyed case law where public pressure combined with procedural anomalies was held sufficient to show discriminatory purpose. TRO Order at 13-16. As the surveyed cases make plain, impermissible animus in the community can be a basis for determining that a government official acted with discriminatory intent by essentially adopting the community's views even if the official does not personally share those views. However, these cases also establish the requirement of a showing connecting the animus in the community to the government action for that action to constitute a violation of law. *See Ass'n of Relatives and Friends of AIDS Patients (A.F.A.P.S.) v. Reguls. & Permits Admin. or Administracion de Regalamentos & Permisos (A.R.P.E.)*, 740 F.Supp. 95, 105 (D.P.R. 1990) (finding discriminatory intent where there is public opposition on impermissible grounds and a decisionmaker stated that public opinion would be taken into account, there was a pretextual reason for denying the application that had not been raised previously, and the agency could have granted the application if it wanted to); *Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding discriminatory intent where decisionmakers themselves made racially charged comments and decisionmakers conducted an unprecedented public opinion poll after race-based opposition surfaced); *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263-65 (4th Cir. 2019), *as amended* (Feb. 25, 2019) (finding plaintiffs stated a plausible claim of officials' discriminatory animus where the decision-making board denied a zoning application for its church even though the county official in charge of planning did not oppose it and after opposed neighbors made ethnically and religiously disparaging

remarks during the board hearing); *Valentin*, 633 F.Supp.3d at 375 (finding plaintiffs adequately stated a claim of discriminatory intent where their permit was denied amid racist public backlash and unusual procedural hurdles raised by the Planning Board).

Often, the connection between the community animus and the government action is a procedural irregularity, a hurdle that deviates from the procedural norms, or a substantive departure from factors usually considered important to the decisionmaker. *See Town of Clarkton*, 682 F.2d at 1066 (deployment of a never before used public opinion poll); *Jesus Christ is the Answer Ministries, Inc.*, 915 F.3d at 264-65 (the Board did not follow the recommendations and positions of two county officials with expertise); *Valentin*, 633 F.Supp.3d at 375 (subjecting plaintiffs to an excessive number of public hearings). Sometimes the government officials themselves make statements that indicate they are taking the public animosity into account in their decision-making or the officials themselves share in the animosity. *See A.F.P.S.*, 740 F.Supp. at 105 (decisionmaker stated public opinion would play a role in the decision-making); *Town of Clarkton*, 682 F.Supp.2d at 1066 (defendants themselves made racially "camouflaged" statements).

In support of its request for a temporary restraining order the Church argued that, when the System rescinded its initial award to the Church rather than negotiate the Networkmaine hub's permanent location directly with the Church, the System engaged in a procedural irregularity showing evidence of the System's religious bias against the Church. *See* TRO Order at 17. In issuing its Order denying the temporary restraining order, the Court examined the record evidence and concluded the System had not deviated from procedure and had in fact followed the terms of the RFP because the RFP prohibited "significant changes" to the RFP terms, and leaving the hub in place indefinitely would be a significant change. *Id.* at 17-19. Further, the Court concluded there

was no evidence "to suggest any party, let alone the System—the party in charge of the RFP and owner of the property—had ever contemplated leaving the hub in place indefinitely until FHC-WA proposed it by way of its appeal to the original RFP." *Id.* at 18.

The Church now argues evidence of the System's religious animus can be inferred from both a substantive deviation—the System did not have to rescind the RFP to keep the hub in place because of the language of the draft lease circulated with Addendum 4— and a procedural deviation—FHC-WA and WCAP's appeals should not have been considered at all because they were untimely "specification protests" and should have been submitted before the RFP closed. The Court considers each in turn.

### a.    Alleged Substantive Deviation: The Draft Lease

On the augmented record following the evidentiary hearing on the Church's request for a preliminary injunction, the Church now argues the System was never required to move the Networkmaine hub and had indeed contemplated leaving it inside the Hutchinson Center. Pl.'s Post-Hr'g Prelim. Injunction Brief (ECF No. 62) ("Church's Brief") at 4-7. The Church bases this argument on language contained in the draft lease circulated with Addendum 4 to RFP #2024-048. The Church argues Vice Chancellor Low's stated rationale for rescinding the award to the Church because of FHC-WA's proposal to leave the hub in place was pretext for impermissibly adopting the community's religious animus, because the System, by way of the draft lease language, already had the right to keep the hub in place. Church's Brief at 7-9. The System argues that, despite the language of the draft lease, the evidence establishes that everyone understood through Addendum 4 of RFP #2024-048 that the System would be moving the hub to an outside purpose-built utility building, not leaving it in place like FHC-WA proposed. Therefore, according to the System, Vice Chancellor Low's stated reason for

rescinding the award was the true reason for the rescission, not religious animus. Def.'s Post-Hr'g Brief (ECF No. 61) ("System's Brief") at 13-17.

The draft lease circulated with Addendum 4 to the RFP reads as follows: "Currently located within the Hutchinson Education Center, the University will continue to operate the hub in room 100Y Phase 1 plan noted below with an option to permanently relocate the hub as outlined in the Phase 2 plan below." Joint Hr'g Ex. 2. It goes on to describe the treatment of the hub in the two phases: Phase 1 would require a "carve out" lease of the closet currently containing the hub and Phase 2 proposes constructing the utility building on the Hutchinson Center property rather than an off-site location. *Id.*

As the Church argues, the draft lease's use of the phrase "an option to permanently relocate the hub" appears to leave the choice of whether to move the hub out of the closet and into an external building on the property up to the System's discretion and therefore also contemplates the inverse—leaving the hub in place within the Hutchinson Center. *See id.* Vice Chancellor Low acknowledged that the draft lease language could have been so interpreted. Hr'g Tr. 75:22-24 ("It was my belief that [keeping the hub in place] was not what my intent was. But under your reading, could we have literally done that? Yes."). Regardless of the language contained in the draft lease, the evidence shows that all the parties involved—including the Church—understood that the hub would be moved out of the Hutchinson Center.

Vice Chancellor Low testified credibly that, at the time he made the decision to grant FHC-WA's appeal and rescind the Church's bid award, he understood the hub would remain in the Hutchinson Center in the short term and then be moved to a location outside the Hutchinson Center building. Hr'g Tr. 109:7-110:16. Ms. Piper also testified credibly that at the time she was reviewing WCAP and FHC-WA's appeals, she believed

20

the System was going to proceed in the two phases outlined in the draft lease: first, the hub would stay inside the Hutchinson Center, then it would be moved to an "outbuilding." Hr'g Tr. 204:24-205:13. Ms. Piper understood the hub relocation as "not a matter of if [the hub would be relocated] but when." Hr'g Tr. 205:3. Pastor Huston also understood the hub would be moved out of the Hutchinson Center. Hr'g Tr. 27:17-20, 49:4-8.

Beyond the testimony, contemporaneous documentation also reflects the general understanding by all, including the Church, that with the initial RFP the System would proceed to the Phase 2 plan and move the hub from inside the Hutchinson Center. Joint Ex. 3 at 16; Joint Ex. 6 at 6. The Church points to the System's award deck and August 22, 2024, press release as evidence that the Church offered to leave the hub in place inside the Hutchinson Center in perpetuity. Church's Brief at 6. An examination of the award deck and the press release belies this argument, however. Under the "[o]ther key considerations" heading of the scoring summary of the Church's proposal, the award deck states the following regarding the Church's treatment of the Networkmaine hub: "[The Church] has requested to negotiate the terms of Phase 2 regarding the building location, the annual lease is $1.00 for Phase 1 & 2 plus utilities . . . ." Joint Ex. 6 at 6. The reference to the building location in the award deck shows that the Church and the System understood the hub would be relocated to a new "building."

The press release states that proposals relating to the hub were "key distinguishing characteristics" between bids. Specifically, the press release states:

> The top-scoring proposal offered a $1 annual lease agreement in perpetuity for a carve-out of space so the UMS can continue to maintain internet connectivity for midcoast schools, libraries and community centers through a Networkmaine access hub historically located at the center. This was more favorable than the proposal from WCAP, which offered to lease the space back to the System at a rate of $2 per square foot annually.

21

Joint Ex. 20 at 1. In context, the press release explains a key distinguishing characteristic of the Church's proposal regarding the hub was that the proposal involved a less expensive lease "in perpetuity" for the university than the next-highest-scoring bidder. The Church offer of a lease "in perpetuity" for one dollar per year compared to WCAP's offer of a lease at two dollars per square foot was a key distinguisher—not that the Church offered to keep the hub inside the Hutchinson Center "in perpetuity." It is neither a surprise nor a suggestion of a different interpretation of the clause that the press release declined to mention the plan to move the hub outside the building. Because all parties understood Phase 2 to be inevitable, the distinguishing feature of the Church's bid was its relative economic benefit for the System, the less expensive lease.

Additionally, two emails sent by Mr. Stutheit on behalf of the Church to Robyn Cyr demonstrate that the Church understood the hub would be relocated from inside the Hutchinson Center to an on-site utility building. Joint Ex. 3 at 16; Joint Ex. 21 at 2. On June 3, 2024, Mr. Stutheit wrote to Ms. Cyr:

> As far as location we would like to put the ground lease location in the Northwest corner of the lot between the current sign and the property adjacent to Sweetser Dr. to keep it out of usable space. We would want the University to plant shrubs around the perimeter for improved esthetics.

Joint Ex. 3 at 21. Second, Mr. Stutheit's April 18, 2024, email to Ms. Cyr references providing the system with twenty-four-hour access to the hub "in the interim." Joint Ex. 21 at 2. His use of the term "interim" is evidence that Mr. Stutheit understood the hub would move elsewhere after phase one – the "interim" phase – concluded.

The ultimate inquiry when deciding whether the Church has adduced enough evidence of an equal protection violation is not whether the System substantively departed from the terms of RFP #2024-048, but whether such a substantive departure, if

one occurred at all, is evidence of pretext disguising discriminatory animus. *See Vill. of Arlington Heights*, 429 U.S. at 267 ("[s]ubstantive departures may also be relevant" evidence of discriminatory purpose). Here, the only evidence the Church posits to demonstrate the System contemplated leaving the hub in place before FHC-WA proposed doing so is the use of the term "option" in the draft lease circulated with Addendum 4. However, the great weight of the evidence, including the credible testimony of all the witnesses and the contemporaneous documents submitted to the Court, does not support this conclusion. All individuals and parties involved in the RFP process, including the Church, believed at the time of the original RFP that the System would relocate the hub from inside the Hutchinson Center to another building. The language of the draft lease, taken as a whole, is at best unclear. Another passage of the draft lease compares moving the hub to the outside building on the property to moving the hub off the site altogether. *See* Joint Ex. 2. ("To ensure the continued provision of connectivity services to the greater coastal area, the University proposes the relocation of the hub from its current site within the Hutchinson Center to a purpose-built utility building. This relocation, while involving initial investment, is anticipated to be less costly for the University of Maine System compared to relocating the hub off-site."). The fact that some language in the draft lease could at a later date be read to allow for the hub to remain in the Hutchinson Center does not mean that was the understanding of the parties—and in particular Vice Chancellor Low—when the System rescinded the initial RFP award.

Even if the Court were to conclude now that, pursuant to the terms in the draft lease, the System could have unilaterally decided to leave the hub inside the Hutchinson Center, such a finding does not equate to a conclusion that the System's rescission of the initial RFP was a "substantive departure" where "the factors usually considered important

23

by the decisionmaker strongly favor a decision contrary to the one reached." *Vill. of Arlington Heights*, 429 U.S. at 267. The fact that Vice Chancellor Low may have been mistaken about whether he was required to rescind the award to the Church in order to leave the hub in place permanently would not change the analysis. The record demonstrates Vice Chancellor Low made the decision to rescind the award and issue a new RFP based on one of the same factors the second-appeal-level administrator would usually consider—cost savings. The Church did not produce evidence indicating such a decision-maker would not have considered that important factor.

The Court does not conclude the isolated use of the term "option" in a draft lease that was never executed is probative of pretext or discriminatory animus.

### b. Alleged Procedural Deviation: Protest Consideration

The Church argues the System deviated from its normal procedures by even considering WCAP and FHC-WA's award protests because, according to the Church, the protests were actually untimely specification protests, and this deviation is evidence of pretext disguising discriminatory animus. Church's Brief at 10-18. The Church further argues that if the protests were not specification protests, they were exceptions to the terms of the RFP, which were due at the time of the proposals. As such, according to the Church, the System should not have considered the protests because, by submitting a response to RFP #2024-048, all respondents agreed to the terms and conditions and agreed that the specifications, including the scoring system, were adequate. *Id.* The System argues it properly considered the appeals because they were award protests, not specification protests, and the disappointed bidders could not have known how the scoring would be applied until after the bids were evaluated. System's Brief at 10-13.

As explained above, section 1.8 of the RFP provides the process and remedies for "specification protests." Joint Hr'g Ex. 2 at § 1.8. A respondent to the RFP may submit a "specification protest" if the respondent "feels that the specifications are written in a way that limits competition." *Id.* "Specification protests shall be presented to the University in writing as soon as identified, but no less than five (5) business days prior to the Deadline for Proposal . . . . No protest against the award due to the specifications shall be considered after this deadline." *Id.*

While it is true that Vice Chancellor Low admitted in his testimony that he believes cost avoidance measures are specifications in an RFP, Hr'g Tr. 90:16-90:21, the Church has not explained, nor can the Court glean, how the specifications in the RFP were written in a way that limits competition. The Church has focused its argument on 1.9.4 of RFP #2024-048. That section provides: "By submitting a Response, the Respondent agrees and assures that the specifications are adequate, and the Respondent accepts the terms and conditions herein. Any exceptions should be noted in your response[.]" Joint Hr'g Ex. 2 at § 1.9.4. There is no evidence that FHC-WA or WCAP noted any exceptions to the specifications and terms and conditions in their bids to the RFP. The Church argues that, by virtue of submitting bid proposals to the original RFP, FHC-WA and WCAP waived any right to protest the specifications, terms, and conditions, of which cost savings is one. Church's Brief at 10-18.

The Court disagrees. As Ms. Piper explained, FHC-WA and WCAP could not have known in advance how the scoring criteria would be applied to their responses. Hr'g Tr. 204:1-19. If bidders were required to note their concerns about how the scoring criteria would apply to their cost-savings proposals or other aspects of their bids, Section 2.5 of the RFP providing the procedures for awards protests would be rendered meaningless.

After all, the scoring criteria determine whether a bid is awarded: if bidders could never protest the application of the scoring criteria, they could never protest an award. *See* Joint Hr'g Ex. 2 at § 2.5. Moreover, as with substantive departures, what is relevant about procedural departures is not any alleged departure from procedure itself, but whether a departure from procedure is probative of pretext that masks discriminatory intent. *See Vill. of Arlington Heights*, 429 U.S. at 267. The Court does not conclude the System's consideration of the disappointed bidders' protests is evidence of discriminatory animus.

### c. Alleged Religious Bias

In its Order on Motion for Temporary Restraining Order, the Court found no evidence of bias from within the System and found no procedural irregularity probative of the System's intent to adopt the bias of outside parties. TRO Order at 19-21. On the augmented record, the Church has produced no evidence of impermissible religious animus from within the System, and the Court has concluded the alleged substantive and procedural departures are not probative of any intent by the System to discriminate on the basis of religion or adopt the community's religious animus. Therefore, the Court does not conclude the Church is likely to succeed on the merits of its Equal Protection Clause claim for relief.

### 2.    Free Exercise

Under the Free Exercise Clause, governmental bodies must act neutrally toward religious beliefs and "cannot impose regulations that are hostile to the religious beliefs of affected citizens and cannot act in a manner that passes judgment upon or presupposes the illegitimacy of religious beliefs and practices." *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Governmental actions that are not neutral "trigger

strict scrutiny under the Free Exercise Clause." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam).

In its Order on Motion for Temporary Restraining Order, the Court explained that in order to succeed on its free exercise claim, the Church would have to adduce evidence that the System decided to rescind the Church's award of RFP #2024-048 because of religious animosity. TRO Order at 21-22. The Court has concluded, above, that the Church has not carried this burden. Therefore, the Court cannot conclude the Church is likely to succeed on the merits of its free exercise claim.

### C.    Other Factors

Having concluded the Church has not demonstrated a likelihood of success on the merits of its claims, the sine qua non of the preliminary injunction analysis, *New Comm Wireless Servs., Inc*, 287 F.3d at 9, the Court does not address the remaining factors and does not revisit its conclusion on whether the Church has demonstrated irreparable harm.

### IV.    Conclusion

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank*, 672 F.3d at 8 (quoting *Voice of the Arab World, Inc.*, 645 F.3d at 26). In the absence of any direct or circumstantial evidence to connect community animus to the System's actions that would enable the Court to conclude the Church is likely to succeed on the merits of its Equal Protection Clause or

Free Exercise Clause Claims due to Defendants' religious discrimination, the Church's motion for a preliminary injunction is DENIED.

**SO ORDERED.**

Dated this 7th day of May, 2025.

/s/ Stacey D. Neumann
**STACEY D. NEUMANN**
**UNITED STATES DISTRICT JUDGE**